HARPER LAW, PLC
Jon V. Harper (1378)
Denise Dalton (9610)
Post Office Box 581468
Salt Lake City, Utah 84158
Telephone: 801-910-4357
Email: jharper@jonharperlaw.com

HUTTON LAW GROUP
Andrew W. Hutton
12760 High Bluff Drive, Suite 240
San Diego, California 92130
Telephone: 858-793-3500
Email: drew@law-hutton.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JUST US REALTORS, LLC on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUDGE, LLC, BUYPD, LLC, INCOME PROPERTY USA, LLC, INSIDER'S CASH, LLC, RYAN POELMAN; GUARDIAN LAW, LLC, AMERICAN LEGAL & ESCROW, LLC, INVICTUS LAW, LLC, and BLAIR R. JACKSON,<br><br>Defendants. | <u>PROPOSED CLASS ACTION</u><br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>Case No. 2:18-CV-00128-TC<br><br>Judge  Tena Campbell<br><br>Magistrate Judge |

Plaintiff, Just Us Realtors, LLC ("Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys.  Plaintiff

believes substantial additional evidentiary support exists for its allegations set forth herein, after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons and entities who, between January 1, 2013 and present, paid Defendants the listed "sales price" for real estate offered by Defendants at their "Buying Summit" events (the "Class").  Defendants did not own these properties at the time they were offered and sold to the Class.  After the "sale," Defendants engaged in secret self-dealing transactions to acquire title to these properties, at significantly lower prices, before formalizing the conveyance of title to Plaintiff and the Class.

2.      Defendants executed their fraudulent real estate scheme in three parts.  First, Defendants invited Plaintiff and members of the Class to attend Defendants' "Buying Summit" events in Las Vegas, promising exclusive access to Defendants' "portfolio" of vetted, "turnkey" rental real estate.  For this access, Plaintiff and members of the Class each paid over $10,000.00 and traveled to the Las Vegas for the 3-day Buying Summit events.

3.      Second, at the Buying Summit, Defendants offered for sale their "portfolio" of "available assets" as vetted investments with "sales prices" based on Defendants' "market research" and "due diligence."  However, unbeknownst to Plaintiff and the Class, Defendants did not own the properties in their "available inventory."  Defendants knew from their "due diligence" the offered "sales prices" far exceeded the actual value of the properties, which was as much as 40% less than the Buying Summit's "sales price."

4.      Third, once Defendants convinced Plaintiff and the Class to purchase properties at the Buying Summit (properties Defendants knew of, but did not own), Defendants told Plaintiff

and the Class that they would handle everything to complete the sale:  prepare the necessary papers, open escrow, get the necessary papers signed and funding arranged, close the escrow, and then record the legal documents that conveyed title.  What Defendants did not tell Plaintiff and the Class was (i) the property was worth far less than the "sales price"; (ii) the attorneys assigned to represent Plaintiff and the Class were beholden to Defendants; and (iii) Defendants had opened concurrent escrows with the actual owner (using the same escrow agent) to convey title in the same property to Defendants, ahead of title transfer to Plaintiff and the Class, and at much lower prices.

5.      To hide this scheme, Defendants conspired with one another to (i) control the escrows for Plaintiff and the Class; (ii) keep secret the concurrent escrow conveying to Defendants the same properties at lower prices; and (iii) use false statements and documents.  As agents, attorneys and fiduciaries for Plaintiff and the Class, Defendants were duty-bound to act ethically and candidly towards Plaintiff and the Class, by disclosing facts material to the transactions, including the properties' true values, attorneys' dual-representation, and Defendants' self-dealing.  Defendants failed to fulfill their duties and lawful obligations, causing Plaintiff and the Class to grossly overpay for the properties offered at the Buying Summit.

6.      A conventional real estate deal would uncover Defendants' fraudulent scheme and self-dealing:  an independent title search would uncover the true owner; a third-party lender would peg the properties' true market value; an independent inspection would report the properties' distressed status; a faithful attorney would spot red flags; and a loyal escrow fiduciary would not agree to also oversee and bless a concurrent escrow for the same property in favor of the seller at a 40% lower price.

7.     Defendants' secret scheme, however, was unconventional.  As a condition of every sale, Plaintiff and the Class were required to (i) use Defendant Income Property USA and/or BuyPD (aka, Nudge) as their agent to complete the sale; (ii) sign powers authorizing attorney American Legal (selected by and beholden to Defendants) to act on their behalf to complete needed documents; (iii) retain Guardian Law (selected by and beholden to Defendants) to oversee and execute the escrow; and (iv) use Insider's Cash (selected by Defendants) to secure financing.

8.     Each of these players in Defendants' scheme was a distinctive and necessary part of an association-in-fact, an enterprise, whose purpose was to defraud Plaintiff and the Class to the sole and substantial benefit of the enterprise.

9.     Plaintiff brings this action against three sets of Defendants – self-described "Strategic Partners" – who conspired with one another throughout the real estate sales process to execute their fraudulent real estate scheme:

(a)     The Property Defendants (who purported to have the portfolio of turnkey properties and who acted as agents for Plaintiff and members of the Class);

(b)     The Cash Defendant (who purported to be a third-party lender for Plaintiff and the Class, but was substantively a money arranger controlled by the Property Defendants); and

(c)     The Attorney Defendants (who, after being retained by Plaintiff and the Class, divided their loyalties by conspiring with the other Defendants to execute the scheme, harming Plaintiff and the Class).

The Property Defendants

10.    The first set of Defendants consists of Nudge, LLC; BuyPD, LLC; Income Property USA, LLC; and Ryan Poelman (collectively, the "Property Defendants"). The Property Defendants offered Plaintiff and the Class a multi-day "Buying Summit" event that promised exclusive access to a "portfolio" of real estate "assets" and "turnkey" rental properties that Property Defendants had already vetted.

11.    Before the Buying Summit events, the Property Defendants had pre-existing contacts with Plaintiff and members of the Class through earlier real estate seminars and programs, sponsored by Scott and Amie Yancey, personalities from the television show "Flipping Vegas."

12.    Property Defendants knew, through their Yancey seminars, that Plaintiff and members of the Class were eager to purchase real estate. By the time Plaintiff and the Class had agreed to attend the Buying Summit, Property Defendants also knew that Plaintiff and the Class had (i) paid Defendants tens of thousands of dollars towards their real estate careers up to that point; (ii) traveled across state lines to attend the Buying Summit and purchase real estate; and (iii) had done these things to gain exclusive access to the Property Defendants' "portfolio" of purportedly valuable, performing "assets" and "turnkey" real estate properties, all supposedly suitable for investment. In sum, Property Defendants knew Plaintiff and the Class had traveled to Las Vegas primed to purchase real estate and to begin recouping the tens of thousands of dollars Plaintiff and the Class had already paid Defendants pursuing this investment opportunity.

13.    At the Buying Summit, Property Defendants represented themselves as the entities authorized to sell and deliver to Plaintiff and the Class the vetted properties selected by Property Defendants. Once the Property Defendants had taken the "order" for the sale of a

property (that they did not own), agreeing to deliver that property for their principals (Plaintiff and the Class), Property Defendants then secretly engaged in self-dealing transactions to enrich the enterprise at the expense of Plaintiff and the Class.

14.     In connection with these secret transactions, and in violation of their solemn agency and fiduciary obligations to Plaintiff and the Class, the Property Defendants executed concurrent real estate transactions whereby Property Defendants – after securing their property "sale" to Plaintiff and the Class at above-market prices – then caused entities they controlled to purchase the same properties *ex post* for thousands of dollars less than the prices being paid by Plaintiff and the Class.

15.     Defendants knew the low purchase price paid by the Property Defendants after the sale to Plaintiff and the Class reflected (i) a comparable arm's-length value of the properties; (ii) the fact the properties were distressed or sub-par; and (iii) that the properties were poor investments at the prices listed by Property Defendants.

16.     The chronology of events for Plaintiff's purchase provides an example of Defendants' fraudulent scheme to sell properties Defendants did not own at above-market prices, then to cause their controlled entity to secretly purchase those same properties at much lower prices *ex post*:

(a)     February 13, 2015 – During a Buying Summit event, Property Defendants sold to Plaintiff, for $54,200.00, real property located in 341 Caithness, St. Louis, Missouri ("341 Caithness") – a property that Property Defendants had researched but did not own on this date.   The next day, Plaintiff deposited $5,000.00 with Defendants, thereby acquiring an

equitable interest in 341 Caithness in favor of Plaintiff.  Guardian Law was appointed escrow agent.

