IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JUST US REALTORS, LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUDGE, LLC, BUYPD, LLC, INCOME PROPERTY USA, LLC, INSIDER'S CASH, LLC, RYAN POELMAN, GUARDIAN LAW, LLC, AMERICAN LEGAL & ESCROW, LLC, INVICTUS LAW, LLC, and BLAIR R. JACKSON,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:18-cv-00128-TC-CMR |

Plaintiff Just Us Realtors, LLC filed this case, a putative class action, against a number of

individuals and limited liability corporations that sold and financed real estate through investor

training seminars.  Just Us Realtors, which bought a house through the seminars, alleges that the

Defendants misrepresented the ownership and value of the real estate it offered for sale and

fraudulently induced it and other investors to overpay for property.  It brings claims under the

Racketeering Influenced and Corrupt Organizations Act (RICO) and state law.  The Defendants

have filed four motions to dismiss the case under Federal Rule of Civil Procedure 12(b)(6).  The

court will grant the motions to dismiss, but allow Just Us Realtors to file a motion to amend with a proposed amended complaint to cure the pleading deficiencies discussed below.

## BACKGROUND

To resolve the Defendants' motions to dismiss, the court accepts the well-pleaded facts of the complaint as true, and draws all reasonable inferences in favor of the Plaintiff. Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017).

The Defendants in this case fall into one of three categories depending on their role in the alleged scheme to sell real estate: (1) the "Property Defendants": Nudge, LLC; Buy PD, LLC; Income Property USA, LLC; and Ryan Poelman; (2) the "Cash Defendant": Insider's Cash, LLC; and (3) the "Attorney Defendants": Blair R. Jackson and three law firms he allegedly controls or represents—Invictus Law, LLC; Guardian Law, LLC; and American Legal & Escrow, LLC.

According to the complaint, the Property Defendants canvassed the United States for sellers of distressed real estate. Rather than buy the real estate outright, the Property Defendants entered into contingency agreements to buy the real estate themselves only after securing customers who would buy the same real estate at a significant markup. And to recruit their customers, the Property Defendants organized real estate investment training seminars sponsored by Scott and Amie Yancey from the television show "Flipping Las Vegas." At the initial free training seminars, the Property Defendants offered attendees the chance to pay for additional seminars that culminated with the "Buying Summit"—an event in Las Vegas at which the Property Defendants would offer "exclusive access" to buy the distressed properties, which they called "turnkey" "performing assets." (Compl. ¶¶ 12, 44(a), ECF No. 2.)

In December of 2014, Iris Hoard saw a television commercial advertising a free Yancey-sponsored seminar. She and her partner Douglas Foster (the two members of Just Us Realtors) attended the seminar, called the "Simple Real Estate Program," where they were encouraged to attend additional trainings. Later that month, they paid $1,197 to attend a three-day "Real Estate Workshop." They then paid $12,500 to attend a "Boots on the Ground" seminar.

In January of 2015, shortly after the Boots on the Ground seminar, the Property Defendants began recruiting Ms. Hoard and Mr. Foster to attend the upcoming Buying Summit in Las Vegas. The Property Defendants sent the two a series of emails advertising the event as a place "to get some deals done," (id. ¶ 44(a)), and to purchase "performing assets" provided by BuyPD and Income Property USA. (Id. ¶ 72.) Ms. Hoard and Mr. Foster signed up for the Buying Summit by telephone, paying $17,497 for entry.

Ms. Hoard and Mr. Foster attended the Buying Summit in February of 2015. At the Summit, the Property Defendants attempted to convince attendees to buy homes it was offering for sale. A workbook provided to attendees represented that the Property Defendants had performed due diligence, conducted market research, and relied on "Trusted Informants" and "Inside Information" to vet the properties. (Id. ¶ 48.) The workbook also represented that the Property Defendants had "Bought" homes from "MOTIVATED SELLERS" and chosen homes with "Positive Cash Flow." (Id. ¶ 49.) Mr. Poelman made many of these same representations in live presentations at the Summit.

On February 13, 2015, the second day of the Buying Summit, Ms. Hoard and Mr. Foster met with Jonny Payne, a BuyPD "real estate consultant," who showed them on a laptop computer a single-family house available to purchase. Mr. Payne told the two that they had

limited time to purchase the property because the "portfolio" would quickly expire and the property would be sold to someone else. (Id. ¶ 80.) Ms. Hoard and Mr. Foster agreed to buy the house, which was located in St. Louis, Missouri, for a purchase price of $54,200 (a voucher effectively lowered the price to $52,950, though additional fees ultimately pushed the total price to $56,792).

