# Exhibit A

HARPER LAW, PLC
Jon V. Harper (1378)
Denise Dalton (9610)
Post Office Box 581468
Salt Lake City, Utah 84158
Telephone: 801-910-4357
Email: jharper@jonharperlaw.com

HUTTON LAW GROUP
Andrew W. Hutton
12760 High Bluff Drive, Suite 240
San Diego, California 92130
Telephone: 858-793-3500
Email: drew@law-hutton.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JUST US REALTORS, LLC on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUDGE, LLC, BUYPD, LLC, INCOME PROPERTY USA, LLC, INSIDER'S CASH, LLC, RYAN POELMAN; GUARDIAN LAW, LLC, AMERICAN LEGAL & ESCROW, LLC, INVICTUS LAW, LLC, and BLAIR R. JACKSON,<br><br>Defendants. | <u>PROPOSED CLASS ACTION</u><br><br>**[PROPOSED] AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>Case No. 2:18-cv-00128-HCN-CMR<br><br>Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff, Just Us Realtors, LLC ("Plaintiff" or "Just Us Realtors"), individually and on

behalf of all others similarly situated, by its undersigned attorneys, alleges the following based

upon personal knowledge as to Plaintiff and its own acts, and upon information and belief as to all

other matters, based on the investigation conducted by and through Plaintiff's attorneys.  Plaintiff believes substantial additional evidentiary support exists for its allegations set forth herein, after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons and entities who, between January 1, 2013 and present, purchased real estate in connection with defendants' fraudulent scheme, as described herein (the "Class").

2.      Defendants are an association of two individuals, and entities they control, that formed a fraudulent scheme to sell real estate at inflated prices to thousands of aspiring real estate investors (mostly retirees).  The scheme was a roaring success for Defendants.  Defendant BuyPD, LLC ("BuyPD") – and its founder defendant Ryan Poelman ("Poelman") – were featured in *Inc. Magazine's* fastest growing companies for 2014, with an astonishing 3-year growth rate of 2,606%, generating over $140 million in revenue for the two-year period 2013-2014.

3.      Defendants executed their fraudulent real estate scheme in three parts.

(a)      First, Plaintiff and members of the Class were urged by BuyPD and Poelman-controlled Nudge, LLC ('Nudge") to attend Defendants' "***Buying Summit***" events in Las Vegas, "***get some deals done***" with promises of exclusive access to "***performing assets***" with "***incredible value***."  For this exclusive access, Plaintiff and members of the Class each paid over $10,000 and traveled to Las Vegas for the 3-day event.

(b)      Second, at the Buying Summit, BuyPD and Income Property USA, LLC ("IPUSA") offered for sale an "***available inventory***" of "***turnkey***" "***performing properties***" with "***sales prices***" based on their "***market research***" and "***due diligence***."  BuyPD-controlled Insider's

Cash, LLC ("Insider's Cash") offered purchase money ***financing***.  However, unbeknownst to Plaintiff and the Class, BuyPD and IPUSA did not own "***performing properties***" and Insider's Cash was <u>not</u> a *bona fide* lender.  Nudge and BuyPD knew from their "due diligence" that the properties were <u>not</u> "performing," <u>not</u> "turnkey," and the "sales prices" far exceeded the properties' values, which was as much as 40% less than the Buying Summit's "sales price." Insider's Cash likewise knew the unimproved properties were worth less than the offered loans, so it immediately offloaded the credit risk to an unsuspecting note purchaser.

(c)     Third, once Plaintiff and the Class agreed to purchase properties – properties BuyPD and IPUSA purported to own but did not – Plaintiff and the Class were told that a real estate team of "Strategic Partners" would handle everything to complete the investment: open escrow, prepare and execute the necessary paperwork, check title, arrange purchase financing, close the escrow, and record the legal documents that conveyed title.

4.      Plaintiff and the Class reasonably believed these inducements, unaware that:

(a)     The properties were not "turnkey" and worth far less than the "sales price."

(b)     The "Lender," Insider's Cash, was unwilling to carry loans to Plaintiff and the Class because it knew the loans were too risky and worth less than the property value.  So, Insider's Cash attracted new money for the scheme's needed financing through the fraudulent sale of trust deeds (a Ponzi scheme).[1]

---

[1]  A "Ponzi scheme" has a "common base" defined in this District as "a fraudulent investment scheme in which "'returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.'"  *SEC v. Management Solutions, Inc.*, 2013 U.S. Dist. LEXIS 120277, *66 (D. Utah 2013) (quoting *In re Independent Clearing House Co.*, 41 B.R. 860, 994, n.12 (D. Utah 1987).

(c)     The attorneys assigned to help Plaintiff and the Class with their investments – Guardian Law, LLC ("Guardian Law") and American Legal & Escrow ("AL&E") – were secretly beholden to Poelman and his entities.  So, throughout the process Guardian Law and AL&E had divided their loyalties in order to protect Poelman and his group, to the detriment of Plaintiff and the Class.

5.     A conventional real estate deal would have uncovered Defendants' fraudulent scheme and self-dealing:  an independent title search would uncover the true owner; a third-party lender would peg the properties' true market value; an independent inspection would report the properties' unimproved status; a faithful attorney would spot patent red flags; and a loyal escrow and title fiduciary would not oversee and bless a concurrent escrow for the same property in favor of the seller at a 40% lower price.

6.     Defendants' secret scheme, however, was unconventional.  As a condition of every sale, Plaintiff and the Class were required to (i) use BuyPD or IPUSA as their agent to complete the sale; (ii) sign powers authorizing attorney AL&E (selected by and beholden to Poelman and his entities) to act on Class members' behalf to execute needed documents; (iii) retain Guardian Law (also selected by and beholden to Poelman and his entities) as escrow and title agent; and (iv) use Insider's Cash (also selected by Poelman and his controlled entities) to secure purchase financing.

7.     To hide this scheme, Defendants each conspired with one another to (i) control the documentation and escrows for Plaintiff and the Class; (ii) keep secret the concurrent escrow conveying to the Nudge-controlled entity the same properties at lower prices; (iii) hide the Ponzi

scheme that was attracting new investment to finance the venture; and (iv) use false statements and documents.

8.      As agents, attorneys and fiduciaries for Plaintiff and the Class, Defendants were duty-bound to act ethically and candidly towards Plaintiff and the Class, by disclosing facts material to the transactions, including the properties' values reflected in the secret escrows, attorneys' dual-representation, and Defendants' self-dealing.  Defendants failed to fulfill their duties and lawful obligations, causing Plaintiff and the Class to grossly overpay for the properties offered at the Buying Summit.

9.      The chronology of Plaintiff's purchase provides an example of the fraudulent scheme to "sell" "turnkey" "performing" properties (that BuyPD and IPUSA did not own or improve) at above-market prices, with the material assistance of Blair Jackson ("Jackson") and his law firms, to secretly purchase those same unimproved properties at much lower prices *ex post*:

(a)      <u>Late January 2015</u> – Steve Liechty, an executive with Nudge, BuyPD and IPUSA, executed an agreement giving IPUSA-controlled 5 Choices, LLC ("5 Choices") a no-risk option to purchase from American Real Estate Investments, LLC ("AREI") a distressed property located at 341 Caithness in St. Louis, Missouri ("341 Caithness") for $39,000.

(b)      <u>Early February 2015</u> – Nudge and BuyPD sent Plaintiff a series of emails encouraging attendance at the Buying Summit to gain exclusive access to "***performing assets***" with "***incredible value***."  Plaintiff paid $17,000 and traveled interstate to Las Vegas to attend the Summit.

(c)      <u>February 13, 2015</u> – IPUSA sold 341 Caithness to Plaintiff, a property IPUSA said was from an "inventory" of "rehabbed," "turnkey" "performing assets."  The non-

- 5 -

negotiable price was $54,200, supported by IPUSA's "Market Analysis" of comparable sales with a "Title Summary" indicating 5 Choices held clean "Fee Simple" title.  On that date, however, neither IPUSA nor 5 Choices had title to, or possession of, the property.  To pay for 341 Caithness, Plaintiff agreed to borrow $40,300 from Insider's Cash.  The next day, Plaintiff placed a purchase deposit of $5,000 with "ReadyProp" (a "Strategic Partner") thereby acquiring an equitable interest in 341 Caithness.  Guardian Law was appointed escrow agent.

(d)     February 16, 2015 – Plaintiff made another deposit of $14,309 with IPUSA towards purchase of 341 Caithness.  Concurrently, 5 Choices purchased 341 Caithness for $39,000 – $15,200 less than Plaintiff's $54,200 purchase price (inferring a 40% premium paid by Plaintiff).  Guardian Law was escrow agent for this secret $39,000 transaction.

(e)     February 27, 2015 – Plaintiff's purchase deposits totaling $19,309 became fully non-refundable by this date, further cementing Plaintiff's equitable interest in 341 Caithness.

(f)     March 6, 2015 – 5 Choices recorded its purchase of 341 Caithness for $39,000, taking possession of the property on this date.  Again, Defendants, who each had notice of Plaintiff's equitable interest in 341 Caithness, did not notify Plaintiff of this transaction, the $39,000 market price, or the fact that IPUSA or 5 Choices did not have possession before this date.

(g)     March 16, 2015 – AL&E executed, as Plaintiff's attorney in fact, transaction documents for the $54,200 sale of 341 Caithness to Plaintiff.  Nudge executive Steve Liechty represented 5 Choices as its manager in this transaction.  At closing, and in addition to IPUSA having secured a grossly inflated "sales price" over what 5 Choices paid for the property, Plaintiff was also charged $4,448.30, consisting of the following:

        (i)     $2,050.00 "Title charges" (including "Legal Fees" and "Postage, Shipping, and Handling") paid to Guardian Law;

        (ii)    $2,248.30 "Loan origination fee" paid to Insider's Cash; and,

        (iii)   $150 paid to PropAsure, an entity controlled by attorney Jackson.[2]

        (h)    March 18, 2015 – AL&E executed, as Plaintiff's attorney in fact, a loan agreement between Just Us Realtors, LLC and Insider's Cash for $40,300.

        (i)    March 19, 2015 – AL&E notified Plaintiff via email that it had received closing documents from Guardian Law and would be using both email and the U.S. Mail to consummate the transaction.

        (j)    April 6, 2015 – AL&E told Plaintiff that, as a condition of closing, Plaintiff had to enroll in "ACH auto draft" that would use interstate wires each month to deduct from Plaintiff's bank account the $403 monthly interest-only payments on the fraudulent mortgage.

        (k)    May 11, 2015 – Because Insider's Cash was unwilling to accept the credit risk on the fraudulent transaction with Plaintiff (unwilling to carry a $40,300 loan secured by property it knew was worth only $39,000), IPUSA found a new investor (Amara Investments, LLC) to purchase the $40,300 note/trust deed.

     10.    The "Title Summary" prepared by Guardian Law (Plaintiff's title and escrow agent) indicated that on February 13, 2015, "Seller" 5 Choices was conveying "Fee Simple" to Plaintiff, but the property's title history belies those representations:

---

[2] PropAsure became a DBA effective August 27, 2015 (post-dating this transaction) for "Invictus Insurance Agency" at the address for Invictus Law (controlled by Blair Jackson).

| On 2/13/2015, Plaintiff purchased 341 Caithness from IPUSA for **$54,200** with a **$40,300** bridge loan (12% annual rate) purportedly from Insider's Cash | | | | | |
|---|---|---|---|---|---|
| Title Date | Recording | Grantor | Grantee | Price | Escrow/Title |
| 2/13/2015 | 2/26/2015 | Venus Props. | AREI | N/A | Guardian Law |
| 2/16/2015 | 3/6/2015 | AREI | 5 Choices | $39,000 | Guardian Law |
| 3/18/2015 | 4/23/2015 | 5 Choices | ***Plaintiff*** | $54,200 | Guardian Law |

11.     Had the truth been known, no reasonable investor would have paid a 40% premium over market value for an unimproved property.  Likewise, no reasonable investor would place a $19,000 down payment, then borrow $40,300 purchase financing, to acquire an unimproved property that was in a pending transaction valued at $39,000.  Nor would any reasonable investor have taken a hard money, 12% interest-only (1%/month simple interest) bridge loan (balloon payment due in 3 years) for more than the market value of the property because no conventional lender would agree to refinance a loan amount that exceeded the value of the security interest.

12.     For example, Plaintiff would not have made a $19,000 down payment, then have taken a hard money bridge loan for $40,300 against a property that had just been sold for $39,000. *See* Dkt. 72 at 18 (Court's Order dated June 19, 2019).  ("Just Us Realtors alleges—and facts support—that "[h]ad Ms. Hoard and/or Mr. Foster known the truth . . . they would not have permitted Defendants to consummate the . . . real estate transaction.").

13.     The scheme continues to this day, albeit under some different aliases, but the model and the extensive use of the instrumentalities of interstate commerce continue to perpetuate this fraudulent scheme, harming aspiring real estate investors (mostly retirees).

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action includes claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

15.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the District of Columbia and Defendants are citizens of Utah or Nevada.  Also, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, including the following:

        (a)     Plaintiff seeks relief and rescission to unwind transactions totaling over $100,000, including rescission of the property purchase for $54,200; rescission of mortgage interest paid of $10,800; and relief to unwind or cancel the $40,300 loan.

        (b)     Plaintiff seeks monetary damages of at least $50,000, including the $17,000 paid to travel interstate and attend the Buying Summit; recovery of $29,000 paid towards the property and mortgage interest; and recovery of $4,444.30 in settlement charges.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"), because less than one-third of Class members are Utah residents and the aggregate amount in controversy exceeds $5,000,000 for this class action, exclusive of interest and costs, including the following:

        (a)     Plaintiff estimates over 2,000 members of the Class (or their representatives) were harmed when each paid over $10,000 on average to attend the fraudulent Buying, with Class-wide harm exceeding $20 million (i.e., 2,000 X $10,000).

(b)     Plaintiff estimates over 2,000 properties were sold to members of the Class pursuant to the fraudulent scheme alleged herein, with members of the Class being harmed by at least $5,000 on average in overcharges for each transaction, with <u>Class-wide harm exceeding $10 million</u> (i.e., 2,000 X $5,000).

(c)     Plaintiff estimates over 2,000 members of the Class incurred at least $2,500 on average of unnecessary transaction costs and/or fees pursuant to the fraudulent scheme alleged herein, with <u>Class-wide harm exceeding $5 million</u> (i.e., 2,000 X $2,500).

(d)     Plaintiff's recession-based claims on behalf of the Class are <u>estimated to exceed $80 million</u> (2,000 transactions rescinded with at least $40,000 worth of rescinded property purchases and related expenditures).

17.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1965(a) as the District of Utah is the district where one or more of the Defendants resides.