(b)    February 16, 2015 – Plaintiff deposited another $14,309.00 with Defendants towards 341 Caithness.  Concurrently, Property Defendants, who had notice of Plaintiff's equitable interest in 341 Caithness, caused an entity they controlled (in this instance, 5 Choices, LLC) to purchase 341 Caithness for $39,000.00 – 39% less than the "sales price" Defendants had offered to Plaintiff.  Guardian Law was the escrow agent for this secret, concurrent escrow.

(c)    March 6, 2015 – 5 Choices, LLC (controlled by Defendants) recorded its purchase of 341 Caithness for $39,000.00, yet Property Defendants and Guardian Law, who each had notice of Plaintiff's equitable interest in 341 Caithness, did not notify Plaintiff of this transaction or market valuation, concealing this transaction and the price that 5 Choices, LLC had paid for the property.

(d)    March 16, 2015 – Defendants executed transaction documents in the escrow on the sale of 341 Caithness to Plaintiff for $54,200.00.  Nudge's senior executive, Steve Liechty, represented 5 Choices, LLC as its manager in this transaction.  At closing, and in addition to Property Defendants having secured a grossly inflated "sales price" over what Defendants later paid for the property (i.e., $15,200.00) through their secretive self-dealing, Defendants also charged Plaintiff $4,448.30, consisting of the following:

(i)    $2,050.00 "Title charges" (including $60.00 for "Postage, Shipping, and Handling"; $50.00 "Expedited Recording fee") paid to Guardian Law;

(ii)        $2,248.30 "Loan origination fee" (5.6% of the $40,300.00 interest-only loan, with balloon payment after 3 years) paid to Insider's Cash; and,

(iii)       $150.00 paid to PropAsure, an entity controlled by Defendants. The Cash Defendant

17.     Insider's Cash, LLC ("Insiders Cash") is the second of three sets of Defendants. Property Defendant – BuyPD – is the sole member of Insider's Cash.

18.     At the Buying Summit and thereafter, the Property Defendants described Insider's Cash to Plaintiff and the Class as "Your Money Partner" that guaranteed Buying Summit participants immediate funding for purposes of completing purchases from Property Defendants' "portfolio" of performing and turnkey properties.

19.     Insiders Cash was instrumental to Defendants' fraudulent scheme for at least the following reasons:

(a)     Insider's Cash controlled and provided the funding and liquidity for the Property Defendants' fraudulent scheme, either actually and/or creating the appearance of directing funds to and from Property Defendants in connection with their property sales to Plaintiff and the Class.  It is also apparent that Insider's Cash directed funds for Property Defendants' secret purchases of those same properties.

(b)     Defendants' use of Insider's Cash as an apparent third-party lender was essential to the Property Defendants' fraudulent scheme because, without Insider's Cash, Plaintiff and the Class would have used conventional lenders who would have not approved the loans after due diligence, primarily because the proposed loans exceeded the properties' market values (reflecting the inflated sales prices and distressed nature of the properties).  In the case of

Plaintiff, a third-party lender would not have approved a loan for $40,300.00 on a property that had just transacted for $39,000.00.

(c)     Similarly, Defendants knew the properties could not be refinanced because "loans" from Insider's Cash to Plaintiff and the Class often exceeded the market value of the properties.  For example, Plaintiff's loan was an onerous 1%/month interest-only loan, with a balloon payment after three years.  Under these circumstances, Defendants knew Plaintiff would need refinancing.  But, given the fact the property was only worth $39,000.00, a bank would immediately balk at such an application, because the comparable arm's-length value exceeded the $40,300.00 loan.

(d)     For these reasons, Defendants' representations that Insider's Cash was a "bridge lender" and "Your Money Partner" were false or misleading when made because Defendants knew Insider's Cash was not a *bona fide* lender, but more substantively a middleman/broker (controlled by Property Defendants) that was facilitating fraudulent transactions and commanding outrageous fees for its so-called "loans."  This control and status is evident from the fact that Nudge executive Steve Liechty executed documents on behalf of Income Property USA (not Insider's Cash) assigning Plaintiff's loan in May 2015.

(e)     Because Defendants also knew that the investments made by Plaintiff and the Class were likely to fail at the prices they commanded, Defendants drafted and approved language to protect Insider's Cash, circumventing lending laws and crafting powers of appointment (signed by American Legal on behalf of Plaintiff and Class members) that dispensed with formal foreclosure proceedings.

20.    In sum, Defendants' scheme made it highly unrealistic, if not impossible, to secure a good loan for the property at the prices commanded by Property Defendants. Defendants knew that these purchase-money loans to Plaintiff and the Class were extraordinarily poor, overpriced loans, exceeding the properties' market values, and that Plaintiff and the Class had entered into fraudulent real estate transactions with Property Defendants that could not be refinanced.

The Attorney Defendants

21.    The third set of defendants consists of a Utah attorney, Defendant Blair R. Jackson, and three law firms that he controls and/or represents:  Invictus Law, PLLC ("Invictus Law"); Guardian Law, PC ("Guardian Law"); and American Legal & Escrow, LLC ("American Legal").  Mr. Jackson and his law firms are referred to herein as the "Attorney Defendants."

22.    The Attorney Defendants controlled all aspects of the scheme's title and escrow processes, and closings, for both the Class escrows and secret escrows.  In this regard, they orchestrated the sequence of Property Defendants' concurrent real estate transactions whereby Property Defendants – after securing their "sale" to Plaintiff and the Class at the offered "sales prices" – then caused an entity they controlled to purchase the same properties *ex post* at market value (prices thousands of dollars less than the "sales prices" paid by Plaintiff and the Class to Property Defendants).

23.    The Attorney Defendants were essential to the Property Defendants' fraudulent scheme and conspiracy, in at least the following respects:

(a)    The Attorney Defendants conspired with one another and the other Defendants by, *inter alia*,  (i) drafting and executing documents that effectuated the fraudulent

10

real estate transactions; (ii) causing Guardian Law to oversee and execute the escrows and titles for the complained-of real estate transactions; (iii) representing to Plaintiff and the Class that Guardian Law and/or Invictus Law were their legal representative while concealing the Attorney Defendants' (including Blair Jackson's) ongoing representations and loyalties to the Property Defendants; (iv) causing American Legal to act as attorneys in fact for Plaintiff and the Class, executing the escrow documents on behalf of Plaintiff and the Class; and (iv) while the Attorney Defendants were executing the escrows for the Class Properties, they were also orchestrating the series of real estate transactions and money flows that would both conceal and execute Defendants' fraudulent scheme.

      (b)    American Legal purported to act as attorneys and fiduciaries to Plaintiff and the Class for purposes of executing the key transaction documents (e.g., the Deed of Trust; the Settlement Statement; the Loan Agreement and Personal Guarantees) without disclosing their gross conflicts of interest, pre-existing and ongoing loyalties to the Property Defendants, and their participation in Property Defendants' scheme to defraud Plaintiff and the Class.

      (c)    The Attorney Defendants directed Plaintiff and the Class to consult with Invictus Law about resolving disputes they had related to the Class Properties without disclosing the Attorney Defendants' gross conflicts of interest and divided loyalties.

      (d)    The Attorney Defendants defrauded Plaintiff and the Class and breached their fiduciary duties to Plaintiff and the Class, failing to disclose their pre-existing and ongoing loyalties to the Property Defendants as part of the scheme to defraud Plaintiff and the Class.

## JURISDICTION AND VENUE

24.     This Court has diversity jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Further, the aggregate amount in controversy exceeds $5,000,000 for this class action (exclusive of interest and costs) and less than one-third of Class members are Utah residents.  *See* Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25.     Pursuant to 28 U.S.C. § 1331, this Court also has federal question jurisdiction over this action as it includes claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1965(a) as the District of Utah is the district where one or more of the Defendants resides, and pursuant to the forum selection clauses in the contracts at issue.

## PARTIES

27.     Plaintiff Just Us Realtors, LLC ("Just Us") is a limited liability company organized under the laws of the District of Columbia.  Douglas Foster and Iris Hoard are the sole principals of Just Us.  On behalf of Just Us, Mr. Foster and Ms. Hoard were subject to Defendants' fraudulent real estate and lending scheme as described herein and have been damaged by Defendants' misconduct.