At the time of the sale, the Defendants made a number of representations concerning the ownership of the St. Louis house. Mr. Payne provided Ms. Hoard and Mr. Foster with a document he prepared, titled "Purchase Details," which stated that the house was being "Purchased From" Income Property USA. (Id. ¶ 82.) He also gave them a "Property Analysis Report" containing a "title summary" prepared by Guardian Law. The title summary read that "[t]itle to the Fee Simple estate . . . is at the Effective Date [February 13, 2015] to be vested in: 5 Choices, LLC by Warranty Deed" (5 Choices, a now defunct company, was allegedly controlled by Nudge). (Ex. E to Pl.'s Opp. to Mots. to Dismiss, ECF No. 45-5.[1])

When Just Us Realtors agreed to buy the house, the Defendants set in motion two sets of transactions. First, the Property Defendants acquired title to the house from the actual owner, Venus Properties, for $39,000. Guardian Law facilitated the transfer of title from Venus Properties to an entity called American Real Estate Investments, LLC, and then to 5 Choices.

---

[1] The court considers this document for the purpose of Defendants' Rule 12(b)(6) motions because it was referred to in the complaint and its authenticity is not in dispute. See Prager v. LaFaver, 180 F.3d 1185, 1189 (10th Cir. 1999). But the court declines to consider other materials submitted by the parties with their briefs, such as conveyance documents and various legal disclaimers. The significance of these other documents—and the arguments surrounding them—are best resolved after discovery. See, e.g., Grigsby v. Income Prop. USA, LLC, No. 2:17-cv-011100-RJS, 2018 WL 4621766, at *11 (D. Utah Sept. 26, 2018) (declining to consider the effect of a "Conflict of Interest Disclosure" for the purpose of deciding a breach of fiduciary duty claim at the motion to dismiss stage).

Second, Insider's Cash, American Legal & Escrow, and Guardian Law (advertised at the Buying Summit as "Strategic Partners") effectuated the sale of the house to Just Us Realtors— and did so in a way that masked the $39,000 Venus Properties sale.  Insider's Cash provided Just Us Realtors with a three-year, $40,300 bridge loan, removing the need for a conventional lender that might conduct due diligence into the actual value of the property.  Additionally, the Property Defendants required that Just Us Realtors grant American Legal & Escrow power of attorney to complete transaction paperwork, and assigned Guardian Law to act as the title and escrow agent for Just Us Realtors' transaction.  In that way, Guardian Law acted as the title and escrow agent for Just Us Realtors as it simultaneously effectuated the "secret" title transfers from Venus Properties to the Property Defendants.  As a consequence, Just Us Realtors closed on the St. Louis house without any knowledge of its title history (including the $39,000 sale) or the house's true value.  According to Just Us Realtors, it was left owing more than the house was worth, and unable to refinance its balloon-payment bridge loan.

In 2016, after Buying Summit attendees began to question the propriety of the Defendants' business practices, Ms. Hoard and other attendees received the following email from Bill Knowlton, an attorney from Defendant Invictus Law:

> My name is Bill Knowlton, and our Firm has had the privilege of representing BuyPD for the last 5 years. As you can likely appreciate, I was very surprised to read this e-mail string and some of the comments made by some of my client's customers. It is very unfortunate these frustrations exist—and I would like to offer some insights, and potential resolutions for each and every one of you.
>
> While I do not know all of the facts of your concerns that precipitated the creation of this e-mail, what I do know is that my client has gone above-and-beyond with its clients in the past. I have no doubt that, given the chance, they can (and will) resolve any and all concerns some of you may be having.

My client does everything in its power to ensure the investment properties it sells offer the greatest value to its customers. Despite thousands of happy customers and buyers over the years, occasionally a problem arises.

Unfortunately, real estate is unique. Tenants are not perfect. Contractors can be less than forthright. Misunderstandings and miscommunications occur.

That said, however, my client has a long and distinguished history of dealing with these issues head-on, and addressing them directly in a positive and reasonable manner.

I have no doubts they will do the same here. To that end, I would respectfully request each of you contact me individually to discuss our concerns, and I will work directly with my client to reach a resolution.