## PARTIES

19.     Plaintiff Just Us Realtors, LLC is a limited liability company organized under the laws of the District of Columbia.  Douglas Foster and Iris Hoard are the sole principals of Just Us Realtors.  On behalf of Just Us Realtors, Mr. Foster and Ms. Hoard were subject to and harmed by Defendants' fraudulent real estate and lending scheme as described herein.

20.     Defendant NUDGE, LLC ("Nudge") is a Utah limited liability company with its principal address in Lindon, Utah and/or American Fork, Utah.  Invictus Law, controlled by defendant Blair Jackson, is a registered agent of Nudge.  As stated on its website in 2014 (emphasis

added): "Nudge owns and manages multiple businesses providing a wide range of products and services to individuals, entrepreneurs, investors and businesses. ***Our number one focus is related to purchasing single-family homes for our own long-term hold portfolio***, along with, commercial, multi-family, developed land, tax liens and real estate trust deeds." Nudge Funding, LLC, a Nudge affiliate, does business as Canopy Mortgage and Box Loans. It is believed that Nudge continues to offer real estate seminars through affiliation with Response North, LLC and/or Response Marketing, located at Nudge's headquarters at 360 South Technology Court, Lindon, Utah. Nudge affiliate, Nudge Real Estate, LLC, is licensed to sell real estate in Utah. Nudge is a citizen of Utah.

21.    Defendant BUYPD, LLC ("BuyPD") is an affiliate of Nudge and a Utah limited liability company with a principal address in Lindon, Utah. In connection with the sale of real property to Plaintiff, 5 Choices, LLC (a former limited liability company controlled by Nudge and IPUSA) paid BuyPD $200.00 for a "Market Analysis." Defendant Blair Jackson is a registered agent of BuyPD. BuyPD is sole member of Defendant Insider's Cash. Defendant Poelman, an individual who resides in Utah, is founder of Nudge and member/founder of BuyPD. BuyPD stated on its website (emphasis added): "***The core of our business is to provide turnkey, rental real estate to investors around the world***. We focus on emerging markets hit hard by the recession and are not yet in recovery. ***Additionally, we provide other real estate related services that complement our core offering, such as private lending, corporation/entity setup, tax liens, trust deeds, and residential, improved building lots***." BuyPD is a citizen of Utah.

22.    Defendant INCOME PROPERTY USA, LLC ("IPUSA") is a Utah limited liability company with a principal address in Pleasant Grove, Utah. IPUSA's sole member is Core Capital

Property, LLC ("Core Capital"), a Utah limited liability company.  Core Capital's sole member is BuyPD, and therefore Core Capital and IPUSA are controlled by Poelman.  Defendant Invictus Law is a registered principal of IPUSA.  IPUSA was registered agent for 5 Choices, LLC.  IPUSA is a citizen of Utah.

23.     Defendant INSIDER'S CASH, LLC ("Insider's Cash") is a Utah limited liability company.  BuyPD is the sole member and manager of Insider's Cash.  Insider's Cash was called a "Strategic Partner" at the Buying Summit events.  William Knowlton, attorney at Invictus Law, is a registered principal of Insider's Cash.  Insider's Cash purports to provide loans on properties sold at the Buying Summit.  Insider's Cash has done business under such names as "American Cash Funding," "Money to Lend," and "Strategic Funding Partner."  Insider's Cash is a citizen of Utah.

24.     Defendant RYAN POELMAN ("Poelman") is founder of Nudge.  In 2015 Poelman told Utahvalley360.com that "Nudge is the parent company to BuyPD and a whole lot of other companies."  Poelman is principal of BuyPD, a company he founded in 2010 (according to *Inc. Magazine*).  Through BuyPD, Poelman controls a constellation of companies, including, IPUSA, Insiders Cash and 5 Choices.  Poelman is a citizen of Utah.  Poelman was, at all relevant times, founder and chief instigator of Defendants' fraudulent scheme and conspiracy, as evidenced by the allegations herein, including the following:

(a)     In late 2011, Poelman and others with EvTech Media, LLC[3] acquired control of real estate seminars featuring television personalities, including "Yancey Events"

---

[3] Evolved Technologies, LLC and EvTech Media, LLC are referred to collectively as "EvTech."

featuring Scott and Amie Yancey, stars of the television show "Flipping Vegas." "Yancey Events" included a three-day event in Las Vegas called the "Buying Summit."

(b)     After taking control of Yancey Events and the Buying Summit event, and no later than the beginning of the Class Period, Poelman conceived of financing the scheme and repurposed the Buying Summit to become its centerpiece.

(c)     To supply a fraudulent "available inventory" of "performing" "turnkey" "assets" to be sold at Buying Summit events, Poelman knew of and/or caused Nudge and BuyPD to scout properties in distressed communities throughout the U.S., including St. Louis, Kansas City and Detroit.  No later than the beginning of the Class Period, entities ultimately controlled by Nudge and Poelman acquired no-risk options to later acquire these distressed and unimproved properties.

(d)     Poelman caused Yancey Events and similar types of seminars to qualify, recruit and induce aspiring real estate investors to attend the three-day Buying Summit event with promises of an "available inventory" of "turnkey" real estate with "incredible value."

(e)     Poelman and his controlled entities determined the Buying Summit curriculum and messaging through publication of a "Workbook" to be distributed and presented at the Buying Summit event.

(f)     Poelman made personal appearances at the Buying Summit and was knowledgeable of the secretive transactions whereby his controlled entities acquired distressed properties through concurrent escrows for purposes of consummating the transactions that would harm Plaintiff and the Class.

(g)     Poelman's leadership of BuyPD was featured by *Inc. Magazine* as the driving force behind BuyPD's status as one of the fastest growing companies in the U.S. in 2014, with a 3-year growth rate of 2,606%, selling thousands of properties and generating over $140 million in revenue for the two-year period 2013-2014.

25.     Defendant GUARDIAN LAW, LLC ("Guardian Law") is a Utah limited liability company with a principal address in Lehi, Utah.  Guardian Law was referred to as a "Strategic Partner" at the Buying Summit events.  Guardian Law performed escrow and title services for Plaintiff and the Class in connection with their purchases of real property from Poelman-controlled entities and the issuance of a related property loans from Insider's Cash.  Guardian Law has two members: Gregory Christiansen, an individual residing in Utah and GJ Christiansen P.C., a company incorporated in the Utah with a principal place of business in Utah.  Defendant Blair Jackson is also a representative of Guardian Law and acted in that capacity at the Buying Summit during the Class Period.  Christiansen and Jackson are current and/or former law partners and/or business partners.  Christiansen and Jackson were beholden to Poelman and his related entities during the Class Period.  Guardian Law purports to be a title agent and real estate escrow agent for properties purchased at the Buying Summit.  Guardian Law is a citizen of Utah.

26.     Defendant INVICTUS LAW, PLLC ("Invictus Law") is a Utah limited liability company with a principal place of business in Lindon, Utah.  Defendant Blair Jackson is the managing partner and owner of Invictus Law and is a former and/or current business and law partner of Gregory Christiansen or his P.C., members of Defendant Guardian Law.  Greg Christiansen (a principal of Guardian Law) is a current or former partner of Invictus Law.  William Knowlton, the registered principal of Insider's Cash, LLC, is an attorney with Invictus Law who

is identified in key documents that concealed the scheme, including metadata indicating Knowlton is "author" of the January 2015 no-risk purchase option between 5 Choices and AREI. Dkt. 29-1. Invictus Law is a citizen of Utah.

27.     Defendant AMERICAN LEGAL & ESCROW, LLC ("AL&E") is a Nevada limited liability company with a principal place of business of in Las Vegas, Nevada. AL&E acted as attorney-in-fact for Plaintiff and members of the Class, with responsibilities to dutifully execute all necessary documentation in the best interests of Plaintiff and members of the Class, and to complete their purchases of real property and issuance of related property loans, as described herein. Kirstyn Anderberg is AL&E's Customer Support Manager, custodian of email communications with Plaintiff, and is believed to be a relative of Ryan Poelman. Defendant Blair Jackson is the managing partner of AL&E. AL&E is a citizen of Nevada and/or Utah.

28.     Defendant BLAIR R. JACKSON ("Jackson") is an attorney licensed to practice law in various states, including Utah and Nevada. Jackson is a representative of Guardian Law (and is a former and/or current business and law partner of Gregory Christiansen, another principal of Guardian Law), is a principal of AL&E, and is principal of Invictus Law. Jackson was, at all relevant times, a central player in Defendants' fraudulent scheme and conspiracy. Jackson made appearances at the Buying Summit, offering legal services to participants of the Buying Summit, helped control the sequence in which the subject properties and notes were transacted thereby effectuating the fraudulent scheme. Jackson controlled AL&E, who acted as attorney-in-fact for Plaintiff and the Class, executing documents on their behalf for purposes of consummating the transactions that would benefit Defendants to the detriment of Plaintiff and the Class. Plaintiff and the Class paid "Legal Fees" to Jackson's firms via the escrows. Jackson is a citizen of Utah.

**DEFENDANTS' FRAUDULENT SCHEME AND CONSPIRACY**

29.     During the Class Period, Defendants engaged in a fraudulent scheme and related conspiracy whereby Defendants, using the instrumentalities of U.S. interstate commerce, induced Plaintiff and members of the Class to attend a Buying Summit for the purpose of fraudulently selling distressed real estate (and related financing) at above-market prices.

30.     Each Defendant participated in the scheme, either at the Buying Summit, in the related real estate transactions, and/or in the secret escrows.  Each Defendant (other than Invictus Law, LLC) directly participated in the Buying Summit event and related property purchases that formed an enterprise (the "Enterprise").  See, Dkt. 72, p. 9.  The Enterprise could not have executed its years-long fraudulent real estate scheme but for its extensive and continuous reliance on the instrumentalities of interstate commerce.

31.     Because each Defendant had multiple touchpoints in the hundreds of Class escrows – and in the hundreds of concurrent secret escrows that concealed Defendants' scheme from the Class – each Defendant knew that claims of an "available inventory" of "turnkey" "performing assets" with "incredible value" were all false.

32.     Defendants also knew that Insider's Cash's purported purchase-money loans to Plaintiff and the Class were extraordinarily poor and overpriced, exceeding the properties' market values, and were likely doomed.  Thus, Defendants each knew the transactions could not be financed through the success of the underlying property transactions but had to be taken from newly attracted investments through fraudulent sale of trust deeds (i.e., a Ponzi scheme).

33.     For years, on thousands of occasions, in violation of 28 U.S.C. § 2314 ("Travel Act"), Poelman, Nudge, BuyPD, IPUSA and Insider's Cash (collectively, the "Poelman

Defendants") caused the inducement of aspiring real estate investors (i.e., Plaintiff and the Class) to travel interstate to attend Defendants' Buying Summit, in furtherance of the fraudulent scheme.

34.     For years, on tens of thousands of occasions, in violation of 28 U.S.C. § 1343, each of the Poelman Defendants caused, or reasonably foresaw, use of interstate wires to identify, solicit and recruit Plaintiff and members of the Class to attend the Buying Summit events, in furtherance of the fraudulent scheme.

35.     For years, on tens of thousands of occasions, in violation of 28 U.S.C. § 1343, each of the Poelman Defendants, Jackson, Guardian Law and AL&E (collectively, the "RICO Defendants") caused, or reasonably foresaw, use of interstate wires to induce and consummate fraudulent real estate purchases and loans with Plaintiff and the Class, in furtherance of the fraudulent scheme.

36.     For years, on thousands of occasions, in violation of 28 U.S.C. § 1341, the RICO Defendants caused, or reasonably foresaw, use of U.S. mails for interstate transport of purchase and loan transaction documents on behalf of Plaintiff and the Class, in furtherance of the fraudulent scheme.

37.     In sum, the RICO Defendants engaged in at least the following interrelated and continuing predicate acts in furtherance of their scheme to defraud Plaintiff and the Class:

| RICO Defendants | Travel Act | Wire Fraud | Mail Fraud |
| --- | --- | --- | --- |
| Poelman Defendants | Yes | Yes | Yes |
| Jackson | | Yes | Yes |
| Guardian Law | | Yes | Yes |
| AL&E | | Yes | Yes |

## THE ROLE OF POELMAN AND HIS CONTROLLED ENTITIES

38.     Ryan Poelman conducted overall management and operation of the Enterprise and its constituent entities.  Poelman has direct and indirect ownership and/or management interests in Buying Summit "Strategic Partners" Nudge, BuyPD, IPUSA and Insider's Cash. Poelman is founder of Nudge, the entity that locates the properties offered for sale at the Buying Summit (properties that BuyPD and IPUSA did not own and had not yet purchased) and that executes the secret concurrent transactions at lower prices.  Poelman controls the false message to Buying Summit participants that BuyPD and IPUSA are providers of the "available," "turnkey," "rehabbed" properties with "incredible value."   Poelman personally appeared at the Buying Summit events as a presenter discussing the Buying Summit "Workbook" produced by his entities. Poelman also controls his attorney, Blair Jackson, and Jackson's law firms, Guardian Law, AL&E and Invictus Law, which each individually have primary loyalties to Poelman and his entities.

**Targeting and inducement of Plaintiff and the Class**

39.     Defendants Nudge and BuyPD—each controlled by Poelman—were responsible for targeting Plaintiff and Class members through real estate seminars, such as "Yancey Events," gaining a thorough understanding of their investment objectives and finances (including Class members' wealth, credit history, and amounts in retirement accounts).  Using this pre-existing and confidential relationship, Nudge and/or BuyPD sent thousands of emails over interstate wires, addressed to and targeting Plaintiff and members of the Class, including the introduction of "Strategic Partners" Guardian Law, Insider's Cash and BuyPD.

40.     Devan Egan, speaking on behalf of Poelman, Nudge, BuyPD, IPUSA and Insider's Cash via interstate wires from their Utah offices, made materially false and/or misleading

statements to Plaintiff and the Class for the purposes of inducing Plaintiff and members of the Class (that live outside of Las Vegas) to travel interstate to attend the Buying Summit and deprive Plaintiff and the Class of at least $5,000 (through fees to attend the Buying Summit and/or through the fraudulent sale of real estate):

     (a)    The emails uniformly stated that "***BuyPD and Income Property USA are the providers of all the performing assets that will be available to you*.  *Having done over 1000 deals in 2013 in over 20 states across the U.S. they've refined the process of delivering an incredible value to their buyers*. . .."**

     (b)    The emails urged the Class of aspiring real estate investors to travel interstate to Las Vegas to "***get some deals done***" with exclusive access to "***performing assets***" with "***incredible value***" at the "Buying Summit."

     (c)    "On the first day of the Summit you'll receive a specific appointment for your consultation, ***which will ensure that you have adequate time to review the inventory and comfortably sort through the available assets***."