28.     Defendant NUDGE, LLC ("Nudge") is a Utah limited liability company with its principal address in Lindon, Utah and/or American Fork, Utah.  Defendant Invictus Law is a

registered agent of Nudge.  As stated on its website in 2014: "Nudge owns and manages multiple businesses providing a wide range of products and services to individuals, entrepreneurs, investors and businesses.  Our number one focus is related to purchasing single-family homes for our own long-term hold portfolio, along with, commercial, multi-family, developed land, tax liens and real estate trust deeds."  Nudge is a citizen of Utah.

29.     Defendant BUYPD, LLC ("BuyPD") is an affiliate of Nudge and a Utah limited liability company with a principal address in Lindon, Utah.  In connection with the sale of real property to Plaintiff, 5 Choices, LLC (a former limited liability company controlled by Nudge) paid BuyPD $200.00 for a "Market Analysis."  Defendant Blair Jackson is a registered agent of BuyPD.  BuyPD is sole member of Defendant Insider's Cash.  Defendant Ryan Poelman, an individual who resides in Utah, is founder of Nudge and a member of BuyPD.  BuyPD stated on its website: "The core of our business is to provide turnkey, rental real estate to investors around the world.  We focus on emerging markets hit hard by the recession and are not yet in recovery.  Additionally, we provide other real estate related services that complement our core offering, such as private lending, corporation/entity setup, tax liens, trust deeds, and residential, improved building lots."  BuyPD is a citizen of Utah.

30.     Defendant INCOME PROPERTY USA, LLC ("Income Property USA") is a Utah limited liability company with a principal address in Pleasant Grove, Utah.  Income Property USA's sole member is Core Capital Property, LLC ("Core Capital"), a Utah limited liability company.  Core Capital's sole member is BuyPD.  Defendant Invictus Law is a registered principal of Income Property USA.  Income Property USA was the registered agent for 5 Choices, LLC.  Income Property USA is a citizen of Utah.

31.     Defendant INSIDER'S CASH, LLC ("Insider's Cash") is a Utah limited liability company.  BuyPD is the sole member and manager of Insider's Cash.  Insider's Cash was called a "Strategic Partner" at the Buying Summit events.  William Knowlton, an attorney at Defendant Invictus Law, is a registered principal of Insider's Cash.  Insider's Cash, in conjunction with Defendants, purports to provide loans on properties sold at the Buying Summit.  Insider's Cash is a citizen of Utah.

32.     Defendant RYAN POELMAN is a founder of Nudge and principal of BuyPD. Mr. Poelman was, at all relevant times, a central player in Defendants' fraudulent scheme and conspiracy.  Mr. Poelman made appearances at the Buying Summit, was knowledgeable of Property Defendants' secretive transactions to have their controlled entities acquire properties through concurrent escrows for purposes of consummating the transactions that would benefit the Property Defendants to the detriment of Plaintiff and the Class.  Mr. Poelman is a citizen of Utah.

33.     Defendant GUARDIAN LAW, PC ("Guardian Law") is a Utah limited liability company with a principal address in Lehi, Utah.  Guardian Law was called a "Strategic Partner" at the Buying Summit events.  Guardian Law performed escrow and title services for Plaintiff and the Class in connection with their purchases of real property from the Property Defendants and the issuance of a related property loan from Insider's Cash.  Guardian Law has two members: Gregory Christiansen, an individual residing in Utah (and current and/or former business partner of Defendant Blair Jackson), and GJ Christiansen P.C., a company incorporated in the Utah with a principal place of business in Utah.  Defendant Blair Jackson is also a representative of Guardian Law and acted in that capacity at the Buying Summit (described

herein).  Guardian Law purports to be a title agent and real estate escrow agent for all properties purchased at the Buying Summit.  Guardian Law is a citizen of Utah.

34.    Defendant INVICTUS LAW, PLLC ("Invictus Law") is a Utah limited liability company with a principal place of business in Lindon, Utah.  Defendant Blair Jackson is the managing partner and owner of Invictus Law and is a former and/or current business and law partner of Gregory Christiansen or his P.C., members of Defendant Guardian Law.  Invictus Law is a citizen of Utah.

35.    Defendant AMERICAN LEGAL & ESCROW, LLC ("American Legal") is a Nevada limited liability company with a principal place of business of in Las Vegas, Nevada. American Legal acted as attorney-in-fact for Plaintiff and members of the Class, with responsibilities to dutifully execute all necessary documentation in the best interests of Plaintiff and members of the Class, and to complete their purchases of real property from the Property Defendants and the issuance of a related property loan from Insider's Cash.  Defendant Blair Jackson is the managing partner of American Legal.   American Legal is a citizen of Nevada and/or Utah.

36.    Defendant BLAIR R. JACKSON is an attorney licensed to practice law in various states, including Utah and Nevada.  Mr. Jackson is a representative of Guardian Law (and is a former and/or current business and law partner of Gregory Christiansen, another principal of Guardian Law), is a principal of American Legal, and is a principal of Invictus Law.   Mr. Jackson was, at all relevant times, a central player in Defendants' fraudulent scheme and conspiracy.  Mr. Jackson made appearances at the Buying Summit, offering legal services to participants of the Buying Summit, helped control the sequence in which the Class Properties

were transacted thereby effectuating Property Defendants' fraudulent scheme, and controlled American Legal, who acted as attorney-in-fact for Plaintiff and the Class, executing documents on their behalf for purposes of consummating the transactions that would benefit the Property Defendants to the detriment of Plaintiff and the Class.  Mr. Jackson is a citizen of Utah.

### DEFENDANTS' FRAUDULENT SCHEME AND CONSPIRACY

37.    Defendants orchestrated their fraudulent scheme and conspiracy from their offices in Utah.

38.    Before the Buying Summit events, Property Defendants had canvassed areas of the United States to identify investors and other groups who were looking to unload their holdings in distressed real estate.  Property Defendants referred to these investors in distressed properties as their "partners."   Property Defendants then arranged with these "partners" to purchase the properties (at prices reflecting the distressed nature of the properties) after Property Defendants found a buyer.  When Property Defendants claimed publicly that they owned and managed a "portfolio" or "inventory of assets," they were referring to these distressed properties that they did not own but had scouted as possible purchases.

39.    Thus, Property Defendants knew before, during and after the Buying Summit events that they did not own the "turnkey" "assets" that were purportedly included in their "inventory" of "available" properties for sale.  Property Defendants also knew that the "assets" identified in their "portfolio" were not "performing" but were instead under-performing distressed properties – which is precisely why they were selected by the Property Defendants for inclusion in Defendants' scheme.

40.     Plaintiff and members of the Class each paid Property Defendants tens of thousands of dollars to attend Property Defendants' Yancey-sponsored real estate training seminars, a fact known by Defendants before Property Defendants promoted the Buying Summit events to Plaintiff and members of the Class.

41.     Thus, Property Defendants knew that Plaintiff and the Class were strong candidates to attend Defendants' Buying Summit events.  In this regard, Property Defendants actively recruited Plaintiff and members of the Class with telephone calls and email correspondence urging Plaintiff and members of the Class to attend the Buying Summit.  The Property Defendants therefore had pre-existing connections with Plaintiff and the Class, understanding their investment goals and propensities and qualifications to purchase real estate, through their Yancey-sponsored real estate training programs.   For example, Property Defendants urged Ms. Hoard by email that "I am anxious to do whatever I can to help you attend the Buying Summit."

42.     The Buying Summit was a separate event, the purpose of which was to provide Plaintiff and the Class an exclusive opportunity to purchase vetted properties for investment. The Property Defendants publicly promoted the Buying Summit as "Real Estate's premier buying event."  Also, Buying Summit "Strategic Partner" – BuyPD – had advertised that "[t]he core of our business is to provide turnkey, rental real estate to investors around the world."

43.     Plaintiff paid Property Defendants over $17,000.00 to attend the Buying Summit and it is believed that members of the Class likewise paid Property Defendants at least over $10,000.00 to attend the Buying Summit.  Defendants therefore knew Plaintiff and members of

the Class viewed the Buying Summit as a significant investment of their resources in exchange for significant value and exclusive access to Property Defendants' "portfolio" of "assets."