I look forward to working with each of you.

Sincerely yours,

Bill Knowlton, Esq.
Invictus Law, P.C.

(Compl. ¶ 105.)

Just Us Realtors filed this case as a class action,[2] alleging violations of RICO as well as state law claims of civil conspiracy, breach of fiduciary duty (and aiding and abetting the breach), and fraud against each Defendant.

The Defendants have arranged themselves into four groups for the purpose of defending this lawsuit: (1) American Legal & Escrow, Invictus Law, and Mr. Jackson (collectively, the "Jackson Defendants"); (2) Insider's Cash; (3) Nudge, BuyPD, Income Property USA, and Mr.

---

[2] The court has not yet certified this case as a class action.

Poelman (collectively, the "Poelman Defendants"); and (4) Guardian Law.  Each group has filed

a motion to dismiss pursuant Federal Rule of Civil Procedure 12(b)(6).  The Defendant groups

all raise essentially the same arguments concerning the sufficiency of Just Us Realtors'

Complaint—that Just Us Realtors has not pled sufficient facts to support RICO or state law

claims, and has not pled the alleged fraud with particularity under Federal Rule of Civil

Procedure 9(b).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain

statement of the claim showing that the pleader is entitled to relief."  This standard "does not

require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In ruling on a Rule 12(b)(6) motion, the court must determine whether the complaint

contains "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on

its face.'" Id. (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Id.

A plaintiff alleging fraud must comply with heightened pleading requirements, and "state

with particularity the circumstances constituting" the fraud.  Fed. R. Civ. P. 9(b).  "More

specifically . . . a complaint alleging fraud [needs] to 'set forth the time, place and contents of the

false representation, the identity of the party making the false statements and the consequences

thereof.'" <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting <u>Lawrence</u> <u>Nat'l Bank v. Edmonds (In re Edmonds)</u>, 924 F.2d 176, 180 (10th Cir. 1991)).

## DISCUSSION

### I.  RICO CLAIMS

Just Us Realtors brings RICO claims against each Defendant.  "RICO vests a private citizen with substantive rights to avoid 'injur[ies]' to 'his business or property' caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights." <u>Safe Streets All. v. Hickenlooper</u>, 859 F.3d 865, 881 (10th Cir. 2017) (quoting 18 U.S.C. § 1964(c)).  Among its four express prohibitions, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

To state a claim for a violation of § 1962(c), a plaintiff "'must plausibly allege that' the defendants 'each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" <u>Safe Streets All.</u>, 859 F.3d at 882 (quoting <u>George v. Urban Settlement</u> <u>Servs.</u>, 833 F.3d 1242, 1248 (10th Cir. 2016)).  In addition, a plaintiff must plead that its "business or property was injured," and "that the defendant's violation is the cause of that injury." <u>Id.</u> at 881.

### A.  Association-in-Fact Enterprise

The court begins with the requirement of an "enterprise."  "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2)

an 'enterprise' that is not simply the same 'person' referred to by a different name." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001).

RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To amount to an association-in-fact enterprise, the union or group "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009).

Just Us Realtors has adequately pled the existence of an enterprise composed of every Defendant but Invictus Law.[3] According to the facts alleged in the complaint, the Defendants worked together as "strategic partners" for the purpose of selling and financing real estate. BuyPD and Income Property USA—both controlled by Mr. Poelman—advertised and offered the real estate for sale, Insider's Cash financed the sales, and Guardian Law and American Legal & Escrow—both controlled by Mr. Jackson—facilitated the closing process. Together, these Defendants formed an enterprise distinct from each person and company.

## B. Conducting the Enterprise's Affairs

Section 1962(c) requires a plaintiff to allege and prove that a RICO defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). "This, in turn, requires a showing that the defendant 'participated in the operation and management of the enterprise itself.'" <u>George</u>, 833 F.3d at 1251 (quoting <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185 (1993)). As the Tenth Circuit summarized in <u>George</u>,

---

[3] The court will address the RICO allegations against Invictus Law in part I.B, below.