     (d)    "You'll have the chance to ***sit down with one of their Property Specialists*** at the Summit to ***review your real estate goals and how they can help you accomplish them***."

     (e)    The emails contained embedded internet links to the event schedule that was "***Introducing the Strategic Partners***" including Guardian Law, Insider's Cash and BuyPD.

     (f)    The Buying Summit would include the "***Real Estate Assets Team***."

     (g)    There would be a Q&A session about "***Property Due Diligence***."

41.    These email and other uniform communications to Plaintiff and members of the Class provide evidence of the Poelman Defendants' knowledge that Plaintiff and the Class

attended the Buying Summit for purposes of gaining exclusive access to "Real Estate Assets" and getting an "incredible value" in "turnkey," "rehabbed" real estate with no-hassle financing.

42.     Each of the above statements was materially false and/or misleading when made. It is reasonable to infer from the payment of fees paid by Plaintiff and the Class for exclusive access to the properties, and their attendance at the Buying Summit, that they were unaware of the above falsity and relied reasonably on the above misrepresentations.

**Poelman-controlled Nudge/BuyPD supply the fraudulent "turnkey" "inventory"**

43.     Nudge and/or BuyPD canvassed areas of the United States to identify investors and other groups who were looking to unload their holdings in distressed, unimproved real estate. Nudge and BuyPD referred to these investors in distressed properties as "partners" with whom Nudge-controlled entities arranged to purchase the properties (at prices reflecting the distressed nature of the properties) after Defendants found a buyer (i.e., a Class member).  When Defendants claimed publicly that BuyPD and/or IPUSA owned (i.e., "bought") and managed (a "inventory" of "performing assets") they were referring to these distressed properties that BuyPD and IPUSA did not own but had scouted as possible purchases.

44.     Invictus Law aided and abetted and conspired with the Enterprise to prepare the legal documents that were necessary to supply the false "inventory," including preparing no-risk options to purchase the properties in furtherance of the secret transactions.

**False messaging to induce property purchases**

45.     At the Buying Summit, Plaintiff and the Class were told they would have exclusive opportunities to purchase vetted properties for investment.  At Poelman's direction or supervision, Nudge and/or BuyPD publicly promoted the Buying Summit as "Real Estate's premier buying

event."  Also, BuyPD had advertised that ***"[t]he core of our business is to provide turnkey, rental real estate to investors around the world***."

46.     Plaintiff and members of the Class each paid thousands of dollars to attend the Buying Summit indicating to each Defendant that Plaintiff and members of the Class viewed the Buying Summit as a significant investment of their resources in exchange for significant value and exclusive access to BuyPD's and/or IPUSA's "portfolio" of "turnkey" "assets."

47.     Buying Summit participants were given a "Workbook" (with its curriculum and messaging controlled by Poelman, Nudge, BuyPD, IPUSA and Insider's Cash) that said financing was available to "***Use as a Bridge Loan to Refinance with a Bank***" and uniformly represented to Buying Summit participants that the performing properties were fully vetted:

   (a)     Performed "Due Diligence" of location and rent rates

   (b)     Conducted "Market Research"

   (c)     Knew the "Local Rules & Regulations"

   (d)     "Manage the inventory of assets available as the Summit"

   (e)     Have superior properties based on "Neighborhood Selection"

   (f)     Have "Trusted Informants" and "Inside Information"

   (g)     Assembles a "Reliable Team" including "Asset Specialists"

48.     The Workbook also uniformly represented that the available inventory had been purchased and represented fair value:

   (a)     "We Bought . . . From . . . MOTIVATED SELLERS"

   (b)     "We Choose" homes with "Positive Cash Flow"

   (c)     "We Choose" homes from "Under-Valued Markets"

> (d)     "We Choose" homes with "Location"
>
> (e)     "We Selected The Markets" based on positive factors

49.     The Workbook's talking points conveyed to participants that purchasing BuyPD/IPUSA properties was superior to a do-it-yourself approach because the work was done:

> (a)     "Market Research"
>
> (b)     "Trusted Informants"
>
> (c)     "Neighborhood Selection"
>
> (d)     "Reliable Team on the Ground (Professionals)"
>
> (e)     "Local Rules and Regulations"
>
> (f)     "Inside Information"

50.     At the Buying Summit, a uniform pitch controlled by Poelman and his entities encouraged the Class to purchase "rehabbed" "turnkey" properties from the "available inventory" with "incredible value."   For example, Poelman's in-person presentation echoed the false statements from the Workbook, including "We bought from motivated sellers," the properties were carefully selected, and "Due Diligence" was performed.

51.     Also, presenter Kory Thurston, hired by Poelman-controlled entities to cheerlead at the Buying Summit (and follow Poelman's messaging and curriculum) explained:

> (a)     "We want to be able to have that *long-term relationship with you* so we can appeal to you again and again and again. *One thing that we specialize in doing obviously is going out, finding property, buying it, fixing it up, getting it under property management and get it tenanted so it is cash flowing*.  How many of you would like a property like that?  Can I see your hands?  *That's what we do*."

(b)     "So the properties you'll see this weekend through your property specialist, that's what they are, ***they're turnkey***."

(c)     "You can go through numbers and that's really what you should be doing because ***real estate is about numbers, it's not about anything else***.  So we'll talk about the property rehab real quick.  ***Every one of the properties has been rental rehabbed***.  Rental rehabbed. OK. What that means is paint, carpet, right, mow the weeds down, whatever, OK."

(d)     "Discounts.  Get this all the time.  Are there discounts?  NO!  It always comes up, right. You guys have been through a massive amount of training and part of your training has been negotiating.  Leave it in the room here.  Don't beat those guys up, gang.  It's already been discounted.  ***Remember, we buy wholesale and sell wholesale so they've already been discounted***.  Please, don't go and try to sit there and work over the consultants. They just don't have that ability, alright?  So, no discounts. You guys got it?"

(e)     "Is there financing available today? Yes. The beautiful thing about American Cash Funding [aka, Insider's Cash] if I didn't mention it, I'll mention it again.  American Cash Funding.  They don't check your credit.  They don't care about your work history. They are not going to ask for a DNA sample alright. ***They only care about the house***. That's American Cash Funding. ***They're lending on the house***.  So I don't care what your history is. What credits you have, anything like that, you have financing options available this weekend through American Cash Funding.  Can we give them a huge round of applause for that."

(f)     "What you guys are understanding if you're the investor and you got a house that's got a cash flow of 300 bucks a month but you have a 1% a month charge on that, you're ***going to go in and get that refinanced how soon? As quick as the bank will let you. Right? Right***

*now*. Having done this somewhat before I can tell you this, ***I've had many people tell them that they've had banks that will refinance the next week or the next month***. Ok. My experience in it is it's usually 3 months to 6 months called seasoning. ***And that's where a bank wants to make sure that you're getting the rental payments and things are going in and it's an investment property, then they'll refinance you. OK. I say 6 months because I'm trying to prepare you. Most of the time it's a 3 month seasoning. You guys got it***?"

**Point of sale misrepresentations and concealment**

52.     At the Buying Summit, Plaintiff and members of the Class were assigned "property specialists" and a "real estate team" to review the available inventory of performing properties. In Plaintiff's purchase of 341 Caithness, Jonny Payne, speaking on behalf of BuyPD and/or IPUSA, represented to Plaintiff, using interstate wires on the IPUSA website, that the property was being purchased from IPUSA. Payne also provided Plaintiff a "Purchase Details" screenshot for 341 Caithness, dated February 13, 2015, which falsely stated that the property was "Purchased from" IPUSA. Also, Plaintiff received an email on February 13, 2015 after the "sale" with an "Order Confirmation from BuyPD" thanking Plaintiff for its "order." In fact, neither BuyPD nor IPUSA owned or had title to 341 Caithness on February 13, 2015. In sum, BuyPD and IPUSA acted as "sellers" of a property they did not have authority to sell and "sold" it to Plaintiff for $54,200.

53.     Steve Liechty, executive for Nudge, BuyPD and IPUSA, and speaking on behalf of those entities and their affiliates, falsely represented in a "RESIDENTIAL PROPERTY DISCLOSURE AND DISCLAIMER STATEMENT" dated February 13, 2015 that 5 Choices, LLC had authority to sell 341 Caithness, title to the property was not subject to a right of first

refusal and was not subject to an option, there were no "material defects affecting this property or its value;" Sellers were providing "Full Disclosure," and 5 Choices "has owned the property . . . ."

54.    IPUSA prepared and presented to Plaintiff a "COMPARATIVE MARKET ANALYSIS" that failed to disclose the pending and/or contingent transactions for 341 Caithness and contained a "TITLE SUMMARY" prepared by Guardian Law falsely stating that the property had clean title as "Fee Simple."

55.    The "Offer and Contract for the Sale and Purchase of Real Estate" executed by Nudge executive Steve Liechty falsely stated that at the "effective date" 5 Choices was the "Seller" with legal authority to sell the property.

56.    After Plaintiff agreed to purchase the property, borrow money from Insider's Cash, and place a deposit, IPUSA-controlled 5 Choices then stepped in to purchase the same property from its actual owner (i.e., BuyPD's "partner" AREI) for a market value of $39,000, a price reflecting the distressed, unimproved nature of the property.

57.    Each of the above statements to induce property purchases was materially false and/or misleading when made.  It is reasonable to infer from the fact that Plaintiff and the Class consummated the purchase and/or loan agreements that Plaintiff and the Class were unaware of the above falsity, the material defects in the transaction, and relied reasonably on the above misrepresentations.

**Misrepresentations and concealment in connection with the escrow**

58.    During escrow and closing, Plaintiff and members of the Class received via interstate commerce false or misleading settlement documents, including the following:

(a)     On the Settlement Statement, Insider's Cash was identified as the lender, but instead was brokering the transaction, facilitating what amounted to Ponzi financing that IPUSA would immediately assign to another Buying Summit participant or other investor who would unwittingly purchase the doomed note.

(b)     The "Commercial Loan Agreement" also stated that Insider's Cash was "Lender," when in fact Insider's Cash was acting as a middleman that undertook no credit risk.

(c)      Each Defendant knew of, but failed to disclose to Plaintiff and the Class, the material inter-relationships among the property "seller," AL&E (who held the Plaintiff/Class power of attorney), Guardian Law (the title and escrow agent for Plaintiff/Class), and Insider's Cash (the Plaintiff/Class "Lender").

(d)     AL&E had also caused issuance of false and/or misleading "Certificates of Value" because AL&E indicated the transaction did not involve related corporations (when in fact Defendants had set up a series of related company transactions) and indicated that the properties' market values were what Plaintiff and the Class had paid, instead of the lower price arm's-length transaction between the Poelman-controlled companies and the pre-selected sellers.

(e)     The "Conflict of Interest Disclosure" misrepresented that Guardian Law was not representing the "Seller," when in fact Guardian Law and Blair Jackson routinely represented the Poelman entities that controlled the Seller and were doing so in the transaction.

(f)     AL&E had also caused issuance of a false and/or misleading "Affidavit by Owner/Seller" because it omitted and failed to disclose the related and concurrent transactions germane to the Affidavit's representations about unrecorded deeds and knowledge of restrictions of record affecting the property.

**Scienter**

59.     Poelman, Nudge, BuyPD and IPUSA each knew from preexisting relations via "Yancey Events" that Plaintiff and the Class were strong candidates to attend their Buying Summit events.  In this regard, at the direction or supervision of Poelman, Nudge and/or BuyPD actively recruited Plaintiff and members of the Class with telephone calls and email correspondence urging Plaintiff and members of the Class to attend the Buying Summit.  Through real estate seminars, such as Yancey Events, Nudge and/or BuyPD had pre-existing confidential relations with Plaintiff and the Class, understanding their investment goals and propensities and qualifications to purchase real estate.  For example, Nudge representative Jennifer Burr urged Ms. Hoard by email that "***I am anxious to do whatever I can to help you attend the Buying Summit***."

60.     Poelman, Nudge, BuyPD, IPUSA and Insider's Cash each knew the above representations were materially false or misleading when made, because, *inter alia*:

(a)     The Buying Summit did not provide "turnkey" "performing assets" but was a ruse that Poelman and his entities had carefully and thoughtfully crafted, with the help of Poelman's attorneys, designed to sell unimproved properties at inflated prices.

(b)     Purported "due diligence," "market research," "neighborhood selection," and "inside information" were not performed to find value for Plaintiff and the Class, but instead identified properties that had been pre-selected by Nudge and BuyPD due to their distressed nature and ability to be passed off as comparable in value to more valuable local properties.

(c)     Nudge, BuyPD and/or IPUSA had not "bought" and did not own what they claimed to be their "inventory of assets" because they did not (and would not) purchase these properties for their own portfolio at the prices listed.

(d)     The transactions promoted at the Buying Summit involved Class escrows, secret escrows, and financing the Enterprise through the fraudulent sale of trust deeds, that were each carefully and thoughtfully planned and required an extremely high level of coordination amongst each Defendant.

## THE ROLE OF POELMAN-CONTROLLED INSIDER'S CASH

61.     Insider's Cash operated and managed financing for the Enterprise property sales. Poelman, Nudge, BuyPD and IPUSA caused Insider's Cash to be falsely portrayed as a *bona fide* lender.   This false portrayal was important to the scheme's success, and material to property purchasers, because it provided a false front that a "Strategic Partner" was willing to undertake the credit risk for the transactions at the listed sales prices.   For example, in the case of Plaintiff, the portrayal of Insider's Cash as a willing "Lender" at $40,300 provided credence and key support for a $54,200 sales price valuation (i.e., a good loan-to-value ratio of 74%).

62.     However, once the purchase was complete, Insider's Cash was unwilling to accept the credit risk on the fraudulent transactions with Class members (e.g., in the case of Plaintiff, unwilling to carry a $40,300 loan on a property worth only $39,000), expecting the note to fail.

63.     Because Insider's Cash (controlled by Poelman and BuyPD) was unwilling to accept this credit risk, the scheme needed to attract new investment to fuel property purchases.   So, Insider's Cash surreptitiously brokered the fraudulent financing, peddling the doomed notes to unsuspecting Buying Summit participants who had come to the Buying Summit for "deals" purchasing trust deeds.   This fraudulent Ponzi structure provided the needed life-blood financing for the Defendants' fraudulent scheme of selling real estate at grossly inflated prices.

**Misrepresentation of Insider's Cash**

64.     At the Buying Summit and thereafter, the Poelman-controlled message to Plaintiff and the Class was that Insider's Cash was "Your Money Partner" that guaranteed immediate funding for purposes of completing purchases from the "portfolio" of "performing" and "turnkey" properties.  Buying Summit presenters told the Class that, by using their "Money Partner," they could bypass the red tape and delays of third-party financing.