44.     Preceding the Buying Summit, Property Defendants sent to Plaintiff and members of the Class uniform email communications explaining the purpose of the Buying Summit:

(a)     "We realize that one of your primary goals in attending the Buying Summit is to get some deals done.  BuyPD and Income Property USA are the providers of all the performing assets that will be available to you.  Having done over 1000 deals in 2013 in over 20 states across the U.S. they've refined the process of delivering an incredible value to their buyers."

(b)     Property Defendants reassured Plaintiff and the Class that they would "have adequate time to review the inventory and comfortably sort through the available assets."

(c)     Property Defendants' email also indicated that BuyPd is "the primary strategic partner of the Buying Summit that provides the Real Estate Assets."

45.     Property Defendants also sent via email to Plaintiff and members of the Class uniform communications that included an advanced look at the Buying Summit "Schedule of Events" that included the following items:

(a)     "Introducing the Strategic Partners" including Guardian Law, Insider's Cash and BuyPD

(b)     Discussion about the "Real Estate Assets Team"

(c)     Question and Answer session about Defendants' "Property Due Diligence"

46.     These email and other uniform communications from Property Defendants to Plaintiff and members of the Class provide evidence of Defendants' knowledge that Plaintiff and the Class attended they Buying Summit for purposes of getting "incredible value" in real estate. Further, these communications were false or misleading when made for at least the following reasons:

(a)     Property Defendants did not own "all of the performing assets" and "available assets."

(b)     Further, Property Defendants' "available assets" were merely lists of distressed properties that they have compiled and expected to purchase at much lower prices after selling the properties to Plaintiff and the Class.

(c)     Therefore, Property Defendants lacked reasonable basis for their false or misleading statement that they had "refined the process of delivering incredible value to their buyers."

47.     While attending the Buying Summit, Defendants furthered their scheme and conspiracy by continuing to portray the Buying Summit as an event that gave the participants incredible real estate deals.

48.     Buying Summit participants were given a "Buying Summit Workbook" that uniformly represented to Buying Summit participants that the Property Defendants' vetted "assets" were available to the choosing:

(a)     Performed "Due Diligence" of location and rent rates

(b)     Conducted "Market Research"

(c)     Knew the "Local Rules & Regulations"

(d)  "Manage the inventory of assets available as the Summit"

(e)  Have superior properties based on "Neighborhood Selection"

(f)  Have "Trusted Informants" and "Inside Information"

(g)  Assembles a "Reliable Team" including "Asset Specialists"

49.  The Buying Summit Workbook also uniformly represented that Property Defendants had already vetted and purchased a portfolio of properties, including the following representations:

(a)  "We Bought . . . From . . . MOTIVATED SELLERS"

(b)  "We Choose" homes with "Positive Cash Flow"

(c)  "We Choose" homes from "Under-Valued Markets"

(d)  "We Choose" homes with "Location"

(e)  "We Selected The Markets" based on positive factors

50.  The Buying Summit workbook also told participants that purchasing property from the Property Defendants was superior to a do-it-yourself approach because Property Defendants had performed or used the following:

(a)  "Market Research"

(b)  "Trusted Informants"

(c)  "Neighborhood Selection"

(d)  "Reliable Team on the Ground (Professionals)"

(e)  "Local Rules and Regulations"

(f)  "Inside Information"

51.     Defendants knew, or were at least reckless in not knowing, that the above representations in the Buying Summit Workbook were materially false or misleading when made, because:

(a)     Property Defendants' "due diligence," "market research," "neighborhood selection," and "inside information" were not performed to find value for Plaintiff and the Class, but instead to identify properties that had been pre-selected by Property Defendants due to their distressed nature and ability to pass off the properties as comparable in value to valuable local properties.

(b)     Property Defendants had not "bought" and did not own what they claimed to be their "inventory of assets" because Defendants did not and would not purchase these properties for their own portfolio at the prices listed.

52.     At the point of purchase, Property Defendants again misrepresented BuyPD and/or Income Property USA as the seller of the properties purchased by Plaintiff and members of the Class.

53.     For example, the "Purchase Details" screenshot for 341 Caithness (Plaintiff's property) was dated February 13, 2015 and stated that the property was "Purchased from" Income Property USA (when in fact Income Property USA did not own the property).  Also, Plaintiff received an email from Property Defendants on February 13, 2015 after the "sale" with an "Order Confirmation from BuyPD" thanking Plaintiff for its "order."   In fact, Property Defendants did not own the 341 Caithness on February 13, 2015.  In sum, Property Defendants acted as "sellers" of a property that they "sold" Plaintiff for $54,200.

54.    Then, after securing the "sale" to Plaintiff, Property Defendants purchased the same property from its actual owner (i.e., their "partner") for a market value of $39,000, a price reflecting the distressed nature of the property.

55.    At closing, Defendants presented Plaintiff and members of the Class false or misleading settlement documents, using interstate commerce to do so, including the following:

(a)    The closing documents uniformly reflected that the property grantor was an entity that did not own the property on the sale date.

(b)    On the Settlement Statement, Insider's Cash was identified as a lender, but was in fact brokering the transaction, facilitating what amounted to seller-based financing by Income Property USA that would be immediately assigned to another Buying Summit participant who would unwittingly purchase the doomed note.

(c)    The "Commercial Loan Agreement" also stated that Insider's Cash was a lender, when in fact Insider's Cash was acting as a middleman.

(d)    Defendants failed to disclose the material inter-relationships among the property "seller," American Legal (who held Plaintiff/Class power of attorney), Guardian Law (the title and escrow agent for Plaintiff/Class), and Insider's Cash (Plaintiff/Class lender).

(e)    American Legal had also caused a false or misleading "Certificates of Value" because they indicated the transaction did not involve related corporations (when in fact Defendants had set up a series of related company transactions) and indicated that the properties' market values were what Plaintiff and the Class had paid, instead of the lower arm's-length transaction between Defendants' related companies and the pre-selected sellers.

(f)     The "Conflict of Interest Disclosure" misrepresented that Guardian Law was not representing the Seller, when in fact Attorney Defendants (which included Guardian Law and its representative Blair Jackson) routinely represented the Property Defendants (who controlled the Seller).

(g)     American Legal had also caused a false or misleading "Affidavit by Owner/Seller" because it failed to disclose the related and concurrent transactions by Property Defendants germane to the Affidavit's representations about unrecorded deeds and knowledge of restrictions of record affecting the property.

(h)     The "Residential Property Disclosure and Disclaimer Statement" falsely stated that at the "effective date":

(i)     Property Defendants' controlled-entity was the "Seller" with legal authority to sell the property;

(ii)     that there were no "material defects" affecting the properties' value; and

(iii)     that Sellers were providing "Full Disclosure."

(i)     The "Offer and Contract for the Sale and Purchase of Real Estate" falsely stated that at the "effective date" Property Defendants' controlled-entity was the "Seller" with legal authority to sell the property;

56.     The Attorney Defendants were essential to executing the fraud, having secured broad powers from Plaintiff and the Class authorizing American Legal to do whatever was necessary to complete the transaction, including executing the transaction documents that would complete the transaction, while shielding co-conspirator Guardian Law in performance of

Guardian Law's escrow duties, signing documents that Attorney Defendants knew to be false, misleading and evidence of their self-dealing, including the following:

(a) Guardian Law knew the power of attorney documents authorizing American Legal to act on behalf of Plaintiff and the Class in the transactions had been procured by a failure to disclose material facts surrounding American Legal's owner Blair Jackson's pre-existing loyalties and relationships with the Property Defendants.

(b) Guardian Law, the escrow agent, and American Legal, attorney in fact who signed escrow settlement statements for Plaintiff and the Class under the POAs, each knew the settlement statements were inherently false, misleading and/or harmful to Plaintiff and the Class in that they (i) fraudulently conveyed real estate at above-market prices; and (ii) described Insider's Cash (a client of Attorney Defendants) as a true lender entitled to a large origination fee.

(c) American Legal had allowed Insider's Cash to be given a special Power of Appointment that allowed the debt-holder to avoid formal judicial foreclosure proceedings (that would likely be executed by Invictus Law).

(d) American Legal had at least constructive knowledge that the "Certificate of Value" they prepared, approved and reviewed in the escrow closing documents was false or misleading;

(e) The Attorney Defendants knew that the structure of each of the transactions had been designed to circumvent consumer protection laws, yet American Legal signed documents for purposes of binding Plaintiff and the Class anyways and without consultation; and

(f)     The "Conflict of Interest Disclosure" was false or misleading because it said that Guardian Law did not represent the seller in the transaction when in fact Attorney Defendants, including Guardian Law, were beholden to the sellers.