> [u]nder <u>Reves</u>' operation or management test, the defendant must
> have "some part in directing" the enterprise's affairs. [507 U.S.] at
> 179. But importantly, the defendant need not have "primary
> responsibility for the enterprise's affairs," "a formal position in the
> enterprise," or "significant control over or within an enterprise."
> <u>Id.</u> at 179 & n.4, 184. Instead, even "lower rung participants in the
> enterprise who are under the direction of upper management" may
> be liable under RICO if they have "some part" in operating or
> managing the enterprise's affairs. <u>Id.</u> at 179, 184. . . . Nevertheless,
> a defendant must do more than simply provide, through its regular
> course of business, goods and services that ultimately benefit the
> enterprise.

<u>Id.</u>

The complaint lays out a tightly-connected network of individuals and companies who worked together to sell and finance real estate, using allegedly fraudulent representations. To start, the Property Defendants are all alleged to be under the control of one individual, Mr. Poelman. Mr. Poelman founded Nudge, which, according to its website, "owns and manages multiple businesses," and focuses primarily on "purchasing single-family homes for our own long-term hold portfolio." (Compl. ¶ 28.) Nudge "controlled" 5 Choices, a now-defunct limited liability company that purported to own the properties for sale. (<u>Id.</u> ¶ 29.) BuyPD is also "an affiliate of Nudge," and Mr. Poelman is BuyPD's principal. (<u>Id.</u> ¶¶ 29, 32.) BuyPD states on its website that "[t]he core of our business is to provide turnkey, rental real estate to investors around the world." (<u>Id.</u> ¶ 29.) Income Property USA is a subsidiary of BuyPD (the sole member of Income Property USA is Core Capital Property, LLC, and Core Capital Property's sole member is BuyPD). Together, these Property Defendants compiled a "portfolio" of properties and advertised and organized the Buying Summit to sell the properties.

Mr. Poelman also controls Insider's Cash—the sole member and manager of Insider's Cash is BuyPD. Nonetheless, Insider's Cash was advertised to Buying Summit attendees as a

third-party lender, and financed the Property Defendants' real estate sales. According to the complaint,

> Defendants' use of Insider's Cash as an apparent third-party lender was essential to the Property Defendants' fraudulent scheme because, without Insider's Cash, Plaintiff and the Class would have used conventional lenders who would have not approved the loans after due diligence, primarily because the proposed loans exceeded the properties' market values (reflecting the inflated sales prices and distressed nature of the properties). In the case of Plaintiff, a third-party lender would not have approved a loan for $40,300.00 on a property that had just transacted for $39,000.00.

(Id. ¶ 19(b).)

The Attorney Defendants—Mr. Jackson, Invictus Law, Guardian Law, and American Legal & Escrow—are also tightly connected. Mr. Jackson, a Utah attorney, is one of two members of Guardian Law, the managing partner and owner of Invictus Law, and the managing partner of American Legal & Escrow. Guardian Law oversaw and executed the various escrow and title transactions related to the sale of properties to Buying Summit attendees, as well as the allegedly concurrent and secret sales from the actual owners to the Property Defendants. American Legal & Escrow executed transaction documents on behalf of Just Us Realtors and other attendees. Invictus Law, for its part, is alleged to have reached out to dissatisfied Buying Summit attendees well after the Buying Summit, and offered to discuss the attendees concerns with them.

Just Us Realtors has alleged that all but one of the Defendants (i.e., Invictus Law) participated in the operation of the enterprise. Nudge, through 5 Choices, claimed to own the St. Louis property. BuyPD and Income Property USA offered properties for sale, Insider's Cash provided financing, and Guardian Law and American Legal & Escrow facilitated and executed

sales transactions.  And they did so at the direction of two individuals, Mr. Poelman and Mr. Jackson, both of whom are alleged to have personally participated in the Buying Summit.  Just Us Realtors has plausibly alleged that these entities and individuals were purposefully organized to control the sale, financing, and closing of real estate, and to mask the allegedly fraudulent details of the transactions and the values of the homes.

But Just Us Realtors has failed to allege that Invictus Law participated in the enterprise. Just Us Realtors claims that Invictus Law helped conceal the Defendants' allegedly fraudulent scheme when its attorney, Bill Knowlton, sent Just Us Realtors and other Buying Summit attendees the 2016 email on behalf of BuyPD in which it sought to address growing concerns about the Summit.  (Compl. ¶ 105.)  The allegations—including the contents of the email— suggest only after-the-fact legal representation, not that Invictus Law participated in the operation of the larger enterprise to sell real estate at the Buying Summit.  For this reason, the RICO claim against Invictus Law must be dismissed.