65.     Buying Summit presenters also said Insider's Cash was a *bona fide* lender:

> Is there financing available today?  Yes. The beautiful thing about American Cash Funding [aka, Insider's Cash] if I didn't mention it, I'll mention it again.  American Cash Funding.  They don't check your credit.  They don't care about your work history.  They are not going to ask for a DNA sample alright.  ***They only care about the house***.  That's American Cash Funding.  ***They're lending on the house***.  So I don't care what your history is.  What credits you have, anything like that, ***you have financing options available this weekend though American Cash Funding***.  Can we give them a huge round of applause for that.

66.     The  Poelman-controlled  messages  that  "They  only  care  about  the  house"  and "They're  lending  on  the  house"  were  materially  false  and/or  misleading  when  made  because Insider's  Cash  was  unwilling  to  accept  the  credit  risk  "lending  on  the  house,"  aware  that  the transactions with Class members were fraudulent and financially unsustainable.

**Insider's Cash played a key role in the fraudulent scheme**

67.     Insiders Cash was instrumental to Defendants' fraudulent scheme for at least the following reasons:

(a)     Insider's Cash controlled and provided the funding and liquidity for the fraudulent scheme, either actually and/or creating the appearance of directing funds to and from

the Poelman-controlled LLCs in connection with property sales to Plaintiff and the Class.  It is also apparent that Insider's Cash directed funds for secret purchases of those same properties.

      (b)    Use of Insider's Cash as an apparent third-party lender was essential to the fraudulent scheme because, without Insider's Cash, Plaintiff and the Class would have used conventional lenders who would not have approved the loans after due diligence, primarily because the proposed loans exceeded the properties' market values (reflecting the inflated sales prices and distressed nature of the properties).  In the case of Plaintiff, a third-party lender would not refinance a loan for $40,300 on a property that had just transacted for $39,000.

      (c)    The purported willingness of Insider's Cash to "lend on the house" indicated to property purchasers that the transactions were fairly priced.

**Scienter**

68.    Similarly, Defendants each knew the properties could not be refinanced because "loans" from Insider's Cash to Plaintiff and the Class often exceeded the market value of the properties.  For example, Plaintiff's loan was an onerous 1%/month interest-only loan, with a balloon payment after three years.  Under these circumstances, each Defendant knew Plaintiff would need refinancing because no bank would refinance the $40,300 loan on a property that was only worth $39,000.

69.    For these reasons, the Poelman-controlled message that Insider's Cash was a "bridge lender" and "Your Money Partner" were materially false or misleading when made because Defendants knew Insider's Cash was not a *bona fide* lender, but more substantively a middleman/broker (controlled by Poelman and BuyPD) that was not only facilitating a Ponzi scheme but was also commanding outrageous 5+% origination fees ($2,248.30 for Plaintiff) for

so-called "loans."  This control and status are evident from the fact that Nudge executive Steve Liechty executed documents on behalf of IPUSA (not Insider's Cash) assigning Plaintiff's loan to Amara Investments, LLC in May 2015.

70.    Each Defendant also knew that the investments made by Plaintiff and the Class were likely to fail at the prices they commanded.  Also, Jackson and/or his firms drafted and approved language to protect Insider's Cash, circumventing lending laws and crafting powers of appointment (signed by AL&E on behalf of Plaintiff and Class members) that dispensed with formal foreclosure proceedings.

71.     In sum, Defendants' scheme made it highly unrealistic, if not impossible, to secure viable financing at the grossly inflated "sales prices" commanded by BuyPD and/or IPUSA in the fraudulent transactions.  Each Defendant knew that the purchase-money loans to Plaintiff and the Class were extraordinarily poor, overpriced loans, exceeding the properties' market values, and thus the transactions were not being financed through the success of the underlying transactions, but are taken from principal sums of newly attracted investments (i.e., trust deeds).

### THE ROLE OF POELMAN'S ATTORNEYS

72.    The Poelman-controlled entities (including BuyPD and Nudge) also promised the Class the faithful services of a "Strategic Partner" real estate attorney, including Guardian Law and AL&E, both controlled by defendant Blair Jackson.  On at least one occasion, as memorialized on videos distributed to Plaintiff and the Class, Blair Jackson was introduced to the Buying Summit audience by Kory Thurston:

> How many of you would like to have a relationship with some type of real estate attorney?  We have that here for you this weekend.  That law firm is called Guardian Law, representing Guardian Law, this is Blair Jackson, he'll have some others over

at the booth.  They'll be here all weekend.  Make sure, especially if you get involved in Tax Liens or anything this weekend, that you stop by and introduce yourself to Guardian Law and if you have questions, obviously they're here for you this weekend.  Let's give Blair and his team a big round of applause.  Woooo!  Thanks Blair.

73.     Guardian Law agreed to provide Plaintiff and members of the Class the necessary legal, escrow and title services for the transaction.  AL&E agreed to act as attorney-in-fact in a broad range of functions, including execution of transaction documents.

**Jackson's loyalty to Poelman and Poelman-controlled entities**

74.     Unbeknownst to Plaintiff and the Class, however, Jackson and his controlled law firms were both Poelman's captive lawyers and willing participants in the fraudulent scheme and conspiracy.  The scheme's secrecy depended on Jackson and his law firms, who controlled all aspects of the scheme's title and escrow processes, and closings, for both the Class escrows and the secret concurrent escrows.  In the escrows, Jackson-controlled Guardian Law could orchestrate the monies flowing to and from Defendants (including Insider's Cash) and the timing of concurrent escrows.

75.     Jackson and his firms worked together to orchestrate concurrent real estate transactions whereby they caused an entity controlled by their client (Poelman and his controlled entities) to acquire the same properties *ex post* at prices far less than the falsely represented "incredible values" paid by Plaintiff and others. When investors complained, the Jackson-owned and controlled Invictus Law furthered the concealment by inviting the scheme's victims to call Invictus Law (Poelman's lawyers) to resolve complaints (about Poelman's scheme).

**Jackson's key role in the scheme and participation in the Buying Summit event**

76.     Jackson and his law firms drafted the transaction documents essential to Defendants' fraudulent scheme.  For example, Jackson and his law firms ensured that the loan documents were labeled "commercial" and were between LLCs, an effort to surreptitiously circumvent consumer protection laws.  Also, Jackson and his law firms drafted the powers of attorney that favored and shielded themselves and their co-conspirators.  And, William Knowlton, an attorney with Invictus Law, is identified in metadata as "author" of the January 2015 no-risk purchase option between 5 Choices and AREI.  Dkt. 29-1.

77.     Jackson and his firms also attended the Buying Summit events offering their services to Plaintiff and the Class (without disclosing their loyalties to Defendants) and later – as escrow/title agents and attorneys-in-fact – provided those services to Plaintiff and the Class, including executing the transaction documents on their behalf.

**Jackson's firms orchestrate the Enterprise cash flows and timing of concurrent escrows**

78.     As a condition of purchasing properties from the "portfolio" of "turnkey" properties, BuyPD and IPUSA required Buying Summit participants (such as Plaintiff and the Class) to execute Power of Attorney documents that would permit an attorney to represent their interests in all aspects of the real estate transactions and to execute documents on their behalf.  The scope of the power of attorney included the following:

(a)     AL&E purported to act as lawful attorney in fact to "exercise or perform any act, power, duty, right, or obligation whatsoever" related to the subject property being purchased.

(b)    AL&E was responsible for all aspects of the transaction, including the "purchase" and "bargain."

79.    The documents executed by Jackson and his law firms on behalf of Plaintiff and the Class were essential to the fraudulent real estate transactions and therefore inherently material to Plaintiff and the Class, and included the following:

(a)    REAL PROPERTY CERTIFICATE OF VALUE indicating a purported "market value" for the property that was far above market value and did not reflect the distressed nature of the property. Jackson and his law firms knew, or should have known, that this amount was overstated, particularly because Jackson and his law firms were contemporaneously orchestrating the purchase and sale of the property at a much lower price that reflected the true market value of the property.

(b)    COMMERICIAL LOAN AGREEMENT and PERSONAL GUARANTEE. Jackson and his law firms had knowledge that this loan was not in the best interests of Plaintiff and were beholden to Insider's Cash and instrumental in maintaining the false front that this was a legitimate commercial loan.

(c)    DURABLE POWER OF ATTORNEY FOR A LIMITED POWER APPOINTMENT in favor of Insider's Cash.  Jackson and his law firms had knowledge that this power was not in the best interests of Plaintiff but favored Insider's Cash.

(d)    DEED OF TRUST AND ASSIGNMENT OF RENTS for the Class Property.

(e)    "Conflict of Interest Disclosure" stating that Guardian Law is not representing seller (i.e., Defendants).

(f)     COMPLIANCE AGREEMENT authorizing Guardian Law to fix any clerical mistakes.

(g)     Order to Issue Title Policy

(h)     Property Transfer Affidavit; Acknowledgment of Homeowner's Residence Exemption Affidavit; and Request to Rescind Homestead Exemption

**Scienter**

80.     Jackson and his law firms were knowledgeable of the fraudulent scheme and conspiracy, in at least the following respects:

(a)     Jackson and his law firms conspired with one another and the other Defendants by, *inter alia*, (i) drafting and executing documents that effectuated the fraudulent real estate transactions; (ii) causing Guardian Law to oversee and execute the escrows and titles for the complained-of real estate transactions; (iii) representing to Plaintiff and the Class that Guardian Law and/or Invictus Law were their legal representative while concealing Jackson and his law firms' (including Blair Jackson's) ongoing representations and loyalties to Poelman, Nudge, BuyPD, IPUSA and Insider's Cash; (iv) causing AL&E to act as attorneys in fact for Plaintiff and the Class, executing the escrow documents on behalf of Plaintiff and the Class; and (iv) while Jackson and his law firms were executing the escrows for the Class Properties, they were also orchestrating the series of real estate transactions and money flows that would both conceal and execute Defendants' fraudulent scheme.

(b)     AL&E purported to act as attorneys and fiduciaries to Plaintiff and the Class for purposes of executing the key transaction documents (e.g., the Deed of Trust; the Settlement Statement; the Loan Agreement and Personal Guarantees) without disclosing their gross conflicts

of interest, pre-existing and ongoing loyalties to Poelman, Nudge, BuyPD, IPUSA and Insider's Cash, and their participation in the scheme to defraud Plaintiff and the Class.

(c)     Jackson-controlled counsel directed Plaintiff and the Class to consult with Invictus Law about resolving disputes they had related to the properties without disclosing gross conflicts of interest and divided loyalties.

(d)     Jackson and his law firms defrauded Plaintiff and the Class and breached their fiduciary duties to Plaintiff and the Class, failing to disclose their pre-existing and ongoing loyalties to Poelman, Nudge, BuyPD, IPUSA and Insider's Cash as part of the scheme to defraud Plaintiff and the Class.

81.     Defendants each knew the low purchase price paid by the Nudge-controlled LLCs (e.g., 5 Choices) after the sale to Plaintiff and the Class reflected (i) a comparable arm's-length value of the properties; (ii) the fact the properties were distressed or sub-par; and (iii) that the properties were poor investments at the listed sales prices.

82.     Jackson and his law firms were also knowledgeable of the overall scheme, having secured broad powers from Plaintiff and the Class authorizing AL&E to do whatever was necessary to complete the transaction, including executing the transaction documents that would complete the transaction, while shielding co-conspirator Guardian Law in performance of Guardian Law's escrow duties, signing documents that Jackson and his law firms knew to be false, misleading and evidence of their self-dealing, including the following:

(a)     Guardian Law knew the power of attorney documents authorizing AL&E to act on behalf of Plaintiff and the Class in the transactions had been procured by a failure to

disclose material facts surrounding AL&E's owner Blair Jackson's pre-existing loyalties and relationships with Poelman, Nudge, BuyPD, IPUSA and Insider's Cash.

(b)     Guardian Law, the escrow agent, and AL&E each knew the settlement statements were inherently false, misleading and/or harmful to Plaintiff and the Class in that they (i) fraudulently conveyed real estate at above-market prices; and (ii) described Insider's Cash (a client of Jackson and his law firms) as a true lender who was undertaking credit risk and was entitled to a large origination fee.

(c)     AL&E had allowed Insider's Cash to be given a special Power of Appointment that allowed the debtholder to avoid formal judicial foreclosure proceedings (that would likely be executed by Invictus Law).

(d)     AL&E had at least constructive knowledge that the "Certificate of Value" they prepared, approved and reviewed in the escrow closing documents was false or misleading;

(e)     Jackson and his law firms knew that the transaction structure had been designed to circumvent consumer protection laws and protect the co-Defendants, yet AL&E signed documents for purposes of binding Plaintiff and the Class to the transactions; and

(f)     The "Conflict of Interest Disclosure" was false or misleading because it said that Guardian Law did not represent the seller in the transaction when in fact Jackson and his law firms, including Guardian Law, were beholden to the Poelman-related "Sellers."

### THE PRINCIPAL-AGENT RELATIONSHIPS

83.     Before the Buying Summit events, Plaintiff and members of the Class had each paid thousands of dollars to gain exclusive access to "turnkey, rental real estate." The Poelman-controlled "Yancey Events" and similar seminars provided pre-existing relationships with Plaintiff

and the Class whereby Nudge, BuyPD and IPUSA undertook agency obligations to provide Plaintiff and the Class exclusive access to turnkey, rental real estate, as promised.

84.     These agency obligations to Plaintiff and the Class, and the scope thereof, are evidenced by various factors, including the following:

(a)     The $10,000 or more that Plaintiff and each member of the Class paid to Defendants for the Buying Summit event included "Strategic Partners," "property specialists," a "real estate team," "due diligence" and exclusive access to "turnkey" properties.

(b)     Plaintiff and members of the Class traveled across state lines to attend the Buying Summit events in Las Vegas, Nevada.

(c)     Nudge, BuyPD and/or IPUSA pre-selected the properties that would be offered at the Buying Summit to Plaintiff and the Class.

(d)     Nudge, BuyPD, IPUSA and Insider's Cash indicated that, after Plaintiff and the Class had placed real estate on "order," the "Strategic Partners" and "Real Estate Team" would be involved in all aspects of settling the sales transaction, escrow and closing, including working with attorneys and title companies.

(e)     Plaintiff and members of the Class were often referred to as "clients."

(f)     Before closing, Nudge, BuyPD and IPUSA were each responsible for managing the property, including determination of an appropriate market value.

(g)     BuyPD and IPUSA had undertaken responsibility for determining property values "using standard market research," including recent sales of comparable properties.