## THE PRINCIPAL-AGENT RELATIONSHIP BETWEEN PROPERTY DEFENDANTS AND PLAINTIFF AND THE CLASS

57.     Before the Buying Summit events, Plaintiff and members of the Class had each paid Property Defendants thousands of dollars to gain exclusive access to Property Defendants' "turnkey, rental real estate."   In connection with this event, therefore, Property Defendants undertook agency obligations to provide Plaintiff and the Class exclusive access to turnkey, rental real estate that had been promised.

58.     Property Defendants' agency obligations to Plaintiff and the Class, and the scope thereof, are evidenced by the following:

(a)     The $10,000.00 or more that Plaintiff and each member of the Class paid to Defendants for the Buying Summit event included exclusive access to Property Defendants' "due diligence" and "turnkey" rental real estate properties.

(b)     Property Defendants arranged for Plaintiff and most members of the Class to travel across state lines to attend the Buying Summit events in Las Vegas, Nevada.

(c)     Property Defendants pre-selected the properties that would be offered at the Buying Summit to Plaintiff and the Class.

(d)     Property Defendants indicated that, after Plaintiff and the Class had placed real estate on "order," Property Defendants would be involved in all aspects of settling the sales transaction, escrow and closing, including working with attorneys and title companies.

(e)     Property Defendants referred to Plaintiff and members of the Class as their "clients."

(f)     Before closing, Property Defendants were responsible for managing the property, including determination of an appropriate market value.

(g)     Property Defendants periodically notified their "clients" of the progress of the application of funds, recordings and general status of closing.

(h)     Defendants were responsible for delivering accurate closing documents, including the Settlement Statement.

(i)     Property Defendants were responsible for determining property values "using standard market research," including recent sales of comparable properties.

(j)     Defendants were responsible for handling property down payments and deposits.

(k)     Property Defendants had arranged for purchase financing for the property purchases.

(l)     Property Defendants had arranged for a law firm (Guardian Law) to act as Escrow Agent in the transactions.

(m)     Property Defendants had arranged for a law firm (American Legal) to act as Attorney in Fact for Plaintiff and members of the Class.

### ATTORNEY DEFENDANTS CONTROLLED ALL ASPECTS OF PROPERTY DOCUMENTATION, ESCROWS AND CLOSING

59.     The Attorney Defendants played an essential role in the fraudulent real estate scheme and conspiracy.

60.     The Attorney Defendants drafted the transaction documents essential to Defendants' fraudulent scheme.  For example, the Attorney Defendants ensured that the loan documents were labeled "commercial" and were between LLCs, an effort to surreptitiously circumvent consumer protection laws.  Also, the Attorney Defendants drafted the powers of attorney that favored and shielded themselves and their co-conspirators.

61.     The Attorney Defendants also attended the Buying Summit events offering their services to Plaintiff and the Class (without disclosing their loyalties to Defendants) and later provided services as attorneys in fact for Plaintiff and the Class, executing the transaction documents on their behalf.

62.     As a condition of purchasing properties from Property Defendants' portfolio of turnkey properties, Defendants required Buying Summit participants (such as Plaintiff and the Class) to execute Power of Attorney documents that would permit an attorney to represent their interests in all aspects of the real estate transactions and to execute documents on their behalf. The scope of the power of attorney included the following powers:

(a)     A representative of American Legal would act as a lawful attorney in fact to "exercise or perform any act, power, duty, right, or obligation whatsoever" related to the subject property being purchased.

(b)     American Legal was responsible for all aspects of the transaction, including the "purchase" and "bargain."

63.     The documents executed by the Attorney Defendants on behalf of Plaintiff and the Class were essential to the fraudulent real estate transactions and therefore inherently material to Plaintiff and the Class, and included the following:

(a)      REAL PROPERTY CERTIFICATE OF VALUE indicating a purported "market value" for the property that was far above market value and did not reflect the distressed nature of the property. The Attorney Defendants knew, or should have known, that this amount was overstated, particularly because the Attorney Defendants were contemporaneously orchestrating the purchase and sale of the property to the Property Defendants at a much lower price that reflected the true market value of the property.

(b)      COMMERICIAL LOAN AGREEMENT and PERSONAL GUARANTEE.  Attorney Defendants had at least constructive knowledge that this loan was not in the best interests of Plaintiff and were beholden to Insider's Cash and instrumental in maintaining the false front that this was a legitimate commercial loan.

(c)      DURABLE POWER OF ATTORNEY FOR A LIMITED POWER APPOINTMENT in favor of Insider's Cash.  Attorney Defendants had at least constructive knowledge that this power was not in the best interests of Plaintiff but favored Insider's Cash.

(d)      DEED OF TRUST AND ASSIGNMENT OF RENTS for the Class Property.

(e)      "Conflict of Interest Disclosure" stating that Guardian Law, LLC is not representing seller (i.e., Defendants).

(f)      COMPLIANCE AGREEMENT authorizing Guardian Law to fix any clerical mistakes.

(g)      Order to Issue Title Policy

(h)      Property Transfer Affidavit; Acknowledgment of Homeowner's Residence Exemption Affidavit; and Request to Rescind Homestead Exemption

**PLAINTIFF'S ALLEGATIONS**

64.     In or about December 2014, while in Washington, D.C., Ms. Iris Hoard was watching television when she saw an advertisement for a free real estate seminar sponsored by Scott and Amie Yancey, well-known personalities from the television show called "Flipping Vegas."  Ms. Hoard called the phone number (listed in the Yancey television advertisement) to register for the seminar.

Lead-up to the Buying Summit

65.     During December 2014, Ms. Hoard and her business partner, Douglas Foster, attended a Yancey program called "Simple Real Estate Program," conducted at the University of Maryland.

66.     Later in December 2014, Ms. Hoard and Mr. Foster paid $1,197.00 to attend the Yancey 3-day "Real Estate Workshop" at the Hyatt Regency in Bethesda, Maryland.  At this workshop, Ms. Hoard and Mr. Foster were encouraged to purchase and attend another Yancey workshop called "Boots on the Ground."

67.     On or about December 21, 2014, Ms. Hoard and Mr. Foster paid $12,500.00 to for the "Boots on the Ground" program, a "Boots" trainer line, and real estate software for a year. At this time, Ms. Hoard and Mr. Foster were also given a "Right to upgrade to Platinum or Diamond at event pricing" – options that included entry to a so-called "Buying Summit: 3-day Asset Buying Retreat."

68.     On or about January 15-16, 2015, Ms. Hoard and Mr. Foster attended a "Boots on the Ground" training seminar at the Hilton Garden Inn in Bethesda, Maryland.  The workshop involved having the seminar participants – including Ms. Hoard and Mr. Foster – contact local

real estate agents and brokers to obtain listings of properties in various areas for sale.  The "Boots on the Ground" students were also encouraged to call realtors to schedule appointments and scout-out property locations.  Students were instructed to create a buyers list to identify cash buyers and potential investors.  As part of the "Boots on the Ground" program, on or about January 17, 2015, Ms. Hoard and Mr. Foster traveled to Columbia, Maryland to meet real estate agents and view properties that were chosen by their fellow students.

69.     On or about January 19, 2015, Jennifer Burr, an event coordinator for the Buying Summit, contacted Ms. Hoard via email encouraging Ms. Hoard to attend the Buying Summit, saying "reviews for our Buying Summits are off the charts, and we want you to join us in Las Vegas for this once-in-a-lifetime experience. . . .  Dates for the upcoming Buying Summit with Diamond Tour:  February $10^{th} - 15^{th}$ . . . ."

70.     On February 3, 2015, Property Defendants contacted Ms. Hoard via email with an embedded, pre-recorded video, explaining: "You'll have the chance to sit down with one of their Property Specialists at the Summit to review your real estate goals and how they can help you accomplish them."

71.     On February 4, 2015, Property Defendants contacted Ms. Hoard via email with an embedded, pre-recorded video, explaining: "The Buying Summit is at the Luxor Hotel & Casino in the Egyptian Ballroom, February 11-14."