### C.  Pattern of Racketeering Activity

RICO defines a "racketeering activity" as any one of many federal criminal offenses known, in RICO parlance, as "predicate acts."  18 U.S.C. § 1961(1).  A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  Id. § 1961(5).

To sustain a claim under 18 U.S.C. § 1962(c), a plaintiff must plead that <u>each defendant</u> engaged in a pattern of racketeering activity by committing at least two predicate acts. As recently stated by another judge of this court,

> it is not enough to allege that a RICO enterprise conducted its affairs through a pattern of unlawful activity and that the several defendants are part of the enterprise. Instead, to state a RICO claim against a person under § 1962(c), the plaintiffs must allege that each defendant conducted the affairs of an enterprise through the defendant's own pattern of racketeering activity.

<u>ZibalStar, L.C. v. Conte</u>, No. 2:17-cv-00563-JNP, 2018 WL 1578019, at *4 (D. Utah Mar. 27, 2018).

Just Us Realtors has alleged that the Defendants violated three federal statutes listed by RICO as predicate acts—18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 2314 (the National Stolen Property Act).

1. <u>Mail and Wire Fraud</u>

To state a claim of mail fraud, a plaintiff must allege "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." <u>Tal v. Hogan</u>, 453 F.3d 1244, 1263 (10th Cir. 2006) (quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 892 (10th Cir.1991)). "The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud." <u>Id.</u> (quoting <u>BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.</u>, 194 F.3d 1089, 1102 (10th Cir. 1999)). The communications themselves need not contain false representations. Rather, "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" <u>Schmuck v. United States</u>, 489 U.S. 705, 710–11 (1989) (quoting <u>Pereira v.</u>

United States, 347 U.S. 1, 8 (1954) and Badders v. United States, 240 U.S. 391, 394 (1916)).

"Nor does the defendant need to use the mails himself:  It is sufficient 'if the perpetrator does an

act with knowledge that the use of the mails will follow in the ordinary course of business, or

where such use can reasonably be foreseen, even though not actually intended.'"  United States

v. Zander, 794 F.3d 1220, 1226 (10th Cir. 2015) (quoting United States v. Washington, 634 F.3d

1180, 1183 (10th Cir. 2011)).

Mail and wire fraud both require an underlying fraud, which, in common law, "consists

of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its

falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance

of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and

(9) injury."  Tal, 453 F.3d at 1263 (quoting BancOklahoma Mortgage Corp., 194 F.3d at 1103).

A plaintiff alleging federal mail or wire fraud as a RICO predicate, however, need not allege and

prove the reliance element.  Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 648 (2008).

The underlying fraud must be pled with particularity in accordance with Federal Rule of Civil

Procedure 9(b).

Just Us Realtors has adequately stated the time, place, and nature of the allegedly false

statements that underlie its claims of fraud.  According to the complaint, the Property Defendants

knowingly misrepresented the ownership status and value of the home they sold to Just Us

Realtors during the February 2015 Buying Summit in Las Vegas.  Many of those representations

were contained in a workshop handbook, presentations, and documents prepared for the sale of

the St. Louis home.  But Just Us Realtors has not adequately alleged who made these

representations; the complaint repeatedly references the "Property Defendants," rather than a

specific person or entity.  While this style of pleading may be convenient, especially given the close relationships between the Defendant entities, it does not satisfy Rule 9(b).[4]  See Koch, 203 F.3d at 1237 (affirming dismissal of fraud claims where a plaintiff "failed to identify any specific Defendant who made [the] alleged fraudulent misrepresentations or omissions").

The allegations of the use of mail and wires are deficient as well.  Just Us Realtors has alleged that the enterprise used mail, email, and television to recruit Buying Summit attendees and execute home sales.  But for the most part, the complaint attributes many of these communications to the "Property Defendants" or "Defendants," without specifying which particular Defendant caused or reasonably foresaw the use of mail or wires.  (See, e.g., Compl. ¶¶ 16(d) ("Defendants executed transaction documents in the escrow on the sale of [the St. Louis home] to Plaintiff for $54,200."), 44 ("Property Defendants sent to Plaintiff and members of the Class uniform email communications explaining the purpose of the Buying Summit.").)