(h)     BuyPD, IPUSA, Guardian Law and Insider's Cash were each responsible for receiving and/or handling cash payments from Plaintiff and members of the Class.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

85.     Defendants have affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Class.  For example, Plaintiff's closing documents were falsified or misleading, and were executed on Plaintiff's behalf by attorneys who were beholden to Defendants.

86.     Plaintiff and other Class members did not know, and could not reasonably have known, of Defendants' fraudulent scheme and could not have reasonably discovered the falsity of Defendants' representations and material omissions concerning the purchased properties' true market values, nor could Plaintiff and the Class reasonably have known of the concealed information until well after their properties had closed escrow and another title search was performed to identify concurrent transactions.

87.     To this day, Defendants continue to actively and fraudulently conceal their practices from the Class and public alike.  For example, in 2016, as a result of emails being exchanged between participants in the Buying Summit events who were questioning the propriety of Defendants' business practices, Just Us Realtors members Iris Hoard and Douglas Foster began to suspect that Just Us Realtors had been subjected to a fraudulent scheme executed by Defendants. In connection with this email traffic, Iris Hoard and other members of the Class received the following unsolicited email from a Utah attorney at Defendant Invictus Law:

> My name is Bill Knowlton, and our Firm has had the privilege of representing BuyPD for the last 5 years.  As you can likely appreciate, I was very surprised to read this e-mail string and some of the comments made by some of my client's customers.  It is very unfortunate these frustrations exist - and I would like to offer some insights, and potential resolutions for each and every one of you.

While I do not know all of the facts of your concerns that precipitated the creation of this e-mail, what I do know is that my client has gone above-and-beyond with its clients in the past. I have no doubt that, given the chance, they can (and will) resolve any and all concerns some of you may be having.

My client does everything in its power to ensure the investment properties it sells offer the greatest value to its customers. Despite thousands of happy customers and buyers over the years, occasionally a problem arises.

Unfortunately, real estate is unique. Tenants are not perfect. Contractors can be less than forthright. Misunderstandings and miscommunications occur.  That said, however, my client has a long and distinguished history of dealing with these issues head-on, and addressing them directly in a positive and reasonable manner.

I have no doubts they will do the same here. To that end, I would respectfully request each of you contact me individually to discuss your concerns, and I will work directly with my client to reach a resolution.

I look forward to working with each of you.

Sincerely yours,

Bill Knowlton, Esq.
Invictus Law, P.C.
360 South Technology Court, Suite 200
Lindon, Utah 84042
Tel.: (801) 854-9212
Fax: (801) 415-9340

88.     Because of the foregoing, including attorney Knowlton's example, Plaintiff and the

Class could not reasonably discover the unlawful practices described herein and did not do so until

just recently.  The clear majority of Class members still do not know <u>why</u> they have been injured

by Defendants' misconduct.  The statute of limitations applicable to any claims brought by Plaintiff

and other Class members because of the conduct alleged herein has been tolled as a result of

Defendants' fraudulent concealment.

- 40 -

**DEFENDANTS' SCHEME IS AN ONGOING AND A CONTINUING THREAT**

89.     Defendants' scheme is an ongoing threat.  "Response Marketing," believed to be a Nudge affiliate doing business with Box Loans (aka Nudge Funding), continues to use the Yanceys and other personalities to draw aspiring real estate investors into training programs, including Boots on the Ground and a 3-day  "Buying Summit" or "Expo."

90.     Nudge affiliate Box Loans, LLC (aka Nudge Funding) tells aspiring investors it can provide unlimited funding, doing so in conjunction with Response Marketing.  Interstate wires are used to induce aspiring investors to travel interstate to attend a "Buying Summit" or "Expo" using the same language used to induced Plaintiff to travel to the February 2015 Buying Summit.  For example:



Investor Expo | Welcome

R staging.response.com/training/investor-expo/investor-expo-welcome

[vc_row][vc_column width="1/1"][vc_single_image border_color="grey" img_link_target="_self" alignment="center" image="1383" img_size="full" img_link_large=""] [/vc_column][/vc_row][vc_row][vc_column width="1/1"][vc_column_text]We are honored to welcome you to the Buying Summit in Las Vegas at the beautiful Luxor Hotel & Casino. **This email is the first of five emails to help you prepare for an incredible weekend with us.**

Schedule of Events

Keep an eye out for the upcoming emails. If you happen to miss one it's okay, you will always be able to view previous or upcoming emails by clicking the email number below.

It is our sincere goal and passion to make your Buying Summit experience one that you will always remember. Please take a second to let us know how we can make this weekend off-the-charts amazing for you! Click here to let us know.

Email 1  |  Email 2  |  Email 3  |  Email 4  |  Email 5

We hope the Buying Summit will be your best event yet, and we look forward to delivering a first-class experience to you at our flagship event.

Best Regards,

Devan Egan
Email: expo@response.com
Phone: 385-375-8625
Fax: 888-419-2576[/vc_column_text][/vc_column][/vc_row]

91.     Compare with format and language used in Devan Egan's February 2015 email to induce Plaintiff to travel to the Buying Summit:

> You'll have the chance to sit down with one of their Property Specialists at the Summit to review your real estate goals and how they can help you accomplish them. One of the best ways to ensure that your consultation meets your needs is to complete the Investor Questionnaire. CLICK HERE, fill out the form and we'll make sure that your 1 on 1 consultation is tailored to your specific needs.
>
> Keep an eye out for the upcoming emails. If you happen to miss one it's okay, you will always be able to view previous or upcoming emails by clicking the email number below.
>
> **Email 1**  |  Email 2  |  Email 3  |  Email 4  |  Email 5
>
> We hope the Buying Summit will be your best event yet, and we look forward to delivering a first-class experience to you at our flagship event.
>
> Best Regards,
>
> Devan Egan
> Email: Booking@BuyingSummit.com
> Phone: 385-375-8625
> Fax: 888-419-2576

92.     At the Expo, "Expo Exhibitors" (i.e., "Strategic Partners") include Defendants AL&E and Guardian Law, and appear to rely on a pattern of racketeering, including extensive travel fraud, wire fraud, and mail fraud.

93.     For example, Response Marketing tells the aspiring real estate investors that they do not need to use their own money to acquire real estate Response Marketing calls "wholesaling," which actually teaches aspiring investors a "double closing" scheme to defraud other real estate investors.

94.     For example, a participant complained to the Better Business Bureau in June 2018:

During the class, Brian told us about "Wholesale Flipping."  This is where I would buy a property for cash for $70,000.  On closing day, I sell it to another cash buyer

- 42 -

for $90,000.  I asked Mike during my consultation, "How is this not shady?"  What happens when the person buying the property from me sees that I marked up the price $20,000?  You can access this information in the public records."  The answer given to me was "That could take months . . . ."

95.     This "Wholesale Flipping" is a close cousin to, and continuation of, Defendants' scheme whereby "Wholesale Flipping" will similarly rely on the instrumentalities of interstate wires and mails to execute concurrent secret escrows, transfer funds, email documents and mail original recorded property documents, all using interstate commerce.

96.     Thus, Defendants' fraud has not only extended over a substantial period of time, their pattern of racketeering (travel fraud, wire fraud, and mail fraud) continues to this day, with the predicates themselves involving a distinct threat of long-term racketeering activity.

## PLAINTIFF'S ALLEGATIONS

### Nudge/BuyPD Target Plaintiff

97.     In or about December 2014, while in Washington, D.C., Ms. Iris Hoard was watching television when she saw an advertisement for a free real estate seminar sponsored by Scott and Amie Yancey, well-known personalities from the television show called "Flipping Vegas."  Ms. Hoard called the phone number (listed in the Yancey television advertisement) to register for the seminar.

98.     During December 2014, Ms. Hoard and her business partner, Douglas Foster, attended a Yancey program called "Simple Real Estate Program," conducted at the University of Maryland.

99.     Later in December 2014, Ms. Hoard and Mr. Foster paid $1,197 to attend the Yancey 3-day "Real Estate Workshop" at the Hyatt Regency in Bethesda, Maryland.  At this

workshop, Ms. Hoard and Mr. Foster were encouraged to purchase and attend another Yancey workshop called "Boots on the Ground."

100.    On or about December 21, 2014, Ms. Hoard and Mr. Foster paid $12,500 to for the "Boots on the Ground" program, a "Boots" trainer line, and real estate software for a year.  At this time, Ms. Hoard and Mr. Foster were also given a "Right to upgrade to Platinum or Diamond at event pricing" – options that included entry to a so-called "Buying Summit: 3-day Asset Buying Retreat."

101.    On or about January 15-16, 2015, Ms. Hoard and Mr. Foster attended a "Boots on the Ground" training seminar at the Hilton Garden Inn in Bethesda, Maryland.  The workshop involved having the seminar participants – including Ms. Hoard and Mr. Foster – contact local real estate agents and brokers to obtain listings of properties in various areas for sale.  The "Boots on the Ground" students were also encouraged to call realtors to schedule appointments and scout-out property locations.  Students were instructed to create a buyers list to identify cash buyers and potential investors.  As part of the "Boots on the Ground" program, on or about January 17, 2015, Ms. Hoard and Mr. Foster traveled to Columbia, Maryland to meet real estate agents and view properties that were chosen by their fellow students.

### The secret $39,000 deal for 341 Caithness

102.    No later than January 2015, personnel from Poelman-controlled entities Nudge, BuyPD and/or IPUSA identified a single family home located at 341 Caithness, St. Louis, MO ("341 Caithness") as a strong candidate for "sale" as "rehabbed" "turnkey" rental real estate in connection with the upcoming February 2015 Buying Summit.

103.    Around mid-January 2015, Steve Liechty, manager of 5 Choices, LLC and executive officer of Nudge, BuyPD and IPUSA, executed a secretive no-risk option (using a form prepared by Invictus Law) to purchase 341 Caithness from American Real Estate Investments, LLC ("AREI") for $39,000.

104.    This "agreement" giving 5 Choices the option to purchase 341 Caithness specified Guardian Law as the parties' agent for escrow, title review and preparation, and transaction closing.   The purchase option was no-risk to 5 Choices because the $100 purchase deposit (assuming it was paid) was fully refundable if 5 Choices did not perfect title or otherwise exited the transaction within 30 days of January 29, 2015.  Before closing, and before all funds were due to seller (*i.e.*, AREI), AREI was required to use interstate wires to post on 5 Choices' website a "Property Profile including Pictures of the property . . . ."  The remaining $38,900 balance was only due later, before the deed transferring title was recorded.  5 Choices would take possession of the property upon recording of the deed showing 5 Choices as owner.

105.    The agreement required the property to remain "in substantially the same condition" (*i.e.*, no improvements) so the Poelman-controlled entities had no expectation the property would be "rehabbed" or made "turnkey" by them or anyone else.  The rider evidencing rental history was blank.  BuyPD and/or IPUSA assigned identification number "pds973987" to the 5 Choices/AREI purchase option.

**Nudge/BuyPD Convince Plaintiff to Attend the Buying Summit**

106.    Concurrent with 5 Choices' secret option to purchase 341 Caithness for $39,000, on or about January 19, 2015, Jennifer Burr, an event coordinator for the Poelman-controlled Buying Summit, contacted Ms. Hoard via interstate email encouraging Ms. Hoard to attend the

Buying Summit, saying "***reviews for our Buying Summits are off the charts***, and ***we want you to join us in Las Vegas for this once-in-a-lifetime experience***. . . .  Dates for the upcoming Buying Summit with Diamond Tour:  February 10th – 15th . . . ."

107.    On February 3, 2015, BuyPD contacted Ms. Hoard via interstate email (Utah to D.C.) with an embedded, pre-recorded video featuring Devan Egan of BuyPD, explaining: "***You'll have the chance to sit down with one of their Property Specialists at the Summit to review your real estate goals and how they can help you accomplish them.***"

108.    On February 4, 2015, BuyPD contacted Ms. Hoard via interstate email with an embedded, pre-recorded Egan video, explaining: "***The Buying Summit is at the Luxor Hotel & Casino in the Egyptian Ballroom, February 11-14***."

109.    On February 5, 2015, BuyPD contacted Ms. Hoard via interstate email with an embedded, pre-recorded Egan video, explaining: "***We realize that one of your primary goals in attending the Summit is to get some deals done.  BuyPD and Income Property USA are the providers of all the performing assets that will be available to you***."

110.    On February 6, 2015, BuyPD contacted Ms. Hoard via interstate email with an embedded, pre-recorded Egan video that explained: "One of the busiest booths at the Summit is our Retirement Accounts booth. ***We work with multiple custodians . . . They specialize in self-directed accounts and have helped 100's of our clients take control of their retirement funds***."

111.    Email communications from these BuyPD emails sent over interstate wire included footers that stated, in part: "***The property sales are 'for sale by owner' transactions***" and they identified Nudge-related entities and sponsorship among the various Defendants.

112.     On or about February 6, 2015, Ms. Hoard and Mr. Foster purchased by interstate phone the Yancey "Diamond Package" for purposes of attending a "Buying Summit:  3 day Asset Buying Retreat" scheduled for February 2015 in Las Vegas, Nevada. Ms. Hoard and Mr. Foster paid the additional fee of $17,497 with a credit card using interstate wires.

113.     On or about February 9, 2015, BuyPD (through one its controlled persons) contacted Ms. Hoard via interstate email with an embedded, pre-recorded video, saying "***The Buying Summit is just around the corner!***"

**Plaintiff Attends the Buying Summit**

114.     On or about February 10, 2015, Ms. Hoard and Mr. Foster traveled from Washington, D.C. to Las Vegas, Nevada to attend the Buying Summit to gain exclusive access to the "deals" and "performing" properties.  Upon arriving in Las Vegas, Ms. Hoard and Mr. Foster registered for the "Diamond Tour" and related Buying Summit.  On February 11, 2015, Ms. Hoard and Mr. Foster participated in property tours and attended a Buying Summit kickoff dinner.

115.     From February 12, 2015 through February 14, 2015, Ms. Hoard and Mr. Foster attended the Buying Summit at the Luxor hotel in Las Vegas, as orchestrated by the Defendants. The Buying Summit activities included receipt of the Buying Summit Workbook, an introduction to the Strategic Partners that would provide Buying Summit participants legal, accounting, insurance, retirement, and investment services.

**Plaintiff Purchases 341 Caithness**

116.     At the Buying Summit on February 13, 2015, Ms. Hoard and Mr. Foster were assigned to meet with BuyPD "real estate consultant" Jonny Payne who pressured Ms. Hoard and Mr. Foster to purchase one of the "turnkey" properties in BuyPD's "portfolio."

117.     Mr. Payne selected a property from BuyPD's "portfolio" of "turnkey" "rehabbed" properties located in St. Louis, Missouri that Mr. Payne pointed to on a website displayed over interstate wires on his laptop.  Mr. Payne told Ms. Hoard and Mr. Foster that they only had a limited amount of time to purchase the property because the portfolio would time-out and someone else could purchase the property.