72.     On February 5, 2015, Property Defendants contacted Ms. Hoard via email with an embedded, pre-recorded video, explaining: "We realize that one of your primary goals in attending the Summit is to get some deals done. BuyPD and Income Property USA are the providers of all the performing assets that will be available to you."

73.     On February 6, 2015, Property Defendants contacted Ms. Hoard via email with an embedded, pre-recorded video from Property Defendants' Utah office, that explained: "One of the busiest booths at the Summit is our Retirement Accounts booth. We work with multiple custodians . . . They specialize in self-directed accounts and have helped 100's of our clients take control of their retirement funds."

74.     Email communications from Property Defendants included footers that stated, in part: "The property sales are 'for sale by owner' transactions.  We sell properties in 'as is' condition."   The emails from Property Defendants identified Nudge-related entities and sponsorship among the various Defendants.

75.     On or about February 6, 2015, Ms. Hoard and Mr. Foster purchased by phone the Yancey "Diamond Package" for purposes of attending a "Buying Summit:  3 day Asset Buying Retreat" scheduled for February 2015 in Las Vegas, Nevada. Ms. Hoard and Mr. Foster paid the additional fee of $17,497.00 with a credit card.

76.     On or about February 9, 2015, Property Defendants contacted Ms. Hoard via email with an embedded, pre-recorded video, saying "The Buying Summit is just around the corner!"

The Buying Summit Event

77.     On or about February 10, 2015, Ms. Hoard and Mr. Foster traveled from Washington, D.C. to Las Vegas, Nevada to attend the Buying Summit and get exclusive access to Property Defendants' properties.  Upon arriving in Las Vegas, Ms. Hoard and Mr. Foster registered for the "Diamond Tour" and related Buying Summit.  On February 11, 2015, Ms.

Hoard and Mr. Foster participated in property tours in Las Vegas, and attended a Buying Summit kickoff dinner.

78.     From February 12, 2015 through February 14, 2015, Ms. Hoard and Mr. Foster attended the Buying Summit at the Luxor hotel in Las Vegas, as orchestrated by the Defendants. The Buying Summit activities included an introduction to the Strategic Partners that would provide Buying Summit participants legal, accounting, insurance, retirement, and investment services.

Plaintiff Purchases 341 Caithness

79.     At the Buying Summit on February 13, 2015, Defendants assigned Ms. Hoard and Mr. Foster to meet with BuyPd "real estate consultant" Jonny Payne who pressured Ms. Hoard and Mr. Foster to purchase one of the "turnkey" properties in Defendants' "portfolio" that Property Defendants had already selected.

80.     Mr. Payne selected a property from Property Defendants' "portfolio" of "turnkey" properties located in St. Louis, Missouri that Mr. Payne pointed to on his laptop.  Mr. Payne told Ms. Hoard and Mr. Foster that they only had a limited amount of time to purchase the property because the portfolio would time-out and someone else could purchase the property.

81.     Mr. Payne asked how Ms. Hoard and Mr. Foster would pay for the property and Ms. Hoard responded that they would pay with a credit card.  Mr. Payne then rushed Ms. Hoard and Mr. Foster to purchase a single-family home located at 341 Caithness Road, St. Louis, Missouri 63137 ("341 Caithness").

82.     On, about or before February 13, 2015, Mr. Payne prepared the "Purchase Details" indicating that 341 Caithness had purchase identification no. PDS973987, identifying

341 Caithness, with a "sale price" and "purchase price" of $54,200.00, other costs of $3,842, and "total cost" of $56,792.  The document also stated that the "Purchase Date" is February 14, 2015, "Purchased From" Income Property USA, "You are paying $19,309, and are financing $37,483," "The total loan amount is $40,300 at 12% interest only for a term of 36 months ($37,483 + $3,748 + $1,500 + $569)."   "Special instructions" indicated that "Paying $5000 on the credit card.  Then wiring the funds before Wednesday."

83.     On or about February 13, 2015, Property Defendants sent a confirmation email to Ms. Hoard saying "Thank you for your order!" and "ORDER CONFIRMATION FROM BUYPD."  The confirmation indicated the address as 341 Caithness Rd., St. Louis, MO 63137, in the amount of $56,792.00.

Plaintiff's Attorneys and Fiduciaries

84.     As a condition of Plaintiff's purchase of 341 Caithness, Defendants required Ms. Hoard and Mr. Foster to execute "Power of Attorney" documents that would permit an attorney to represent them and Just Us in the transactions and to complete the transaction paperwork for 341 Caithness.  On February 14, 2015, Ms. Hoard and Mr. Foster executed Power of Attorney documents authorizing Defendant American Legal, a law firm controlled by attorney and Defendant Blair Jackson, to act as their attorney and fiduciary with respect to the purchase of 341 Caithness.

85.     Also, as part of the transaction, Property Defendants assigned Guardian Law to be the title and escrow agent for the 341 Caithness transaction.  Unbeknownst to Ms. Hoard and Mr. Foster, Buying Summit "strategic partner" – Guardian Law – the assigned escrow agent for the 341 Caithness transaction had concurrently opened an escrow for a transaction of 341 Caithness, that included a Corporation Warranty Deed dated February 13, 2015 (executed February 12, 2015), indicating Venus Properties, LLC as grantor and American Real Estate Investments, LLC as grantee.  This deed was recorded on February 26, 2015.

86.     Also, unbeknownst to Ms. Hoard and Mr. Foster, on or about February 13, 2015, a Corporation Warranty Deed dated February 16, 2015 was executed transferring ownership of 341 Caithness from American Real Estate Investments, LLC to 5 Choices, LLC.  This deed was not recorded in St. Louis County until March 6, 2015.  Defendant Guardian Law undertook responsibility for recording of this deed, and Guardian Law is believed to be the escrow agent for this transaction.  The Defendants did not disclose this material fact to either Mr. Foster or Ms. Hoard.

87.    Before, during and after this time, the Attorney Defendants were also representing the Property Defendants on a continuous, ongoing basis, in a manner that conflicted with the interests of Plaintiff; and were acting as escrow agents in the transactions between Property Defendants and Plaintiff; while simultaneously acting as Plaintiff's attorney in fact for purposes of executing the necessary documents to consummate the property transaction.  The Attorney Defendants never disclosed their multiple conflicts of interest and inability to fulfill their fiduciary responsibilities to Plaintiff.

88.    In connection with the purchase of 341 Caithness, Guardian Law represented Plaintiff, acting as Plaintiff's title and escrow agent.  Also, American Legal and Escrow acted as Plaintiff's attorney-in-fact.

89.    In connection with the purchase of 341 Caithness, and without consulting Mr. Foster or Ms. Hoard about the matter contained therein or of the Attorney Defendants' multiple conflicts of interests, American Legal and Escrow executed, *inter alia*, the following documents on behalf of Just Us:

(a)    REAL PROPERTY CERTIFICATE OF VALUE indicating that as February 13, 2015, 5 Choices, LLC was the "Grantor" and Just Us was the "Grantee" of 341 Caithness with consideration of $52,950.00 and that the transaction represented market value for 341 Caithness.  The Attorney Defendants knew, or should have known, that 5 Choices, LLC was not the owner or "Grantor" of the property at February 13, 2015 and that the market value was $39,000.00, the price 5 Choices, LLC paid for the property.

(b)    BUYER & SELLER SETTLEMENT STATEMENT, made as of March 16, 2015.

(c)     COMMERICIAL LOAN AGREEMENT dated March 18, 2015 between Insiders Cash and Just Us, indicating a loan amount of $40,300.00 at a 12% rate of interest per annum.

(d)     PERSONAL GUARANTY dated as of March 18, 2015, signed in the names of Iris Hoard and Douglas Foster.

(e)     DURABLE POWER OF ATTORNEY FOR A LIMITED POWER APPOINTMENT dated March 18, 2015, regarding the appointment of Darren Eady of Insiders Cash.

(f)     DEED OF TRUST AND ASSIGNMENT OF RENTS for 341 Caithness, made March 18, 2015 between Insiders Cash and Just Us.

(g)     "Conflict of Interest Disclosure" explaining that Guardian Law, LLC did not represent the seller.

(h)     COMPLIANCE AGREEMENT authorizing Guardian Law to fix any clerical mistakes.

Defendants Misrepresent Escrow Status and Conceal Material Facts

90.     On or about February 26, 2015, at the request of Jonny Payne, Ms. Hoard and Mr. Foster transferred $14,309.00 to BuyPD, as a payment that constituted the remaining deposit for their purchase of 341 Caithness.  Also, on this date the Corporation Warranty Deed between Venus Properties, LLC and American Equity Investments, LLC was recorded in St. Louis County, Missouri.