_____

[4] Just Us Realtors appended various documents to its Opposition Brief, and these documents do provide some specific details about who made the allegedly fraudulent statements. For instance, Income Property USA provided Just Us Realtors with a title report prepared by Guardian Law, which represented that 5 Choices (controlled by Nudge) owned title to the home in fee simple on the date of the sale.  (Ex. E to Pl.'s Opp., ECF No. 45-5, at 27.)  Income Property USA also provided a comparative market analysis that listed the sale price of five comparable homes, to support the $54,200 listed sales price of the St. Louis home.  (Id. at 6–7.) And, in a disclosure statement, 5 Choices appears to deny that the property was subject to any sort of option contract with Venus Properties.  (Ex. F to Pl.'s Opp., ECF No. 45-6, at 2.)  These documents suggest that Just Us Realtors had the ability to identify the specific Defendants who made the allegedly fraudulent statements, and opted instead for a simpler shorthand.  But because a Rule 12(b)(6) motion generally depends on the facts as pled in the complaint, and because Just Us Realtors will have an opportunity to amend its Complaint, the court will not use these documents to resolve the Defendants' pending motions.  Cf. Prager, 180 F.3d at 1189 (recognizing that the court may, at its discretion, decline to consider materials appended to a Rule 12(b)(6) motion).

The complaint does contain some concrete allegations of wire use. Ms. Hoard received two emails in April of 2015—one from American Legal & Escrow, and another from Mr. Payne, who represented BuyPD. (See id. ¶¶ 94, 95.) But, even assuming that Just Us Realtors had adequately pled the existence of a fraudulent scheme, these communications would amount to just one predicate act committed by each of these Defendants.

### 2. National Stolen Property Act, 18 U.S.C. § 2314

The National Stolen Property Act makes it illegal to "induce[] any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more." 18 U.S.C. § 2314. This "travel fraud" provision "was passed to fill a gap in the mail fraud statute," and "prevent criminals engaged in fraud from evading prosecution merely by using a different means of transporting money." United States v. Steffen, 251 F.3d 1273, 1277 (9th Cir. 2001).

Just Us Realtors has clearly alleged Ms. Hoard and Mr. Foster were induced to travel across state lines to the Buying Summit. But again, its allegations are hamstrung by its reference to the "Property Defendants" broadly and not any individual Defendant.[5] (See, e.g., Compl. ¶¶ 41 (alleging that "Property Defendants actively recruited Plaintiff and members of the Class with telephone calls and email correspondence urging Plaintiff and members of the class to attend the Buying Summit"), 44–46 (further describing the efforts of "Property Defendants" to recruit Just Us Realtors for the Buying Summit), 58(b) (alleging that "Property Defendants arranged for

---

[5] The Complaint does not allege travel fraud on the part of Insider's Cash and the Attorney Defendants.

Plaintiff and most members of the Class to travel across state lines to attend the Buying Summit events in Las Vegas, Nevada").) Even under the more liberal pleading standard set forth by Rule 8, Just Us Realtors has failed to connect a specific Defendant to a predicate act of travel fraud.

In sum, Just Us Realtors has not adequately alleged that any of the individual Defendants committed at least two RICO predicate acts, whether mail, wire, or travel fraud. As a consequence, its RICO claims must be dismissed.[6]

## D. Causation and Injury

In addition to alleging a violation of 18 U.S.C. § 1962(c), Just Us Realtors must plead "(1) injuries to their property (2) that were caused by those violations." Safe Streets All., 859 F.3d at 885. RICO's civil remedy provision limits recovery to a "business or property" injury. 18 U.S.C. § 1964(c). And RICO's causation element requires a plaintiff to "plausibly plead 'that the defendant's violation not only was a but for cause of his injury, but was the proximate cause as well.'" Safe Streets All., 859 F.3d at 889 (quoting Bridge, 553 U.S. at 654). That is, "when a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Id. (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)).

Just Us Realtors has adequately alleged injury to its business, as well as causation. It spent tens of thousands of dollars to purchase the St. Louis house at an inflated price. Because of the Defendants' misrepresentations about the value of the house, it took out a balloon-payment

---

[6] Because Just Us Realtors has not alleged the requisite number of predicate acts against each Defendant, the court cannot decide whether it has additionally alleged a "pattern" of racketeering activity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238–39 (1989).

bridge loan that it could not refinance. As for causation, Just Us Realtors alleges—and facts support—that "[h]ad Ms. Hoard and/or Mr. Foster known the truth about [the house] . . . they would not have permitted Defendants to consummate the . . . real estate transaction." (Id. ¶ 101.) While Just Us Realtors' RICO claims are deficient in other respects, it has adequately pled damages and causation.