118.     Mr. Payne asked how Ms. Hoard and Mr. Foster would pay for the property and Ms. Hoard responded that they would pay with a credit card.  Mr. Payne then rushed Ms. Hoard and Mr. Foster to purchase 341 Caithness.

119.     On, about or before February 13, 2015, Mr. Payne prepared the "Purchase Details" indicating that 341 Caithness had purchase identification no. PDS973987 (the same number used by Defendants for the 5 Choices/AREI no-risk purchase option), identifying 341 Caithness, with a "sale price" and "purchase price" of $54,200, other costs of $3,842, and "total cost" of $56,792. The document also stated that the "Purchase Date" is February 14, 2015, "Purchased From" IPUSA, "You are paying $19,309, and are financing $37,483," "The total loan amount is $40,300 at 12% interest only for a term of 36 months ($37,483 + $3,748 + $1,500 + $569)."  "Special instructions" indicated that interstate wires would be used for the deposits:  "Paying $5000 on the credit card.  Then wiring the funds before Wednesday."

120.     Plaintiff was provided IPUSA's February 13, 2015 "Market Analysis" that appraised market "value" for 341 Caithness at $54,200 based on recent comparable sales in the neighborhood.  The "Market Analysis" did not identify or otherwise disclose the $39,000 transaction between AREI and 5 Choices, or the related purchase option.  The seller disclosed to

Plaintiff that it had legal authority to sell the "rehabbed" property and there were no material valuation issues.

121.   On or about February 13, 2015, Nudge, BuyPD and/or IPUSA sent a confirmation email using interstate wires to Ms. Hoard saying, "Thank you for your order!" and "ORDER CONFIRMATION FROM BUYPD."  The confirmation indicated the address as 341 Caithness Rd., St. Louis, MO 63137, in the amount of $56,792.

122.   Meanwhile, unbeknownst to Plaintiff, Defendants conspired with one another to have 5 Choices secretly acquire title to 341 Caithness for $39,000, without improvements to the property, before 5 Choices conveyed title to Plaintiff to satisfy the $54,200 sale.

123.   5 Choices was granted a warranty deed for 341 Caithness dated February 16, 2015, three days after that property was "sold" to Plaintiff.  On March 6, 2015, Guardian Law recorded the 5 Choices purchase from AREI of 341 Caithness, but the deed did not reflect the $39,000 sales price from the purchase option executed by Nudge/IPUSA executive Steve Liechty.

124.   On March 16, 2015, Steve Liechty, representing 5 Choices as its manager, executed transaction documents in the escrow on the sale of 341 Caithness to Plaintiff for $54,200.  At closing, and in addition to BuyPD and/or IPUSA having secured a grossly inflated (by 40%) "sales price" over what 5 Choices later paid for the property through their secretive self-dealing, Plaintiff was also charged $4,448.30, consisting of the following:

(a)   $2,050.00 "Title charges" (including $60.00 for "Postage, Shipping, and Handling"; $50.00 "Expedited Recording fee") paid to Guardian Law;

(b)   $2,248.30 "Loan origination fee" (5.6% of the $40,300, 12% interest-only loan, with balloon payment after 3 years) paid to Insider's Cash; and,

       (c)    $150.00 paid to PropAsure, an entity controlled by Jackson.

125.    On March 19, 2015, AL&E notified Plaintiff that it had received closing documents from Guardian Law and would be using interstate email and the U.S. Mail to consummate the transaction.  Dkt. No. 24-5 at 2.

126.    On April 6, 2015, AL&E asked for (and ultimately received) Plaintiff's banking information for "the ACH auto draft" to use interstate wires to deduct from Plaintiff's bank account the monthly payments on the fraudulent mortgage originated by Insider's Cash.

**Conflicted Attorneys Loyal to Poelman are Assigned to Represent Plaintiff**

127.    As a condition of Plaintiff's purchase of 341 Caithness, Ms. Hoard and Mr. Foster were required to execute "Power of Attorney" documents that would permit an attorney to represent them and Just Us Realtors in the transactions and to complete the transaction paperwork for 341 Caithness.  On February 14, 2015, Ms. Hoard and Mr. Foster executed Power of Attorney documents authorizing Defendant AL&E, a law firm controlled by attorney and Defendant Blair Jackson, to act as their attorney and fiduciary with respect to the purchase of 341 Caithness.

128.    Also, as part of the transaction, Nudge, BuyPD and/or IPUSA assigned Guardian Law to be the title and escrow agent for the 341 Caithness transaction.  Unbeknownst to Ms. Hoard and Mr. Foster, Buying Summit "strategic partner" – Guardian Law – the assigned escrow agent for the 341 Caithness transaction had concurrently opened an escrow for a transaction of 341 Caithness, that included a Corporation Warranty Deed dated February 13, 2015 (executed February 12, 2015), indicating Venus Properties, LLC as grantor and American Real Estate Investments, LLC as grantee.  This deed was recorded on February 26, 2015.

129.     Also, unbeknownst to Ms. Hoard and Mr. Foster, on or about February 13, 2015, a Corporation Warranty Deed dated February 16, 2015 was executed transferring ownership of 341 Caithness from American Real Estate Investments, LLC to 5 Choices, LLC.  This deed was not recorded in St. Louis County until March 6, 2015.  Defendant Guardian Law undertook responsibility for recording of this deed, was the escrow agent for this transaction, instructing that the U.S. Mails for executing its escrow responsibilities.  At no time did any Defendant disclose this concurrent, secret escrow to either Mr. Foster or Ms. Hoard.

130.     Before, during and after this time, Jackson and his law firms were also representing Poelman, Nudge, BuyPD and/or IPUSA on a continuous, ongoing basis, in a manner that conflicted with the interests of Plaintiff.   Jackson and his law firms were also acting as escrow agents in the transactions between BuyPD and/or IPUSA and Plaintiff; while simultaneously acting as Plaintiff's attorney in fact for purposes of executing the necessary documents to consummate the property transaction.  Jackson and his law firms never disclosed their multiple conflicts of interest and their inability to faithfully fulfill their fiduciary responsibilities to Plaintiff.

131.     In connection with the purchase of 341 Caithness, Guardian Law represented Plaintiff, acting as Plaintiff's title and escrow agent.  Also, AL&E acted as Plaintiff's attorney-in-fact.

132.     In connection with the purchase of 341 Caithness, and without consulting Mr. Foster or Ms. Hoard about the matter contained therein or of Jackson and his law firms' multiple conflicts of interests, AL&E executed, *inter alia*, the following documents on behalf of Just Us Realtors:

(a)     REAL PROPERTY CERTIFICATE OF VALUE indicating that as of February 13, 2015, 5 Choices, LLC was the "Grantor" and Just Us Realtors was the "Grantee" of 341 Caithness with consideration of $52,950 and that the transaction represented market value for 341 Caithness.  Jackson and his law firms knew, or should have known, that 5 Choices, LLC was not the owner or "Grantor" of the property on February 13, 2015 and that the market value was $39,000, the price 5 Choices, LLC paid for the property.

(b)     BUYER & SELLER SETTLEMENT STATEMENT, made as of March 16, 2015.

(c)     COMMERICIAL LOAN AGREEMENT dated March 18, 2015 between Insiders Cash and Just Us Realtors, indicating a loan amount of $40,300 at a 12% rate of interest per annum.

(d)     PERSONAL GUARANTY dated as of March 18, 2015, signed in the names of Iris Hoard and Douglas Foster.

(e)     DURABLE POWER OF ATTORNEY FOR A LIMITED POWER APPOINTMENT dated March 18, 2015, regarding the appointment of Darren Eady of Insiders Cash.

(f)     DEED OF TRUST AND ASSIGNMENT OF RENTS for 341 Caithness, made March 18, 2015 between Insiders Cash and Just Us Realtors.

(g)     "Conflict of Interest Disclosure" explaining that Guardian Law, LLC did not represent the seller.

(h)     COMPLIANCE AGREEMENT authorizing Guardian Law to fix any clerical mistakes.

**Misrepresentation and Concealment of Material Facts in Escrow**

133.    On or about February 26, 2015, at the request of Jonny Payne (via email using interstate wires), Ms. Hoard and Mr. Foster used interstate wires to transfer $14,309 to BuyPD, as a payment that constituted the remaining deposit for their purchase of 341 Caithness.  Also, on this date the Corporation Warranty Deed between Venus Properties, LLC and American Equity Investments, LLC was recorded in St. Louis County, Missouri.

134.    On February 27, 2015, Mr. Payne contacted Ms. Hoard and Mr. Foster via interstate email to say the interstate wire of funds was successful:  "We have received your funds and applied them.  The closing has now started on your asset."

135.    On March 2, 2015, Mr. Payne again contacted Ms. Hoard and Mr. Foster via interstate email to say that "Both your signed documents and payment has been received and everything looks good!"

136.    In fact, unbeknownst to Plaintiff, everything looked bad.  Concurrent with the 341 Caithness escrow, Defendants, including Guardian Law, were executing concurrent secret escrows whereby Defendants' controlled entity, 5 Choices, LLC, would purchase 341 Caithness for $39,000.

137.    On April 6, 2015, Ms. Hoard received an email over interstate wires from AL&E confirming permission to execute transaction documents and requesting Plaintiff's banking information.

138.    On April 7, 2015, Ms. Hoard received interstate email notification from Mr. Payne stating: "The Title Company has just informed me that they received your closing documents and

everything looks good!  You're almost finished."  It is believed that these closing documents were original documents transported by U.S. Mail.

139.    On April 10, 2015, Ms. Hoard received email notification over interstate wire from Nudge, BuyPD and/or IPUSA indicating that Plaintiff's purchase of the 341 Caithness property had closed.

140.    On May 1, 2015, Ms. Hoard received via email, over interstate wire, copies of the closing documents, executed on Plaintiff's behalf by AL&E, and executed on behalf of Steve Liechty, manager of 5 Choices, LLC and Nudge, BuyPD and/or IPUSA' executive officer, including the following:

  (a)    Commercial Loan Agreement

  (b)    Durable Power of Attorney for a Limited Power of Appointment.

  (c)    Conflict of Interest Disclosure (regarding Guardian Law).

  (d)    Compliance Agreement.

  (e)    Order to Issue Title Policy.

  (f)    Property Transfer Affidavit.

  (g)    Survey Waiver.

  (h)    Water Escrow Waiver.

  (i)    Waiver of Settlement Agent Responsibility.

  (j)    Construction Lien Indemnity Agreement.

**Insider's Cash is unwilling to accept credit risk, so it brokers new investment**

141.    Plaintiff's $40,300 loan purportedly funded on April 21, 2015.  Two days later, the sale to Plaintiff of 341 Caithness, along with trust deed in favor of Insider's Cash, was recorded.

142.    Unwilling to accept the credit risk on the $40,300 note, that was expected to fail, on or about May 11, 2015 Insider's Cash and/or IPUSA brokered the debt, selling the note with Just Us Realtors, LLC to Amara Investments, LLC, evidenced by the "ASSIGNMENT OF RIGHTS AND DISCLOSURE AGREEMENT" between Steve Liechty, on behalf of IPUSA, and Amara Investments, LLC (another victim of the scheme).

143.    Instead of accepting the credit risk, a Ponzi structure was erected whereby Insider's Cash and IPUSA surreptitiously brokered fraudulent financing, peddling Plaintiff's doomed note to an unsuspecting Buying Summit participant who had come to the Buying Summit for "deals" purchasing trust deeds.

**Defendants' concealment of material facts**

144.    Up through and including May 11, 2015, and unbeknownst to Ms. Hoard and Mr. Foster, Defendants had concealed the following material facts bearing on the 341 Caithness transaction:

(a)    Defendants had created the "Buying Summit" as a venue to sell distressed real estate under false pretenses that the properties were "turnkey" and suitable real estate investments that were part of Nudge, BuyPD and/or IPUSA' "portfolio."

(b)    Income Properties, USA was not the owner of 341 Caithness at the time of its sale to Just Us Realtors.  Defendants either did not have authorization to sell 341 Caithness on February 13-14, 2015 and/or had engaged in a secret scheme with undisclosed entities or persons to sell 341 Caithness.

(c)     After selling 341 Caithness to Just Us Realtors for $54,200 on February 13-14, Defendants caused an entity they controlled to purchase 341 Caithness for $39,000 on February 16 and delayed recording the $39,000 transaction until March 6, 2015.

(d)     The assigned attorney for Just Us Realtors – AL&E, LLP – was controlled by defendant attorney Blair Jackson, Defendants' chief counsel and a former and/or current business partner of attorney Greg Christiansen, principal of Guardian Law, the entity that controlled the escrow process in Defendants' scheme.

(e)     Guardian Law coordinated both the 341 Caithness escrow and the secret 5 Choices escrow for purposes of accomplishing Defendants' fraudulent scheme and inducing Just Us Realtors to grossly overpay for 341 Caithness by 40%.

(f)     Guardian Law was at all relevant times controlled by attorney Greg Christiansen and Blair Jackson who were/are business partners and their firms conspired to execute Defendants' fraudulent scheme.

145.    Had Ms. Hoard and/or Mr. Foster known the truth about 341 Caithness and the role of Guardian Law and AL&E, they would not have permitted Defendants to consummate the 341 Caithness real estate transaction.

**Post-purchase facts**

146.    Since purchase, Plaintiff paid over $10,800 in interest payments on the fraudulent $40,300 loan issued by Insider's Cash.  After purchase, the property did not increase in value beyond the $56,000 purchase price.  As of mid-July 2019, for example, the market value of 341 Caithness reported by Zillow's "Zestimate" is $31,015, more than $20,000 less than Plaintiff paid for the property.

147.    Plaintiff did not begin to suspect that they had been defrauded until mid-2016 and did not discover the fraud and other causes of action until late 2017.

## CLASS ACTION ALLEGATIONS

148.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who, between January 1, 2013 and present, purchased real estate in connection with Defendants' fraudulent real estate sales scheme, as alleged herein (the "Class").  Excluded from the Class are Defendants and members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

149.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are at least 2,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and upon certification may be notified of the pendency of this action by mail, using the form of notice like that customarily used in class actions.

150.    Common questions of law and fact predominate over questions concerning individual Class members only and include:

(a)    Did Plaintiff and members of the Class receive email communications from one of the Defendants urging them to attend the Buying Summit?

(b)    Did Plaintiff and members of the Class attend Defendants' Buying Summit events?

(c)    At the Buying Summit events, did Nudge, BuyPD and/or IPUSA offer properties for sale that Plaintiff and members of the Class later purchased from BuyPD or IPUSA?

(d)    Did BuyPD and/or IPUSA own the properties that they "sold" to Plaintiff and the Class at the time of the "sale?"

(e)    Did Defendants have a duty to disclose material facts at the point of sale, such as their relationship to the property seller, their interests in the properties, the properties' values, and involvement of their attorneys, to Plaintiff and the Class?

(f)    Did Jackson and his law firms have duties to Plaintiff and the Class to disclose conflicts of interests, concurrent escrows, and concurrent prices?

(g)    Did Defendants aid and abet the other Defendants' breaches of fiduciary duty?

(h)    Did Defendants, after the "sale" to Plaintiff and members of the Class, later cause a related and controlled entity to purchase the same property for less than the "sales price" offered to Plaintiff and members of the Class?

(i)    Did Defendants form an association-in-fact that constituted an Enterprise under RICO?

(j)    Did Defendants make uniform oral and written statements, that were false or misleading when made, about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that Defendants had "bought" the Buying Summit properties, they were vetted by "due diligence," available for sale, in good condition, and available for a fair price?

(k)     Did Jackson and his law firms orchestrate the property closings to delay the sales to Plaintiff and members of the Class so that entities controlled by Poelman, Nudge, BuyPD and/or IPUSA could acquire the properties for a lower price prior to escrows closing?

(l)     Did Insider's Cash participate in Defendants' fraudulent scheme by providing a false lending front and/or Ponzi scheme in connection with Defendants' scheme and secret purchases of properties?

151.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct complained of herein.

152.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual Class members may be relatively small compared to the expense and burden of individual litigation, making it impossible for members of the Class to individually redress the wrongs done to them.

154.    There will be no difficulty in the management of this action as a class action.

### COUNT I

### Fraud
### Against All Defendants

155.    Plaintiff incorporates all allegations above, as if set forth fully herein.

156.    During the Class Period, Defendants engaged in a fraudulent real estate scheme and related conspiracy whereby:

(a)     Plaintiff and members of the Class were induced to attend a Buying Summit (with false/misleading promises of exclusive access to a "***portfolio***" of vetted, "***turnkey***" rental real estate with "***incredible value***") for purposes of fraudulently selling distressed real estate (and related financing) at above-market prices.  Plaintiff and members of the Class reasonably relied upon these misrepresentations as evidenced by their payment of over $10,000 and interstate travel to attend the event.

(b)     At the Buying Summit, BuyPD and IPUSA offered an "***available inventory***" of "***performing properties***" with "***sales prices***" based on their "***market research***" and "***due diligence***."  However, unbeknownst to Plaintiff and the Class, BuyPD and IPUSA did not own "performing" properties in their "available inventory."  Nudge and BuyPD knew from "due diligence" that the properties were <u>not</u> "performing," <u>not</u> "turnkey, and the offered "sales prices" far exceeded the actual value of the properties, which was as much as 40% less than the Buying Summit's "sales price."

(c)     At point of purchase, Plaintiff and the Class were told that a real estate team of "Strategic Partners" would handle everything to complete the investment: open escrow, prepare and execute the necessary paperwork, check title, get funding from Insider's Cash, close the escrow, and then record the legal documents that conveyed title.

(d)     Once engaged to perform these functions, Defendants were under obligations to disclose material facts about the transactions, including the following:

(i)     the properties were not "turnkey," not "rehabbed," not "performing," and were worth far less than the "sales price;"

- 60 -

(ii)     Insider's Cash was unwilling to carry its loan because the loan was worth less than the unimproved property, so Defendants (who expected the loan would fail) attracted the scheme's needed financing through the fraudulent sale of trust deeds to unsuspecting Buying Summit participants;

(iii)    the Defendant attorneys assigned to represent Plaintiff and the Class had divided loyalties, and were secretly beholden to Poelman and his entities and would carry out their instructions to complete the fraudulent sale of real estate and trust deeds; and

(iv)     concurrent, undisclosed escrows were executed by the Defendant attorneys with the undisclosed owner of the properties to secretly convey title in the same property ahead of title transfer to Plaintiff and the Class, and at much lower prices.

157.    Because each Defendant had multiple touchpoints in the hundreds of secret escrow transactions that concealed Defendants' scheme from the Class, each Defendant knew throughout the process described above that none of the Defendants had "bought" an "available inventory," the properties were not "turnkey," and the properties were being sold for far more than they were actually worth (and even more than the bridge loan offered by Insider's Cash).

158.    Defendants also knew that the purchase-money loans to Plaintiff and the Class were extraordinarily poor, overpriced loans, exceeding the properties' market values, and thus the transactions were not being financed through the success of the underlying transactions, but are taken from principal sums of newly attracted investments.

159.    Each Defendant therefore knew that the "assets" BuyPD and IPUSA had identified in their "portfolio" were not "performing" but were instead under-performing distressed properties

– which is precisely why they were selected by the Poelman-controlled entities for inclusion in Defendants' scheme.

160.   Poelman, Nudge, BuyPD and IPUSA made uniform oral and written statements that were knowingly false or misleading when made about the condition, tenancy, and value of the properties available for purchase in connection with the Buying Summit, representing, among other things, that the Buying Summit properties were vetted, available for sale, in good condition, and available for a fair price.  See above, ¶¶ 38-42.

161.   Defendants targeted and induced Plaintiff and members of the Class with false statements for purposes of inducing them to attend the Buying Summit, while Poelman-controlled entities supplied the fraudulent "turnkey" "inventory."  These Defendants engaged in false messaging to induce property purchases, through false "Workbook" statements and false statements in Buying Summit presentations.  See above, ¶¶ 45-51.

162.   Representatives of Nudge, BuyPD and IPUSA, while under the ultimate supervision of Poelman, also made false and misleading statements for purposes of inducing property purchases at the point of sale.  See above, ¶¶ 52-57.

163.   False statements included material misrepresentations of Insider's Cash as a *bona fide* lender when in fact Insider's Cash was a false front and was central to the Enterprise's Ponzi-financing whereby Insider's Cash would not incur the credit risks on the transactions (as represented) but would instead offload that risk to unsuspecting Buying Summit participants purchasing notes/trust deeds.  See above, ¶¶ 64-67.

164.   Then, during the escrow process, these same Defendants presented Plaintiff and the Class with false and/or misleading escrow documents, and concealed material facts while under a

duty to disclose those known facts.  These Defendants also misrepresented the role of Insider's Cash.  See above, e.g., ¶ 58.

165.    Defendants each engaged in a fraudulent scheme to control the closing process, shielding one another from the checks and balances of a conventional escrow closing process, and to hide the inter-relationships among Nudge, BuyPD and/or IPUSA, Insider's Cash and Jackson and his law firms.  See above, e.g., ¶¶ 72-79.

166.    Each Defendant had affirmative obligations to disclose known material facts to Plaintiff and members of the Class.

167.    When making false statements and/or material omissions of fact, each Defendant acted with actual knowledge and/or reckless disregard for the truth of their representations to Plaintiff and the Class.  See above, e.g., ¶¶ 59-60, 69-71, 80-82.

168.    The actionable falsity was material and Plaintiff and members of the Class reasonably relied on the uniform false and misleading statements and material omissions in attending the Buying Summit, purchasing their properties and undertaking purchase money loans. Plaintiff and members of the Class acted reasonably upon, and in ignorance of the uniform false and misleading statements and omissions.

169.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff and members of the Class suffered damages in amounts to be proven at trial.

170.    Plaintiff and members of the Class are entitled to an award of punitive damages based on Defendants' intentional and reckless conduct alleged herein.

## COUNT II

**Racketeering Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962
Against All Defendants Except Invictus Law, LLC**

171.    Plaintiff incorporates all allegations above, as if set forth fully herein.

172.    During the Class Period, all Defendants except Invictus Law (the "RICO Defendants") engaged in a fraudulent real estate scheme whereby RICO Defendants extensively and continuously used instrumentalities of interstate commerce:

(a)    to induce Plaintiff and members of the Class to attend a Buying Summit for the purpose of fraudulently selling distressed real estate and related financing at above-market prices;

(b)    to engage in secret self-dealing transactions to acquire title to these properties, at significantly lower prices, before formalizing the conveyance of title to Plaintiff and the Class; and

(c)    to attract financing for the scheme through the fraudulent sale of trust deeds.

173.    In violation of 18 U.S.C. § 1962(a), Insider's Cash, IPUSA and Guardian Law received income derived from a pattern of racketeering activity, and used part of such income, or the proceeds of such income, in the operation of the Enterprise which was engaged in, or the activities of which affect, interstate or foreign commerce.

174.    In violation of 18 U.S.C. § 1962(c), all Defendants (except Insider's Cash) have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above.

**RICO Defendants' Enterprise**

175.    RICO Defendants formed an association-in-fact constituting an "Enterprise" within the meaning of 18 U.S.C. § 1961(4) whereby RICO Defendants coordinated their efforts for purposes of executing a scheme to enrich the Enterprise by defrauding aspiring real estate investors, including Plaintiff and members of the Class.

176.    The existence of an "Enterprise" is demonstrated by the common ownership, operation, and control of each RICO Defendant.  It is also demonstrated by the integrated efforts of Poelman, Nudge, BuyPD and/or IPUSA, Insider's Cash and Jackson and his law firms, all as described above.

177.    Each Defendant is a "person" as defined by 18 U.S.C. § 1961(3) and is an entity legally distinct from the Enterprise.

178.    Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and members of the Class.  Dkt. 72, p. 9.

**Poelman, Nudge, BuyPD, IPUSA and Insider's Cash violated the Travel Act**

179.    In furtherance of the fraudulent scheme and conspiracy to defraud or obtain money or property from Plaintiff and the Class by false pretenses, representations or promises, Poelman, Nudge, BuyPD, IPUSA and Insider's Cash engaged in racketeering activity by committing multiple related acts of the National Stolen Property Act, in violation of 18 U.S.C. § 2314 ("Travel Act").

180.    Poelman individually and through each of the Defendant entities he controlled during the Class Period (i.e., Nudge, BuyPD, IPUSA and Insider's Cash) set into motion and

perpetuated a fraudulent scheme, beginning no later than 2013 and in effect continuously since then, in which transportation of Plaintiff and members of the Class over interstate lines for purposes of defrauding each of $5,000 or more were incidental to essential elements of the scheme or were steps in the plot to defraud Plaintiff and the Class.

181.    Poelman, Nudge, BuyPD, IPUSA, and Insider's Cash each acted with knowledge that, on hundreds of occasions for purposes of furthering the fraudulent scheme, use of interstate travel in violation of the Travel Act would follow in the ordinary course of business, and were reasonably foreseen, in a least the following respects:

(a)    Using this pre-existing and confidential relationship about members of the Class, Nudge and BuyPD sent thousands of phone calls and emails over interstate wires, addressed to and targeting members of the Class, for purposes of inducing attendance and introducing "Strategic Partners" Guardian Law, Insider's Cash and BuyPD.

(b)    The interstate emails urged the Class of aspiring real estate investors to travel interstate to Las Vegas to "get some deals done" with exclusive access to financing, "performing assets" with "incredible value" at the "Buying Summit."

(c)    Devan Egan, speaking on behalf of Poelman, Nudge, BuyPD, IPUSA and Insider's Cash, via interstate wires from their Utah offices, on hundreds of occasions over several years, made materially false and/or misleading statements to Plaintiff and the Class for the purposes of inducing Plaintiff and members of the Class (that live outside of the Buying Summit locale) to travel interstate to attend the Buying Summit and deprive Plaintiff and the Class of at least $5,000 through fees to attend the Buying Summit and/or through the fraudulent sale of real estate.

**RICO Defendants each committed mail fraud to further the scheme**

182.     In furtherance of the fraudulent scheme and conspiracy to defraud or obtain money or property from Plaintiff and the Class by false pretenses, representations or promises, each member of the Enterprise engaged in racketeering activity by committing multiple related acts of mail fraud, in violation of 18 U.S.C. § 1341 (mail fraud).

183.     Poelman individually and through each of the Defendant entities he controlled during the Class Period (i.e., Nudge, BuyPD, IPUSA and Insider's Cash) set into motion and perpetuated a fraudulent scheme, beginning no later than 2013 and in effect continuously since then, in which extensive mailings and use of interstate carriers were incidental to essential elements of the scheme or were steps in the plot to defraud Plaintiff and the Class.

184.     Poelman, Nudge, BuyPD, IPUSA, and Insider's Cash each acted with knowledge that use of the U.S. Mails were necessary "steps in the plot," would follow in the ordinary course of business, and were reasonably foreseen, in at least the following respects:

(a)     The escrows conveying properties either being acquired and/or sold by entities controlled by Poelman, Nudge, BuyPD, IPUSA and Insider's Cash, pertaining to the Class transactions, indicated that "postage" and "shipping" costs were incurred for purposes of executing thousands of escrows (including both Class and secret escrows).  These charges were incurred and paid by Plaintiff in its escrow and would have been similarly charged to members of the Class in thousands of other escrows, in furtherance of the fraudulent scheme.

(b)     Insider's Cash (controlled by Poelman and BuyPD) set into motion a fraudulent scheme, beginning no later than 2013 and in effect continuously since then, to provide financing for the fraudulent real estate transaction in which mailings were incidental to essential

elements of the scheme or were steps in the plot to defraud Plaintiff and the Class.  For example, a deed of trust between Insider's Cash and Plaintiff relative to securing the fraudulent financing was recorded and mailed from Clayton, Missouri to Guardian Law in American Fork, Utah.  It was foreseeable to these Defendants (Insider's Cash, Poelman and BuyPD) that the mails would be used in hundreds of cases incidental to essential elements of the Ponzi financing scheme, continuously during the Class Period.

(c)     Guardian Law would be using the U.S. Mail on thousands of occasions over the years, in furtherance of the fraudulent scheme, by instructing Recorder's Offices around the United States to use the U.S. Mails when mailing original recorded documents via interstate carrier to Guardian at its offices in Utah, to consummate thousands of transactions for Class members and the related secret escrows, in furtherance of the fraudulent scheme.

185.    Jackson, Guardian Law and AL&E each acted with knowledge that use of the U.S. Mails would follow in the ordinary course of business, and were reasonably foreseen, in at least the following respects:

(a)     The escrows conveying properties either being acquired and/or sold by entities controlled by Poelman, Nudge, BuyPD, IPUSA, and Insider's Cash pertaining to the Class transactions, indicated that "postage" and "shipping" costs were incurred for purposes of executing the escrows(including both Class and secret escrows orchestrated by the attorneys).  These charges were incurred and paid by Plaintiff in its escrow and would have been similarly charged to members of the Class in thousands of other escrows, in furtherance of the fraudulent scheme.

(b)     Insider's Cash (controlled by Poelman and BuyPD) set into motion a fraudulent scheme, beginning no later than 2013 and in effect continuously since then, to provide

financing for the fraudulent real estate transaction in which mailings were incidental to essential elements of the scheme or were steps in the plot to defraud Plaintiff and the Class.  For example, a deed of trust between Insider's Cash and Plaintiff relative to securing the fraudulent financing was recorded and mailed from Clayton, Missouri to Guardian Law in American Fork, Utah.  It was foreseeable to these Defendants (Jackson, Guardian Law and AL&E) that the mails would be used in hundreds of cases incidental to essential elements of the scheme, continuously during the Class Period.

(c)     Guardian Law caused the U.S. Mail to be used on thousands of occasions over the years, in furtherance of the fraudulent scheme, by instructing Recorder's Offices around the United States to use the U.S. Mails when mailing original recorded documents via interstate carrier to Guardian to its offices in Utah, to consummate transactions for Class members and the related secret escrows, in furtherance of the fraudulent scheme.

**RICO Defendants each committed wire fraud**

186.    In furtherance of the fraudulent scheme and conspiracy to defraud or obtain money or property from Plaintiff and the Class by false pretenses, representations or promises, each member of the Enterprise engaged in racketeering activity by committing thousands of related interstate acts, including use of interstate wire, internet and email communications, each in furtherance of the scheme to defraud Plaintiff and the Class, in violation of 18 U.S.C. § 1343 (wire fraud).

187.    Poelman individually and through each of the Defendant entities he controlled during the Class Period (i.e., Nudge, BuyPD, and IPUSA) set into motion and perpetuated a fraudulent scheme, beginning no later than 2013 and in effect continuously since then, in which

use of interstate wire, internet and email communications were incidental to essential elements of the scheme or were steps in the plot to defraud Plaintiff and the Class.

188.    Poelman, Nudge, BuyPD, IPUSA, and Insider's Cash each acted with knowledge that use of interstate wires would follow as "steps in the plot" and in the ordinary course of business, and were reasonably foreseen, in a least the following respects:

(a)    Plaintiff and the Class used interstate wires to make purchase deposits towards the fraudulent transactions paid to IPUSA and "ReadyProp" with "Special instructions" that indicated interstate wires would be used for the deposits, in furtherance of the scheme and making it less likely the scheme's victims could stop payment when cooling down after purchase.

(b)    Using this pre-existing and confidential relationship about members of the Class, Nudge and BuyPD sent thousands of emails over interstate wires, addressed to and targeting members of the Class, introducing the "Strategic Partners" in furtherance of the scheme.  Using email allowed Nudge and BuyPD to embed links in the emails that could track user activity for purposes of gauging interest and provide confidential information in response to questionnaires.

(c)    The interstate emails urged the Class of aspiring real estate investors to travel interstate to Las Vegas to "get some deals done" with exclusive access to "performing assets" with "incredible value" at the "Buying Summit."

(d)    Devan Egan, speaking on behalf of Poelman, Nudge, BuyPD and IPUSA via interstate wires from their Utah offices, made materially false and/or misleading statements to Plaintiff and the Class for purposes of inducing Plaintiff and members of the Class (that live outside of the Buying Summit locale) to travel interstate to attend the Buying Summit and deprive Plaintiff

and the Class of at least $5,000 through fees to attend the Buying Summit and/or through the fraudulent sale of real estate.

(e)    Jonny Payne, speaking on behalf of BuyPD and/or IPUSA, represented to Plaintiff, using interstate wires on the IPUSA website, that the property was being purchased from IPUSA.   Use of interstate wires facilitated the "hard sell" and extreme sense of urgency in the deals.

(f)    AREI was required to use interstate wires to post on 5 Choices' website a "Property Profile including Pictures of the property . . . ."

(g)    Nudge, BuyPD and/or IPUSA sent a confirmation email using interstate wires to Ms. Hoard saying, "Thank you for your order!" and "ORDER CONFIRMATION FROM BUYPD."

(h)    Mr. Payne contacted Ms. Hoard and Mr. Foster via interstate email to say the interstate wire of funds was successful:  "We have received your funds and applied them.  The closing has now started on your asset."

(i)    Mr. Payne again contacted Ms. Hoard and Mr. Foster via interstate email to say that "Both your signed documents and payment has been received and everything looks good!"

(j)    Ms. Hoard received email notification over interstate wire from Nudge, BuyPD and/or IPUSA indicating that Plaintiff's purchase of the 341 Caithness property had closed.

189.    Jackson, Guardian Law and AL&E each acted with knowledge that use of interstate wires would follow in the ordinary course of business, and were reasonably foreseen, in at least the following respects:

(a)     These attorneys would see from the escrow documents that Plaintiff and the Class used interstate wires to make purchase deposits towards the fraudulent transactions to IPUSA and Poelman-controlled ReadyProp, and "Special instructions" indicated that interstate wires would be used for the deposits.

(b)     AL&E asked for (and ultimately received) Plaintiff's banking information for "the ACH auto draft" to use interstate wires each month to deduct from Plaintiff's bank account the $403 monthly interest-only payments on the fraudulent mortgage.

(c)     AL&E notified Plaintiff that it had received closing documents from Guardian Law and would be using interstate email and the U.S. Mail to consummate the transaction.  Dkt. No. 24-5 at 2.

(d)     As would be the case in hundreds of Class transactions, Ms. Hoard received email over interstate wires from AL&E confirming permission to execute transaction documents and requesting Plaintiff's banking information.

(e)     As would be the case in hundreds of Class transactions, Ms. Hoard received via email, over interstate wire, copies of the closing documents, executed on Plaintiff's behalf by AL&E, and executed on behalf of Steve Liechty, manager of 5 Choices, LLC and Nudge, BuyPD and/or IPUSA's executive officer.

**Defendants' pattern of racketeering was extensive and continuous**

190.     As explained above, each Defendant engaged in "racketeering activity" involving two or more criminal offenses, known as "predicate acts," each committed within a 10-year period.

191.     These series of related predicate acts – thousands of emails with embedded internet links to induce interstate travel through false pretenses and for fraudulent purposes; and thousands

of emails and interstate mails to consummate fraudulent purchases and a Ponzi financing scheme – have extended continuously since 2013.

192.   For example, Poelman-controlled Nudge and/or BuyPD also used email communications in 2015 introducing Plaintiff to the Buying Summit, admitting that for years thousands of investors purchased properties (i.e., "over 1000 deals in 2013"), urging Plaintiff to also attend the Buying Summit to "get some deals done," adding:  "BuyPD and IPUSA are the providers of all the performing assets that will be available to you.  ***Having done over 1000 deals in 2013 in over 20 states across the U.S. they've refined the process of delivering an incredible value to their buyers***. . .. [T]he primary strategic partner of the Buying Summit that provides the Real Estate Assets."

193.   RICO Defendants each engaged in a "pattern" of racketeering activity because of the "continuity plus relationship" between the predicate acts.

194.   The predicate acts were interrelated with each other in at least the following respects:

(a)   For Poelman, Nudge, BuyPD, IPUSA and Insider's Cash, their Travel Act and Wire Fraud violations were intertwined and served similar and overlapping purposes of recruiting Plaintiff and members of the Class to attend the Buying Summit and purchase properties in furtherance of the scheme.  That is, these Defendants caused or reasonably foresaw that sending thousands of emails containing thousands of false and/or misleading designed to induce violations of the Travel Act.

(b)   Once the prospective victims were at the Buying Summit, to induce the property purchases and execute the fraudulent Ponzi financing these same Defendants again

engaged extensive use of the wires in thousands of instances to display the subject properties, falsely portray the properties, receive purchase deposits, and send purchase confirmations.

(c)     For Jackson, Guardian Law and AL&E, their Wire Fraud and Mail Fraud violations were intertwined and served similar and overlapping purposes of receiving purchase deposits, faxing transaction documents, sending purchase confirmations via wire, orchestrating the cash flows and timing of closing to effectuate the scheme using the wires and U.S. Mails in the furtherance of the scheme, executing the secret escrows ahead of the escrow for Plaintiff and the Class.

(d)     It was also reasonably foreseeable to each RICO Defendant that following the thousands of Class purchases, the next step in the plot would be extensive use of the U.S. Mails in thousands of instances (including mailing instructions sent via interstate wire) to cause mailings of fraudulently-procured Deeds and Trust Deeds for purposes of mailing original recorded across state lines in both the Class transactions and secret transactions.

195.    There is a distinct threat of continuing, long-term racketeering activity for at least the following reasons:

(a)     The interrelated and intertwined predicate acts (Travel Act, Mail Fraud, and Wire Fraud) have facilitated the success of the Enterprise extensively and continuously since at least 2013.

(b)     The same intertwined predicate acts are continuing (Travel Act, Mail Fraud, and Wire Fraud) and are the means by which the Enterprise continues to operate and therefore poses a distinct threat of continuing, long-term racketeering activity.  See above, ¶¶ 89-96.

(c)     The fraudulent real estate transactions themselves are financially unstainable and subject to foreclosure, posing a threat that Defendants will continue their involvement in the fate of the properties, increasing the likelihood the distressed property will revert back to a Poelman-controlled entity (using wires and mails) that will again use it as "available inventory" at the next Buying Summit (using Travel Act violations).

**Remedies for Defendants' violations of 18 U.S.C. § 1962**

196.    Plaintiff and the Class seek relief allowed by federal RICO, including attorney's fees.  Plaintiff and the Class are entitled to punitive damages, as the conduct was intentional and reckless.  Plaintiff and the Class are entitled to triple their actual damages, as allowed by statute.

**COUNT III**

**Civil Conspiracy**
**Against All Defendants**

197.    Plaintiff incorporates all allegations above, as if set forth fully herein.

198.    Defendants jointly agreed to pursue the object of defrauding Plaintiff and members of the Class (including attendees of the Buying Summit events) through a fraudulent real estate scheme, as described herein.

199.    Defendants engaged in one or more unlawful, overt acts in connection with and furtherance of their conspiracy, as alleged herein, including but not limited to the fraudulent sale of real estate and related purchase-money loans, breach of fiduciary duty, and federal RICO.

200.    Defendants' wrongful and unlawful conduct was pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by encouraging, ratifying, or adopting the conduct of each other.

201.   The agreement to further the conspiracy is further demonstrated by the common ownership, operation, and control of the Enterprise, the "Strategic Partners, Poelman and his entities, Jackson and his entities, and their past and ongoing business relationships, as described herein.  It is also demonstrated by the integration of the real estate sales scam, lending scam, and escrow scam, including that the same employees took on multiple roles with the different entities in the various phases of this scheme, all as described above.

202.   As a direct and proximate result of the conduct in furtherance of the conspiracy, Plaintiff and members of the Class have suffered damages in the amount of the fees they paid to attend the fraudulent Buying Summit, the above-market prices that they paid for real estate, the fees and costs of the fraudulent real estate transactions, the fees and costs of the fraudulent loan, all in an amount to be proven at trial.

203.   Plaintiffs are entitled to punitive damages, as the conduct was intentional and reckless.

## COUNT IV

### Breach of Fiduciary Duty (and Aiding and Abetting that Breach)
### Against All Defendants

204.   Plaintiff incorporates all allegations above, as if set forth fully herein.

205.   Defendant AL&E undertook to provide legal services to Plaintiff and members of the Class, as attorneys-in-fact, directly related to the transactions at issue and, having created an attorney-client relationship with Plaintiff and members of the Class, owed duties of care, loyalty and good faith to Plaintiff and members of the Class.  AL&E was introduced at the Buying Summit as a "law firm" "which is located in the County of Clark, State of Nevada" that would "perform any act" including "all and every act and thing whatsoever requisite, proper, or necessary to be

done, in the exercise of any of the rights and powers herein granted . . . ." relating to the subject property."

206.    AL&E breached its duties to Plaintiff and members of the Class by executing documents on behalf of Plaintiff and members of the Class with either actual or constructive knowledge of concurrent and secret escrows involving transactions and real estate transactions that were material to the purchases of Plaintiff and members of the Class and failing to affirmatively inform Plaintiff and members of the Class of Guardian Law's conflicting interests in the subject transactions and its relationships and other activities with AL&E, BuyPD and IPUSA.

207.    Guardian Law undertook to provide legal and escrow services to Plaintiff and members of the Class directly related to the transactions at issue and, having created an attorney-client relationship with Plaintiff and members of the Class, owed duties of care and loyalty to Plaintiff and members of the Class.  Guardian Law was introduced at the Buying Summit as a law firm and "Strategic Partner" that would provide legal, escrow, title and closing services for Plaintiff, and Guardian Law received compensation from Plaintiff and the Class for those services.

208.    Guardian Law breached its duties to Plaintiff and members of the Class by conducting concurrent and secret escrows involving transactions and real estate transactions that were material to the purchases of Plaintiff and members of the Class and failing to affirmatively inform Plaintiff and members of the Class of Guardian Law's conflicting interests in the subject transactions and its relationships and other activities with AL&E, BuyPD and IPUSA.

209.    Insider's Cash was introduced as a "Money Partner" and Insider's Cash also possessed knowledge and information, i.e., that the property was selling for less than the loan amount.  This fact was highly material to Plaintiff's decision to enter into the borrowing and

purchase transaction, because it jeopardized Plaintiff's future ability to refinance the property with a conventional lender and get out from under a 12% interest rate and/or refinance when the 3-year balloon payment came due.

210.    Nudge, BuyPD, IPUSA and Insider's Cash also intentionally created an agency relationship between themselves and members of the Class, telling them that they would vet and choose properties for Plaintiff and members of the Class. Through this agency relationship, these Defendants owed duties of care and loyalty to Plaintiffs.

211.    Nudge, BuyPD, IPUSA and Insider's Cash breached the fiduciary duties and obligations they owed Plaintiff and members of the Class by self-dealing in its transactions with Plaintiff and members of the Class within the scope of its agency, by misrepresenting the origins, conditions, and value of the properties it sold to Plaintiffs, by failing to fully disclose the nature and terms of the transactions it proposed to Plaintiff and members of the Class, and by failing to disclose its conflicting interests.  Poelman aided and abetted those breaches.

212.    Through their preparation of transaction documents and providing counsel to the Enterprise, Jackson and Invictus Law aided and abetted their co-Defendants' breaches of fiduciary duty to Plaintiff and members of the Class.

213.     These breaches of fiduciary duty were the proximate cause of damages to Plaintiff and members of the Class, which include the amount of the fees and costs paid in the property escrows and include the amount of the overcharge for the purchase of the properties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding Plaintiff and the Class treble damages under federal law; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including rescission of the complained-of transactions and imposition of a constructive trust.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: _____.

HARPER LAW, PLC

*/s/ Jon V. Harper*_____

HUTTON LAW GROUP

Attorneys for Plaintiff