91.     On February 27, 2015, Mr. Payne contacted Ms. Hoard and Mr. Foster via email to say "We have received your funds and applied them.  The closing has now started on your asset."

92.     On March 2, 2015, Mr. Payne again contacted Ms. Hoard and Mr. Foster via email to say that "Both your signed documents and payment has been received and everything looks good!"

93.     In fact, unbeknownst to Plaintiff, everything looked bad.  Concurrent with the 341 Caithness escrow, Defendants, including Guardian Law, were executing concurrent secret escrows whereby Defendants' controlled entity, 5 Choices, LLC, would purchase 341 Caithness for $39,000.00.

94.     On April 6, 2015, Ms. Hoard received an email from American Legal confirming permission to execute transaction documents and requesting Plaintiff's banking information.

95.     On April 7, 2015, Ms. Hoard received email notification from Mr. Payne stating: "The Title Company has just informed me that they received your closing documents and everything looks good!  You're almost finished."

96.     On April 10, 2015, Ms. Hoard received email notification from Property Defendants that Plaintiff's purchase of the 341 Caithness property had closed and attaching a copy of the transaction's settlement statement signed on behalf of Plaintiff by POA American Legal.

97.     On May 1, 2015, Ms. Hoard received via email copies of the closing documents, executed on Plaintiff's behalf by American Legal, and executed on behalf of Steve Liechty, manager of 5 Choices, LLC and Property Defendants' executive officer, including the following:

    (a)      Commercial Loan Agreement

    (b)      Durable Power of Attorney for a Limited Power of Appointment.

    (c)      Conflict of Interest Disclosure (regarding Guardian Law).

    (d)      Compliance Agreement.

    (e)      Order to Issue Title Policy.

    (f)      Property Transfer Affidavit.

    (g)      Survey Waiver.

    (h)      Water Escrow Waiver.

    (i)      Waiver of Settlement Agent Responsibility.

    (j)      Construction Lien Indemnity Agreement.

98.    Plaintiff's loan funded on April 21, 2015.  Two days later, Defendants recorded their sale to Plaintiff of 341 Caithness along with recording the trust deed in favor of Insider's Cash.

99.    On or about May 11, 2015, Income Property USA, LLC assigned the 341 Caithness Note for $40,300.00 to Amara Investments, LLC.

100.    Up through and including May 11, 2015, and unbeknownst to Ms. Hoard and Mr. Foster, Defendants had concealed the following material facts bearing on the 341 Caithness transaction:

    (a)      Defendants had created the "Buying Summit" as a venue to sell distressed real estate under false pretenses that the properties were "turnkey" and suitable real estate investments that were part of Property Defendants' "portfolio."

(b)     Income Properties, USA was not the owner of 341 Caithness at the time of its sale to Just Us.  Defendants either did not have authorization to sell 341 Caithness on February 13-14, 2015 and/or had engaged in a secret scheme with undisclosed entities or persons to sell 341 Caithness.

(c)     After selling 341 Caithness to Just Us for $54,200.00 on February 13-14, Defendants caused an entity they controlled to purchased 341 Caithness for $39,000.00 on February 16 and delayed recording the $39,000 transaction until March 6, 2015.

(d)     The assigned attorney for Just Us – American Legal & Escrow, LLP – was controlled by defendant attorney Blair Jackson, Defendants' chief counsel and a former and/or current business partner of attorney Greg Christiansen, principal of Guardian Law, the entity that controlled the escrow process in Defendants' scheme.

(e)     Guardian Law coordinated both the 341 Caithness escrow and the secret 5 Choices escrow for purposes of accomplishing Defendants' fraudulent scheme and inducing Just Us to grossly overpay for 341 Caithness by 40%.

(f)     Guardian Law was at all relevant times controlled by attorney Greg Christiansen and Blair Jackson who were/are business partners and their firms conspired to execute Defendants' fraudulent scheme.

101.    Had Ms. Hoard and/or Mr. Foster known the truth about 341 Caithness and the role of Guardian Law and American Legal, they would not have permitted Defendants to consummate the 341 Caithness real estate transaction.

102.    Plaintiff did not begin to suspect that they had been defrauded until mid-2016 and did not discover the fraud and other causes of action until late 2017.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

103.    Defendants have affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Class.  For example, Plaintiff's closing documents were falsified or misleading, and were executed on Plaintiff's behalf by attorneys who were beholden to Defendants.

104.    Plaintiff and other Class members did not know, and could not reasonably have known, of Defendants' fraudulent scheme and could not have reasonably discovered the falsity of Defendants' representations and material omissions concerning the purchased properties true market values, nor could Plaintiff and the Class reasonably have known of the concealed information until well after their properties had closed escrow and another title search was performed to identify concurrent transactions.

105.    To this day, Defendants continue to actively and fraudulently conceal their practices from the Class and public alike.  For example, in 2016, as a result of emails being exchanged between participants in the Buying Summit events who were questioning the propriety of Defendants' business practices, Just Us members Iris Hoard and Douglas Foster began to suspect that Just Us had been subjected to a fraudulent scheme executed by Defendants. In connection with this email traffic, Iris Hoard and other members of the Class received the following unsolicited email from a Utah attorney at Defendant Invictus Law:

> My name is Bill Knowlton, and our Firm has had the privilege of representing BuyPD for
>
> the last 5 years.  As you can likely appreciate, I was very surprised to read this e-mail
>
> string and some of the comments made by some of my client's customers. It is very

unfortunate these frustrations exist - and I would like to offer some insights, and potential resolutions for each and every one of you.

While I do not know all of the facts of your concerns that precipitated the creation of this e-mail, what I do know is that my client has gone above-and-beyond with its clients in the past. I have no doubt that, given the chance, they can (and will) resolve any and all concerns some of you may be having.

My client does everything in its power to ensure the investment properties it sells offer the greatest value to its customers. Despite thousands of happy customers and buyers over the years, occasionally a problem arises.

Unfortunately, real estate is unique. Tenants are not perfect. Contractors can be less than forthright. Misunderstandings and miscommunications occur.

That said, however, my client has a long and distinguished history of dealing with these issues head-on, and addressing them directly in a positive and reasonable manner.

I have no doubts they will do the same here. To that end, I would respectfully request each of you contact me individually to discuss our concerns, and I will work directly with my client to reach a resolution.

I look forward to working with each of you.

Sincerely yours,

Bill Knowlton, Esq.

Invictus Law, P.C.

360 South Technology Court, Suite 200

Lindon, Utah 84042

Tel.: (801) 854-9212

Fax: (801) 415-9340

106.    Because of the foregoing, including as an example, attorney Knowlton's communication with Class members, Plaintiff and the Class could not reasonably discover the unlawful practices described herein and did not do so until just recently.  The clear majority of Class members still do not know that they have been injured by Defendants' misconduct.  The statute of limitations applicable to any claims brought by Plaintiff and other Class members because of the conduct alleged herein has been tolled as a result of Defendants' fraudulent concealment.

## CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who, between January 1, 2013 and present, paid Defendants the listed "sales price" for real estate offered by Defendants at their "Buying Summit" events (the "Class"), as described herein.  Excluded from the Class are Defendants and members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

108.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are approximately 3,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the

pendency of this action by mail, using the form of notice like that customarily used in class actions.

109.   Common questions of law and fact predominate over question concerning individual Class members only and include:

(a)   Did Plaintiff and members of the Class attend Defendants' Buying Summit events?

(b)   At the Buying Summit events, did Property Defendants offer properties for sale that Plaintiff and members of the Class later purchased from Property Defendants?

(c)   Did Property Defendants own the properties that they "sold" to Plaintiff and the Class at the time of the "sale?"

(d)   Did Property Defendants have a duty to disclose material facts such as their relationship to the property seller, their interests in the properties, the properties' values, and involvement of their attorneys, to Plaintiff and the Class?

(e)   Did Attorney Defendants have fiduciary duties to Plaintiff and the Class and related duties to disclose conflicts of interests, concurrent escrows, and concurrent prices?

(f)   Did Defendants aid and abet the other Defendants' breaches of fiduciary duty?

(g)   Did Property Defendants, after the "sale" to Plaintiff and members of the Class, later purchase the same property for less than the "sales price" offered to Plaintiff and members of the Class?

(h)   Did Defendants form an association-in-fact that constituted an Enterprise under RICO?

(i)     Did Defendants make uniform oral and written statements, that were false or misleading when made, about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that Defendants had "bought" the Buying Summit properties, they were vetted, available for sale, in good condition, and available for a fair price?

(j)     Did Attorney Defendants orchestrate the property closings to delay the sales to Plaintiff and members of the Class so that Property Defendants could acquire the properties for a lower price prior to escrows closing?

(k)     Did Insider's Cash participate in Defendants' fraudulent scheme by providing a false lending front in connection with Defendants' scheme and secret purchases of properties?

110.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct complained of herein.

111.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation.

112.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Racketeering Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962(c)**
**Against All Defendants**

113.   Plaintiff incorporates all allegations above, as if set forth fully herein.

114.   During the Class Period, Defendants engaged in a fraudulent real estate scheme whereby Defendants induced Plaintiff and members of the Class to purchase distressed real estate (and related loans) at above-market prices.

115.   Defendants engaged in secret self-dealing transactions to acquire title to these properties, at significantly lower prices, before formalizing the conveyance of title to Plaintiff and the Class.

116.   Defendants formed an association-in-fact constituting an "Enterprise" within the meaning of 18 U.S.C. § 1961(4) whereby Defendants coordinated their efforts for purposes of executing a scheme to enrich the Enterprise by defrauding aspiring real estate investors, including Plaintiff and members of the Class.

117.   The existence of an "Enterprise" is demonstrated by the common ownership, operation, and control of each Defendant, as described in paragraphs 28-36, above.  It is also demonstrated by the integrated efforts of the Property Defendants, the Cash Defendant and the Attorney Defendants, all as described above.

118.   Each Defendant is a "person" as defined by 18 U.S.C. § 1961(3) and is an entity legally distinct from the Enterprise.

119.   Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and members of the Class.

120.   In furtherance of the fraudulent scheme and conspiracy, the Enterprise engaged in racketeering activity by committing multiple related acts of mail fraud, in violation of 18 U.S.C. § 1341, including use of email that were a proximate cause of Plaintiff's and Class members' harm; wire fraud, in violation of 18 U.S.C. § 1343, television and internet advertising of Defendants' services and listings of properties, related to the transactions that are the proximate cause of Plaintiff's and Class members' harm; and inducement of Plaintiff and members of the Class to travel across state lines for the purpose of defrauding them of more than $5,000, in violation of 18 U.S.C. § 2314, a further proximate cause of Plaintiff's and Class members' harm.

121.   Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

122.   Plaintiff and the Class are entitled to attorney's fees.

123.   Plaintiff and the Class are entitled to punitive damages, as the conduct was intentional and reckless.

124.   Plaintiff and the Class are entitled to triple their actual damages, as allowed by statute.

## COUNT II

### Civil Conspiracy
### Against All Defendants

125.   Plaintiff incorporates all allegations above, as if set forth fully herein.

126.   Defendants jointly agreed to pursue the object of defrauding Plaintiff and members of the Class (attendees at Property Defendants' Buying Summit events) through a fraudulent real estate scheme, as described herein.

127.    Defendants engaged in one or more unlawful, overt acts in connection with and furtherance of their conspiracy, as alleged herein, including but not limited to the fraudulent sale of real estate and related purchase-money loans.

128.    Defendants' wrongful and unlawful conduct was pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by encouraging, ratifying, or adopting the conduct of each other.

129.    The agreement to further the conspiracy is further demonstrated by the common ownership, operation, and control of the Property Defendants and Lender Defendant, and their past and ongoing business relationships with Attorney Defendants, as described herein. It is also demonstrated by the integration of the real estate sales scam, lending scam, and escrow scam, including that the same employees took on multiple roles with the different entities in the various phases of this scheme, all as described above.

130.    As a direct and proximate result of the conduct in furtherance of the conspiracy, Plaintiff and members of the Class have suffered damages in the amount of the above-market prices that they paid for real estate, the fees and costs of the fraudulent real estate transactions, the fees and costs of the fraudulent loan, all in an amount to be proven at trial.

131.    Plaintiffs are entitled to punitive damages, as the conduct was intentional and reckless.

### COUNT III

**Breach of Fiduciary Duty (and Aiding and Abetting that Breach)
Against All Defendants**

132.    Plaintiff incorporates all allegations above, as if set forth fully herein.

133.    Defendant American Legal undertook to provide legal services to Plaintiff and members of the Class, as attorneys-in-fact, directly related to the transactions at issue and, having created an attorney-client relationship with Plaintiff and members of the Class, owed duties of care, loyalty and good faith to Plaintiff and members of the Class.

134.    Defendant American Legal breached their duties to Plaintiff and members of the Class by executing documents on behalf of Plaintiff and members of the Class with either actual or constructive knowledge of concurrent and secret escrows involving transactions and real estate transactions that were material to the purchases of Plaintiff and members of the Class and failing to affirmatively inform Plaintiff and members of the Class of Guardian Law's conflicting interests in the subject transactions and its relationships and other activities with American Legal, BuyPD and Income Property USA.

135.    Defendant Guardian Law undertook to provide legal and escrow services to Plaintiff and members of the Class directly related to the transactions at issue and, having created an attorney-client relationship with Plaintiff and members of the Class, owed duties of care and loyalty to Plaintiff and members of the Class.

136.    Guardian Law breached their duties to Plaintiff and members of the Class by conducting concurrent and secret escrows involving transactions and real estate transactions that were material to the purchases of Plaintiff and members of the Class and failing to affirmatively inform Plaintiff and members of the Class of Guardian Law's conflicting interests in the subject transactions and its relationships and other activities with American Legal, BuyPD and Income Property USA.

137.    Property Defendants intentionally created an agency relationship between themselves and Plaintiffs by repeatedly telling Plaintiff and members of the Class that they would vet and choose properties for Plaintiff and members of the Class. Through this agency relationship, Property Defendants owed duties of care and loyalty to Plaintiffs.

138.    Property Defendants breached the fiduciary duties and obligations they owed Plaintiff and members of the Class by self-dealing in its transactions with Plaintiff and members of the Class within the scope of its agency, by misrepresenting the origins, conditions, and value of the properties it sold to Plaintiffs, by failing to fully disclose the nature and terms of the transactions it proposed to Plaintiff and members of the Class, and by failing to disclose its conflicting interests.

139.    These breaches of fiduciary duty were the proximate cause of damages to Plaintiff and members of the Class, which include the amount of the fees and costs paid in the property escrows and include the amount of the overcharge for the purchase of the properties.

## COUNT IV

### Fraud
### Against All Defendants

140.    Plaintiff incorporates all allegations above, as if set forth fully herein.

141.    Property Defendants made uniform oral and written statements, that were knowingly false or misleading when made, about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that the Buying Summit properties were vetted, available for sale, in good condition, and available for a fair price.

142.     Defendants engaged in a fraudulent scheme to control the closing process, shielding one another from the checks and balances of a conventional escrow closing process, and hide the inter-relationships between the Property Defendants, Cash Defendant and the Attorney Defendants.

143.     Property Defendants also made statements, knowingly false or misleading when made, about their progress on the escrows for Plaintiff and members of the Class.

144.     Defendants issued false and misleading closing documents, hiding their tracks and omitting material information about the true prices for the properties.

145.     Property Defendants and Attorney Defendants had an affirmative obligation to disclose known material facts to Plaintiff and members of the Class.

146.     Plaintiff and members of the Class reasonably relied on the uniform false and misleading statements and material omissions in purchasing their properties.

147.     Plaintiff and members of the Class acted reasonably upon, and in ignorance of the uniform false and misleading statements and omissions.

148.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and members of the Class suffered damages in amounts to be proven at trial.

149.     Plaintiff and members of the Class are entitled to an award of punitive damages based on Defendants' intentional and reckless conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the Class damages and interest in an amount to be proven at trial;

C.      Awarding Plaintiff and the Class reasonable costs, including attorneys' fees;

D.      Awarding Plaintiff and the Class treble damages under federal law; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including rescission of the complained-of transactions and imposition of a constructive trust.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 9, 2018.

HARPER LAW, PLC

*/s/ Jon V. Harper*

HUTTON LAW GROUP

Attorneys for Plaintiff