## II. JURISDICTION OVER STATE LAW CLAIMS

Because Just Us Realtors has failed to plead RICO claims against the Defendants, the court lacks federal question jurisdiction over this case. And before addressing the merits of the remaining state law claims, the court will undertake its "'independent obligation to determine whether subject matter exists' that extends to 'any stage in the litigation.'" Mocek v. City of Albuquerque, 813 F.3d 912, 934 (10th Cir. 2015) (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006)). Just Us Realtors asserts two additional bases for original federal jurisdiction over the state law claims: 28 U.S.C. § 1332(a), which confers diversity jurisdiction, and the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d).

Diversity jurisdiction and CAFA jurisdiction both depend on the citizenship of the parties and a minimum amount in controversy. Just Us Realtors is diverse in citizenship from every Defendant. The question, then, is whether it has adequately alleged a sufficient amount in controversy—an amount over $75,000 for the purpose of diversity jurisdiction, or over

$5,000,000, aggregated from all claims of the potential class, for the purpose of CAFA jurisdiction.[7]

The complaint does not allege a specific amount of damages; instead, Just Us Realtors simply alleges that "the matter in controversy exceeds the sum or value of $75,000.00" and "the aggregate amount in controversy exceeds $5,000,000 for this class action." (Compl. ¶ 24.) While "a complaint need not allege a specific sum in order to assert diversity jurisdiction," a plaintiff must still "allege facts sufficient 'to convince the district court that recoverable damages will bear a reasonable relation to the minimum jurisdictional floor.'" Mocek, 813 F.3d at 934 (quoting Adams v. Reliance Standard Life Ins. Co, 225 F.3d 1179, 1183 (10th Cir. 2000)).

Just Us Realtors has not pled sufficient facts to infer damages in excess of $75,000. It allegedly paid approximately $15,200 more than the house was worth, $4,448.30 in transaction fees, and $31,194 to attend the Buying Summit and other seminars—amounts totaling just under $51,000. Additionally, Just Us Realtors has not made any allegations concerning the amounts to be claimed by the prospective class. The court cannot, at this time, infer amounts in controversy that warrant diversity jurisdiction or CAFA jurisdiction. Since Just Us Realtors has not pled a basis for original or supplemental jurisdiction over any of the state law claims, the court must dismiss the entire complaint.

---

[7] CAFA can provide federal jurisdiction regardless of whether a class is certified pursuant to Federal Rule of Civil Procedure 23. 28 U.S.C. § 1332(d)(8); see Pontrelli v. Monavie, Inc., No. 2:17-cv-01215-DN-DBP, 2019 WL 2436437, at *4 (D. Utah June 11, 2019).

### III.  LEAVE TO AMEND

In its Opposition, Just Us Realtors requests that the court, should it dismiss any claims or parties, do so without prejudice and allow Just Us Realtors to file an amended complaint.  (Pl.'s Opp. at 55.)

The court sees no reason to dismiss Just Us Realtors' claims with prejudice.  Just Us Realtors' RICO claims fail because the complaint lacks sufficient detail—it does not allege sufficient predicate acts against each Defendant, it does not plead fraud with particularity, and it too often alleges wrongdoing on the part of "Property Defendants" and "Attorney Defendants," and not each Defendant separately.  These are all potentially curable defects.  And though the court lacks diversity or CAFA jurisdiction over Just Us Realtors' state law claims, this too may only be a consequence of deficient pleading with regards to the amount in controversy.

Just Us Realtors requested leave to amend its complaint in its opposition brief, but this court's local rules prohibit motions from being made in a response or reply memorandum. DUCivR 7-1(b)(1)(A).  Instead, Just Us Realtors may file a separate motion for leave to amend its complaint within twenty-eight days of the date of this Order, and include with its motion a proposed amended complaint.

### ORDER

For the foregoing reasons, the Defendants' Motions to Dismiss (ECF Nos. 24, 26, 28, & 29) are GRANTED, and Just Us Realtors' complaint is dismissed without prejudice.  Just Us Realtors may file a motion to amend its complaint, along with a proposed amended complaint, within twenty-eight days of the date of this Order.

DATED this 19th day of June, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge